# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

**R.P. SMALL CORP.**

**Plaintiff,**

**v.**

**RUCHIR A. KADAKIA,**

**Defendant.**

**and**

**RUCHIR A. KADAKIA, individually and derivatively on behalf of Tethys Trading, LLC,**

**Counterclaimant and Third-Party Plaintiff,**

**v.**

**R.P. SMALL CORP., an Illinois corporation,**

**Counterclaim Defendant,**

**and**

**JOHN E. MEYER, JR.; ROBERT FINNEGAN; and TETHYS SUPPLY AND MARKETING, LLC, *et al.*;**

**Third-Party Defendants.**

---

**JT HODGSON CAPITAL, LLC, a Delaware limited liability company, as assignee of Reinhold Fussle,**

**[Proposed] Intervenor-Counterclaimant and Third-Party Plaintiff.**

---

**Case No. 19-cv-271-JED-JFJ**

**INTERVENOR THIRD-PARTY COMPLAINT**
**OF JT HODGSON CAPITAL, LLC**

Third-Party Complaint of Intervening Party JT Hodgson Capital, LLC (referred to hereafter as "Intervening Party" or "Hodgson Capital") for its claims against Plaintiff/Counterclaim Defendant R.P. Small Corp. ( "Small Corp.") and Third-Party Defendants John E. Meyer, Jr., Robert Finnegan, Tethys Supply and Marketing, LLC, Tethys Trading, LLC, Tethys Capital, LLC, Tethys Biofuels, LLC, Tethys Energy, LLC, Tethys Latin America, LLC, Tethys Partners, LLC, Tethys Derivatives, LLC, Tethys Shipping, LLC, and John Does and Jane Does 1 to 10, states as follows:

*Facts Common to All Counts*

**The Parties**

1. Intervening Party, Hodgson Capital, is a Delaware limited liability company with offices at 127 West Berry Street, Suite 1200, Fort Wayne, Indiana 46802. Hodgson Capital has standing to intervene and to assert claims in this action in its own capacity and as assignee of Reinhold Fussle, a secured creditor of Tethys Trading, LLC as alleged more fully below, by virtue of a written "Assignment of Promissory Note and Security Agreement and Assignment of Claims and Rights Agreement" (at times, the "Assignment Agreement"). A true copy of the Assignment Agreement is annexed as Exhibit "1" to this Intervenor Third-Party Complaint.

2. Defendant/Counterclaimant Ruchir A. Kadakia ("Kadakia") is a citizen of the State of Texas, with a residential address of 2031 Westcreek Lane, Apartment 1716, Houston, Texas 77027.

3. Plaintiff/Counterclaim Defendant Small Corp. is an Illinois corporation with its principal place of business in Tulsa, Oklahoma.

4. Third-Party Defendant John E. Meyer, Jr. (at times, "Meyer") is, upon information and belief, a citizen of the State of Illinois or Nevada, with a mailing address as Managing Member, Tethys Trading, LLC, 954 W. Washington Boulevard, Suite 250, Chicago, Illinois 60607.

5. Third-Party Defendant Robert Finnegan (at times, "Finnegan") is, upon information and belief, a citizen of the State of Illinois, with a mailing address to the attention of Tethys Trading, LLC, 954 W. Washington Boulevard, Suite 250, Chicago, Illinois 60607.

6. Each of Third-Party Defendants Tethys Trading, LLC ("Tethys Trading"), Tethys Supply and Marketing, LLC ("Tethys Supply and Marketing"), Tethys Capital, LLC ("Tethys Capital"), Tethys Energy, LLC ("Tethys Energy"), Tethys Biofuels, LLC ("Tethys Biofuels"), Tethys Latin America, LLC ("Tethys Latin America"), Tethys Partners, LLC ("Tethys Partners"), Tethys Derivatives, LLC ("Tethys Derivatives"), and Tethys Shipping, LLC ("Tethys Shipping") [collectively referred to as the "Tethys Group"], is an Oklahoma limited liability company, with a mailing address c/o the managing member, John E. Meyer, Jr. 954 W. Washington Boulevard, Suite 250, Chicago, Illinois 60607.

7. John Doe 1 through John Doe 10, and Jane Doe 1 through Jane Doe 10, are natural persons, and non-natural persons recognized under law, whose identity is not presently known and who are, upon information and belief, the recipients or additional or other recipients – direct or indirect – of assets of Tethys Trading, LLC which were illegally and wrongfully transferred at the direction of Meyer and Finnegan with the purposes of secreting assets and defrauding creditors other than Small Corp.

## Jurisdiction and Venue

8. The Court has subject matter jurisdiction over Intervening Party's Third-Party Complaint, pursuant to (a) 28 U.S.C. §1331 and 18 U.S.C. §1964(c), based upon violations by Third-Party Defendants Meyer and Finnegan, as well as Counterclaim Defendant Small Corp., of 18 U.S.C. §1962, commonly known as the Racketeer Influenced and Corrupt Organizations Act; and (b) 28 U.S.C. § 1367(a)..

9. Venue in this Court is proper pursuant to 28 U.S.C. §1391.

10. Counterclaim Defendant Small Corp. is subject to the personal jurisdiction of this Court as (a) Small Corp. itself has invoked the jurisdiction of this Court by commencing the instant action against Kadakia in this Court; (b) according to Small Corp.'s allegations in the Complaint (at paragraph 1), Small Corp. maintains a principal place of business in Tulsa, Oklahoma; and (c) Small Corp. is presently, and at other times relevant to this action has been, an owner of membership units in Tethys Trading and, upon information and belief, other companies within the Tethys Group which were created under, and are expressly subject to (under written operating agreements), the laws of the State of Oklahoma.

11. Third-Party Defendants Meyer and Finnegan are subject to the personal jurisdiction of this Court as they have engaged, actively and on a protracted basis, in the business, operations and management, as Managing Member(s) or otherwise, of the limited liability companies comprising Third-Party Defendant Tethys Group, each of which was formed in the State of Oklahoma (and themselves are subject to the exercise of personal jurisdiction by this Court).

12. Third Party Defendants John Doe 1 through John Doe 10 and Jane Doe 1 through Jane Doe 10 are subject to the personal jurisdiction of this Court by virtue of either (a) their

status as citizens of the State of Oklahoma, or (b) their conduct is such as to render it reasonable and foreseeable that they would be subject to a judicial forum located within the State of Oklahoma.

**Nature of Intervening Party's Claims**

13. The claims asserted in this Intervenor Third-Party Complaint arise out of a wrongful scheme orchestrated by Third-Party Defendants Meyer and Finnegan, in their capacities as official or unofficial Managers of Tethys Trading and other entities within the Tethys Group, with the knowledge, consent and/or active participation, of Counterclaim Defendant Small Corp., to engage in a fraudulent scheme with respect to, and fraudulent transfers of, assets of Tethys Trading for the purposes of secreting, transferring, disposing of and relocating Tethys Trading assets beyond the reach of Tethys Trading's creditors, including Hodgson Capital as assignee of Reinhold Fussle.

**History of the Tethys Entities**

14. The energy brand known as "Tethys" was originated by Jeffrey Hodgson ("Hodgson"). In or about 2011, Hodgson met Meyer. Shortly thereafter, Hodgson and Meyer formed a limited liability company known as "Tethys Energy, LLC," which was in the business of financing "upstream" ventures – lending against oil and gas that was in the ground with the view of funding either exploration or production/monetization.

15. Hodgson and Kadakia met around the same time that Hodgson met Meyer. Hodgson and Kadakia quickly developed trust in each other and discussed forming a business that would focus on trading in oil or gas commodities; ultimately, they started a business that was initially known as "Tethys Oil," but later became more formally known as Tethys Trading, LLC.

16. The combination of Hodgson's organized thought processes and articulate manner and Kadakia's creativity was the synergy that fueled Tethys Oil and ultimately its successor Tethys Trading. Approximately twelve (12) months after Hodgson and Kadakia began working together under the "Tethys Oil" name, Hodgson introduced Kadakia to Meyer. Hodgson envisioned a "Tethys"-branded family of entities that covered a wide gamut of energy and commodities trading. Meyer purportedly had relationships with financiers whose funding would be necessary to meet trading margin calls and back letters of credit required to secure trading positions.

17. Kadakia recognized that Tethys Oil would need expertise in the physical movement of oil from one location to the next (*e.g.*, loading oil in tankers and related net/gross conversions taking into account the change in oil volume as temperatures rise or fall). In the second quarter of 2013, Kadakia met Robert Finnegan, who was introduced to Kadakia as a graduate of the Merchant Marine Academy who had spent significant time working on oil tankers.

18. Tethys Trading was formed on or about July 30, 2013 as an Oklahoma limited liability company; and as memorialized in a written Operating Agreement of Tethys Trading effective July 30, 2013, each of Hodgson, Kadakia, Meyer and an entity named "Legasea" (with Finnegan initially holding voting rights and shortly later receiving the membership units) each received 25 voting Membership Units, representing a twenty-five (25) percent equity and voting stake, in Tethys Trading. Tethys Trading was initially funded by a loan of $100,000 from Kadakia, and a loan of $1.8 million of Meyer, to Tethys Trading. Both loans were satisfied by Tethys Trading in or around the Fall of 2013.

19. Meyer instantly exerted his seniority, and dominant personality and will over the younger, less experienced, and compliant Hodgson and Kadakia as it related to Tethys Trading.

Meyer demanded and received complete control over management and operations of Tethys Trading. The initial Operating Agreement of Tethys Trading was drafted and signed with little or no negotiation (as Kadakia and Hodgson proceeded without representation of counsel). The initial Operating Agreement of Tethys Trading vested extensive and significant management and operational authority in the hands of Meyer, as the sole Manager of Tethys Trading, through the inclusion of provisions such as the following:

(a) Under Section 6.01 of the Operating Agreement, Meyer was appointed as initial Manager – a position of authority and control which he has never relinquished.

(b) Under Section 6.01 of the Operating Agreement, Meyer could only be removed as Manager by the unanimous vote of all Members until Meyer (and the John E. Meyer Family, LLC) has "in the reasonable business judgment of John E. Meyer, Jr. been paid in full by each of the other Members of the Company and that all obligations have been fulfilled, regarding any debt or expenses due to John E. Meyer, Jr. …" (including Meyer's loan of $1.8 Million at fifteen (15%) percent interest which he made at or around formation of Tethys Trading, for which he demanded and extracted inordinate return including equity warrants and a favorable fee agreement, and which was satisfied in any within three (3) months of operations).

(c) As Manager, Meyer was vested with conducting all of the business and affairs of the Company under Section 6.01 of the Operating Agreement; "Any third person may rely absolutely upon the act, deed, and/or signature of the Managers [Meyer] as being the act of the Company and no person shall be obliged or privileged to inquire into or to otherwise ascertain whether the act of the Managers [Meyer] has been duly authorized under the terms of the Agreement.

(d) Section 6.02 of the Operating Agreement granted extraordinary power to Meyer and to Meyer alone (and to no other Member absent Meyer's approval), "in his sole discretion and authority and with no other approval necessary …" to borrow money in any amount; to dispose of Company Property, even outside of the ordinary course of business, to enter into any contract in any amount, and to compromise any claim in any amount.

20. Meyer saw to it that he, and he alone, had signature authority over all of Tethys Trading's bank accounts, including the segregated accounts of Tethys Trading at Morgan Stanley in which loan proceeds of the "Fussle Note" and "Small Corp. Note" (both addressed below) were disbursed to and on deposit.

21. Within a month of its formation, Tethys Trading was immersed in carrying on the business of a PEMEX/Shell distillates contract, which Kadakia had developed with Hodgson while the two were operating as Tethys Oil. Starting at the end of August 2013, Tethys Trading began shipping 900,000 barrels of diesel oil a month – 3 shiploads of a standard mid-ranged tanker, with each shipload representing 12.6 million gallons of diesel. The PEMEX/Shell distillates contract was a one (1)-year contract; it was enormous in all respects, representing three (3%) percent of United States distillates exports during the term of the contract. It produced roughly $6 million in profits for Tethys Trading during its one (1)-year term.

22. By approximately mid-2014, Meyer, Finnegan, and Kadakia formed as co-members other Tethys-denominated limited liability companies (and re-formed Tethys Energy to include Kadakia and Finnegan as members along with original member Meyer). To the extent that these other entities conducted any business, they were virtually entirely focused on trading or financing oil and gas and energy products/projects other than diesel oil (distillates).

**<u>Meyer Manufactures Issues and Forces Reduction in Hodgson's Equity Interests</u>**

23. Shortly before Christmas 2013, Meyer manufactured an issue with Hodgson with the view of reducing Hodgson's equity interests in Tethys Trading. Meyer complained that Hodgson had not repaid a personal loan to Meyer of $30,000 or less. Meyer bullied and pressured Hodgson, challenging Hodgson's contributions to Tethys Trading and financial wherewithal to be a member.

24. Meyer forced Hodgson to relinquish approximately fourteen (14%) percent of his equity (reducing his equity stake in Tethys Trading to approximately eleven (11%) percent) even though Hodgson committed to repay, and did repay, the personal loan to Meyer. Hodgson received nothing in return for his equity reduction, despite the fact that a few months later Tethys Trading was valued at $12.5 million.

**Tethys Trading Secures Financing from Reinhold Fussle and R.P. Small Corp.;**
**<u>R.P. Small Corp. Acquires Equity in Tethys Trading and Other Tethys Entities</u>**

25. In the Summer and Fall of 2013 Tethys Trading sought debt funding in order to finance margin requirements associated with the PEMEX/Shell contract and related transactions.

26. An acquaintance of Hodgson, Reinhold Fussle (at times, "Fussle"), expressed interest in extending a loan to Tethys Trading. Fussle and Tethys Trading ultimately closed on a loan in the principal amount of $500,000.00. This loan was memorialized by a written Promissory Note dated January 17, 2014 in the principal amount of $500,000.00 (plus interest at varying rates stated in the Note) [the "Fussle Note"], which was secured by a certain written Pledge and Security Agreement between Tethys Trading as debtor and Fussle as creditor.

27. The stated purpose of the Fussle Note "… is to fund, in whole or part, margin requirements for Maker's Distillates-Light Ends." The Fussle Note further states that "The proceeds of this Note shall be placed by Maker, upon initial receipt, in a segregated account

maintained at Morgan Stanley, and such proceeds shall not be co-mingled with any of Maker's own funds until they are removed from such segregated account, the notice of which shall be made by Maker to Payee as of the date on which such funds are removed from such segregated account."

28. After closing and funding of the Fussle Note, Tethys Trading secured additional funding in the form of a $6 million loan from R.P. Small Corp. The principal of R.P. Small Corp., Richard P. Small, was upon information and belief, a friend and business associate of Meyer's father and Meyer.

29. The $6 million loan from Small Corp. to Tethys Trading was memorialized by a written Promissory Note dated March 27, 2014 (the "Small Corp. Note") and Security Agreement. As with the Fussle Note, the Small Corp. Note provides expressly that it is for the purpose of funding, in whole or part, margin requirements for Tethys Trading's trades in Distillates-Light Ends. As with the Fussle Note, the Small Corp. Note states, "The proceeds of this Note shall be placed by Maker, upon initial receipt, in a segregated account maintained at Morgan Stanley, and such proceeds shall not be co-mingled with any of Maker's own funds until they are removed from such segregated account, the notice of which shall be made by Maker to Payee as of the date on which such funds are removed from such segregated account."

30. At or around the time that Small Corp. extended the $6 million loan to Tethys Trading, Small Corp. acquired a ten (10%) percent Membership interest in Tethys Trading based upon an enterprise valuation of $12.5 million.

**<u>Tethys Trading's Business Downturn in the Last Half of Calendar Year 2014</u>**

31. Tethys Trading's contract with PEMEX/Shell terminated in or around August 2014. Tethys Trading pursued other potential opportunities, including other trades and diesel oil hedge

opportunities. However, Tethys Trading's good fortunes began to run dry, as trading, with its inherent risks, produced certain transaction losses.

32. Tethys Trading had also entered into a "take or pay" oil contract that required Tethys Trading to pay for quantities of oil regardless of whether Tethys Trading was in the position to take possession and secure shipment of the oil. However, Tethys Trading was unable to secure barges and utilize the storage to take and move the oil based on issues with the counterparty. Tethys Trading attempted to terminate the "take or pay" oil contract, but the supplier continued to draw down on the letter of credit posted by Tethys Trading.

**Diversions and Wrongful Transfers of Assets of Tethys Trading by Meyer**

33. In the first half of 2015, with Tethys Trading's business struggling, Meyer and Finnegan hatched a plan to transfer and divert cash assets of Tethys Trading from Tethys Trading accounts to accounts of other Tethys-denominated entities. Their goal was to strip Tethys Trading of assets and to secret these assets in bank accounts of other Tethys Trading entities, thereby defrauding creditors and potential creditors of Tethys Trading, including Reinhold Fussle.

34. This fraudulent scheme was executed by Meyer, as he was the only person who had power under Tethys Trading's bank resolutions to authorize or make transfers out of Tethys Trading's bank accounts. Meyer was the sole Manager under the Operating Agreement of Tethys Trading.

35. The acts perpetrated by Meyer and Finnegan in furtherance of their wrongful scheme include:

(a) In or about the first quarter of 2015, Meyer caused the transfer of approximately $380,000.00 (if not a greater amount) of proceeds of the loan extended by

Reinhold Fussle from a segregated bank account in the name of Tethys Trading to one or more other Tethys denominated entities, in violation of the express covenants of the Fussle Note. This transfer or series of transfers was made without consideration delivered to Tethys Trading.

(b) At or around the same time in 2015, Meyer caused the transfer of millions of dollars of proceeds of the loan extended by Small Corp. from the segregated bank account in the name of Tethys Trading to one or more other Tethys denominated entities, in violation of the express covenants of the Small Corp Note. This transfer or series of transfers was made without consideration delivered to Tethys Trading.

(c) In or about January 2015, Meyer caused Tethys Trading to extend a purported "loan" in the amount of $125,000.00 to Finnegan without guaranty or security and at a low interest rate. Upon information and belief, this loan remains outstanding, and Meyer (as Manager of Tethys Trading) has taken no, or virtually no, action on behalf of Tethys Trading to secure collection. Upon information and belief, Finnegan has failed to satisfy loan payment obligations to Tethys Trading.

(d) Meyer caused the Company to pay to both Meyer and Finnegan several tens, if not hundreds, of thousands of dollars in W-2 compensation. This compensation was paid to Meyer and Finnegan at a time when Tethys Trading was either not operational, or when Meyer and Finnegan were advising Reinhold Fussle that Tethys Trading was without assets and not operating.

36. Small Corp. had knowledge of and/or approved all or virtually all of the fraudulent transfers from Tethys Trading to other Tethys-denominated entities, as well as the unlawful disbursements to Meyer and Finnegan.

37. At or around the same time of the fraudulent transfers of Tethys Trading's assets, Meyer, Finnegan and Small Corp. negotiated and entered into "swap agreements". The details of these negotiations and swap agreement terms were purposefully kept secret from Kadakia and were never disclosed to Hodgson, who by this time was effectively frozen out of Tethys Trading. Upon information and belief, Small Corp. received equity interests or additional equity interests in Tethys-denominated entities (including, upon information and belief, Tethys Capital, which received a portion, if not a significant portion, of the assets of Tethys Trading which were wrongfully transferred out of the accounts of Tethys Trading) in return for Small Corp.'s agreement to extend or defer principal and/or interest payment obligations under the Small Corp. Note.

**<u>Default by Tethys Trading Under the Fussle Note; the Revised Fussle Note</u>**

38. By written First Amendment (dated as of December 31, 2014) to the Fussle Note, Fussle agreed to extend the Maturity Date from December 31, 2014 to December 31, 2015.

39. By December 2016, Tethys Trading had ceased payments, or was threatening, to cease payments, of payments due under the Fussle Note.

40. In communications with Fussle, Meyer stated in words or substance to Fussle, that Tethys Trading was not in the position (or did not have the cash available) to make payments due under the Fussle Note; and Meyer pressured Fussle to again recast, restructure or forgive principal/interest payment obligations due under the Fussle Note. Fussle relented and agreed to a restructuring of the Fussle Note, in reliance upon false and misleading statements by Meyer regarding the financial condition of Tethys Trading. Meyer failed to disclose to Fussle that hundreds of thousands of dollars of proceeds of the Fussle Note (which sums had been on deposit in the segregated account created and maintained in furtherance of express obligations of

Tethys Trading under the Fussle Note) were shifted by Meyer to accounts of one or more other Tethys-denominated entities.

41. The outcome of Meyer's false and misleading communications with Fussle was a three (3)-party agreement by which (a) Fussle reduced the principal amount of the Fussle Note from $500,000.00 to $400,000.00 (with quarterly interest payable beginning on March 31, 2017 and the Maturity Date extended to December 31, 2021), memorialized by a revised written Promissory Note dated January 1, 2017, ("Revised Fussle Note") and (b) Hodgson agreed to pay Fussle the sum of $100,000 plus interest. Hodgson made this agreement as a measure of good faith and concern on his part that Tethys Trading would ultimately not honor its obligations under the Fussle Note and Hodgson has fully satisfied his promise by payment of $126,850.00 in principal and interest to Fussle.

42. Tethys Trading is in default of interest payment obligations due to Fussle under the Revised Fussle Note. Meyer's fraudulent conduct vis-à-vis Fussle and the Revised Fussle Note has continued into 2019. Fussle has sought payment; in response, Meyer has stated that Tethys Trading is non-operational and without assets, or words to this effect; and Meyer has disparaged Kadakia in emailed communications to Fussle by falsely laying blame on Kadakia for the business and financial condition of Tethys Trading. In his emailed communications with Fussle in 2019, Meyer concealed the fact that Meyer has caused millions of dollars of assets of Tethys Trading to be transferred from accounts of Tethys Trading to accounts of other entities.

43. Meyer's communications in 2019 with Fussle went beyond non-disclosure and concealment to false representations. By way of example, in response to Fussle's emailed inquiry of April 10, 2019 (at 8:57 a.m.), Fussle asked Meyer, among other things, whether any funds were removed from Tethys Trading's operating account for the benefit of other

businesses/lenders/shareholders, thereby causing Tethys Trading's insolvency issues, Meyer stated by email of April 10, 2019 (at 1:57 p.m.), in relevant part, that he did move money to pay bills, and that "I am unaware of any money of yours being used for the benefit of any shareholder[,] other businesses or lenders, as I mentioned in an earlier email you are the only lender to have been paid interest in years, that is a fact."

**Kadakia is Forced Out of, and Separates from, the Tethys Entities in 2015**

44. As of the Fall of 2015, Kadakia's relationship with Meyer and Finnegan had become strained if not hostile. Kadakia was summarily removed from payroll, and effectively terminated as an employee, of Tethys Trading.

45. Kadakia sought a formal separation from Meyer, Finnegan, Tethys Trading and the other Tethys entities. Ultimately, Kadakia, Meyer, Finnegan, Tethys Trading and various other Tethys-denominated entities entered into a written "Agreement Regarding Transfer Of Membership Interests" effective December 31, 2015, pursuant to which, among other things, Kadakia's various membership interests in Tethys Trading and other Tethys entities was purchased for the sum of $50,000.00.

**The Lawsuit by Small Corp.**

46. The instant lawsuit was commenced by Small Corp. without prior notice or demand for payment by Small Corp. to Kadakia. Upon information and belief, Small Corp. has continued its dealings with Meyer, Finnegan and the Tethys entities since Kadakia sold his membership interests at the end of 2015.

47. By all appearances reflective of the ongoing relationship between Small Corp., Meyer and Finnegan, Small Corp. has not asserted any claim in this litigation (or, upon information and belief, in any other lawsuit) against Tethys Trading, the obligor under the Small

Corp. Note, or against Meyer and Finnegan who delivered personal guarantees to Small Corp. with respect to Tethys Trading's obligations under the Small Corp. Note.

**<u>The Assignment by Fussle to Hodgson Capital</u>**

48. Pursuant to the Assignment, for good and valuable consideration Fussle has assigned and irrevocably transferred and conveyed to Hodgson Capital (under section 2 of the Assignment) any and all of Fussle's rights, title and interests, whether arising out of contract, federal or state statute or regulation, common law or equity, in or to the following:

A. the Revised Fussle Note dated January 1, 2017;

B. the 2014 Security Agreement between Tethys Trading as borrower and Fussle as lender;

C. any claims or remedies, whether known or unknown, existing now or at any time in the future, of, to or for the benefit of Fussle or Fussle's heirs or estate, arising under law or equity, in any way associated with, related or relating to, or arising out of any one or more of the following –

i. the 2017 Promissory Note, including but not limited to acts or omissions preceding its execution or delivery, or in any way relating to the non-performance or breach of same;

ii. the 2014 Promissory Note, including but not limited to acts or omissions preceding its execution or delivery, or in any way relating to the non-performance or breach of same;

iii. the 2014 Security Agreement, including but not limited to acts or omissions preceding its execution or delivery, or in any way relating to the non-performance or breach of same;

iv. the transfer of assets or income of any kind, or rights or claims associated therewith, of Tethys Trading;

v. the business, operations, or management, or any act or omission, of Tethys Trading or any affiliate of Tethys Trading (including but not limited to, Tethys Supply and Marketing, LLC; Tethys Capital, LLC; Tethys Biofuels, LLC; Tethys Latin America, LLC; Tethys Partners, LLC; Tethys Derivatives, LLC; or Tethys Energy, LLC);

vi. any act or omission of or by Meyer, Finnegan, Small Corp., Richard Small, or Norma Small, or any of their affiliated entities, or any person acting or purporting to act on behalf of any of them.

49. The Assignment from Fussle to Hodgson Capital provides further, in relevant part, that:

A. As of execution and delivery of the Assignment, and for all time thereafter, Fussle disclaims [i] any and all right, title or interest in or to any of the assets, contingent assets, claims or remedies set forth in Section 2. of this Assignment Agreement; and [ii] any right to collect the proceeds of any of the assets, contingent assets, claims or remedies set forth in Section 2. of this Assignment Agreement; and [iii] any right to control, or to demand input with respect to, the collection efforts, strategies, processes, or actions undertaken by Hodgson Capital as Assignee to pursue judgment with respect to, or collection of, any of the assets, contingent assets, claims or remedies set forth in Section 2. of the Assignment.

B. Hodgson Capital, as Assignee, accepts the assignment and transfer of rights, interests and claims provided by the Assignment; and Hodgson Capital undertakes to bear all costs and expenses incurred by Hodgson Capital associated with, or arising from, the assertion,

prosecution, enforcement or litigation of the rights, interests and claims of Fussle assigned and transferred to Hodgson Capital in accordance with the Assignment.

**FIRST COUNT**
***Intervenor Third-Party Complaint Against Meyer, Finnegan and Other Third-Party Defendants***
**[Personal Liability and Entity for Causing Fraudulent Transfers in Violation of 24 O.S. §116]**

50. Intervenor Hodgson Capital repeats the allegations of paragraphs 1 through 49 of the Intervenor Third-Party Complaint above as though herein set forth at length.

51. Hodgson Capital is a creditor of Tethys Trading by virtue of the Assignment.

52. Tethys Trading, under the control, management and direction of Meyer and Finnegan, made transfers which ultimately involved millions of dollars in or about 2015 and other times thereafter which were, and are, fraudulent transfers to creditors, in violation of Oklahoma statutory law, Oklahoma common law, and Oklahoma public policy, including, but not limited to, in violation of 24 O.S. §116(A). The transfers were [i] made with actual intent to hinder, delay, or defraud one or more creditors, including Reinhold Fussle; [ii] made without Tethys Trading's receiving reasonably equivalent value in exchange for the transfer; and Tethys Trading was engaged in a business for which the remaining assets of Tethys Trading were unreasonably small in relation to the business of Tethys Trading, or it would have been reasonable to believe that Tethys Trading would incur debts beyond its ability to pay same as and when they became due.

53. Meyer and Finnegan, as Managing Member(s) under the Tethys Trading Operating Agreement or by virtue of their status as controlling principals of Tethys Trading, bear personal liability under Oklahoma law for the fraudulent transfers of Tethys Trading which they effectuated, implemented and caused to be perpetrated.

54. By virtue of the foregoing wrongful conduct of Meyer, Finnegan, and Third-Party Defendant Tethys-denominated entities participating in the direct or indirect conveyance or receipt of the fraudulently conveyed cash assets of Tethys Trading, Hodgson Capital has suffered damages.

WHEREFORE, Intervenor Hodgson Capital requests judgment on this First Count of the Intervenor Third-Party Complaint against Third-Party Defendants John E. Meyer, Jr. and Robert Finnegan; Tethys Trading, LLC; Tethys Supply and Marketing, LLC; Tethys Biofuels, LLC; Tethys Capital, LLC; Tethys Latin America, LLC; Tethys Partners, LLC; Tethys Derivatives, LLC; Tethys Shipping, LLC; and Tethys Energy, LLC, and John Doe 1 through John Doe 10 and Jane Doe 1 through Jane Doe 10, as follows:

A. Awarding Hodgson Capital the remedies provided in 24 O.S. §119, which include –

  i. Avoiding or reversing the transfer(s) to the extent necessary to satisfy Hodgson Capital's claims as a creditor of Tethys Trading;

  ii. Granting an attachment or other provisional remedy against the assets transferred or other property of the transferee as provided by law;

  iii. Granting an injunction against further disposition of assets of Tethys Trading or any transferee of the assets of Tethys Trading;

  iv. Appointing a receiver to take charge of the assets transferred or other property of any transferee; and

  v. Granting such other relief as the circumstances may require.

B. An accounting by Third-Party Defendants, at the sole expense of Third-Party Defendants, of all receipts, transfers and dispositions of assets, including

cash or other liquid assets, to or from any account of Tethys Trading, LLC; and

C. Awarding Hodgson Capital compensatory damages, punitive damages, costs, attorney fees, interest and such other relief as may be just and proper.

**SECOND COUNT**
**[*Intervenor Third-Party Complaint Against Meyer and Finnegan*]**
**Violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)**

55. Intervenor Hodgson Capital repeats the allegations of paragraphs 1 through 54 of the Intervenor Third-Party Complaint above as though herein set forth at length.

56. Hodgson Capital brings this claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 to §1968 ("RICO") against Meyer and Finnegan (at times, the "RICO Third-Party Defendants").

57. RICO section 1962(c) (of Title 18 of the United States Code) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

58. Hodgson Capital is a "person" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

59. The RICO Third-Party Defendants – Meyer and Finnegan – are "RICO persons" within the meaning of 18 U.S.C. §1961(3) because each is an individual capable of holding a legal or equitable interest in property.

*A. The RICO Enterprise*

60. Tethys Trading (at times, the "RICO Enterprise") constitutes an "enterprise" within the meaning of 18 U.S.C. §1961(4) in that it is legal entity – a limited liability company duly formed, and with a continuing, ongoing existence under the laws of the State of Oklahoma.

61. The RICO Enterprise was and is distinct from the RICO Defendants Meyer and Finnegan.

62. The RICO Enterprise has been engaged in interstate commerce because, among other things, its activities and transactions have included the trading on exchanges and related electronic platforms of diesel- and oil-related commodities and the interstate purchase, sale, shipment and delivery of diesel and oil products.

63. By way of their activities conducted through the RICO Enterprise, RICO Defendants Meyer and Finnegan have engaged or participated in physical movement across state lines in the United States, as well as telephonic and email communications throughout the United States; this interstate activity by Meyer and Finnegan through Tethys Trading includes by way of example and not limitation the transmission of electronic mail [at times, "email"] (using electronic mail servers located at Tethys Trading's offices in Chicago, Illinois or elsewhere) (a) to Hodgson in Indiana and in other states and (b) to Kadakia in Connecticut, Texas and other states, as well as (c) to Fussle in Indiana.

64. By virtue of Meyer's status and powers as Managing Member of Tethys Trading pursuant to the Tethys Trading Operating Agreement, as well as Finnegan's status as Member of Tethys Trading and various official and unofficial capacities and responsibilities held or carried out by Finnegan on behalf of Tethys Trading, the RICO Defendants have exercised control over

the activities of the RICO Enterprise for approximately five (5) to six (6) years if not since formation.

*B. Pattern of Racketeering Activity and Predicate Acts*

65. RICO Defendants Meyer and Finnegan have conducted or participated, directly or indirectly, in the management or operation of the RICO Enterprise, Tethys Trading, and its business and financial affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5) and in violation of 18 U.S.C. §1962(c) – that is, the RICO Defendants have consistently and regularly committed multiple predicate acts of racketeering activity within the meaning of 18 U.S.C. §1961(1)(B).

66. As alleged further below, the RICO Defendants' predicate acts of racketeering activity comprise two (2) or more acts of wire fraud in violation of 18 U.S.C. §1343 and of mail fraud in violation of 18 U.S.C. §1341:

(a) in violation of 18 U.S.C. §1343, they devised, or intended to devise, a scheme or artifice to defraud Reinhold Fussle (if not additional creditors of Tethys Trading) centering on [i] the fraudulent transfer from Tethys Trading of millions of dollars of assets to other Tethys entities, and [ii] inducing these creditors to restructure or recast loan or credit agreements, or to delay or defer or forego actions in furtherance of enforcement and collection when Tethys Trading was in default; and [iii] in furtherance, and for the purpose, of executing or implementing such fraudulent scheme and artifice, RICO Defendants transmitted, used or received, or caused to be transmitted or used or received, wire communications (*i.e.*, telephone communications in interstate commerce or electronic mail).

(b) in violation of 18 U.S.C. §1341, they devised, or intended to devise, a scheme or artifice to defraud Reinhold Fussle (if not additional creditors of Tethys Trading) centering on

[i] the fraudulent transfer from Tethys Trading of millions of dollars of assets to other Tethys entities, and [ii] inducing these creditors to restructure or recast loan or credit agreements, or to delay or defer or forego actions in furtherance of enforcement and collection when Tethys Trading was in default; and [iii] in furtherance, and for the purpose, of executing or implementing such fraudulent scheme and artifice, RICO Defendants transmitted, received or took, or caused to be transmitted, received, or taken, or knowingly caused to be delivered, by the United States Mail, or private or commercial interstate carrier, any matter or thing.

67. RICO Defendants' multiple acts of wire fraud and mail fraud include, but are not limited to the following:

(a) By emails dated November 26, 2016 (at 10:53 a.m.), Meyer wrote to Hodgson that Meyer and Finnegan had spoken to Fussle about the current status of Tethys Trading's outstanding obligation on the 2014 Promissory Note, and in this same communication directed accusations toward Hodgson, which Meyer knew to be false, about the propriety of Tethys Trading obtaining the loan from Fussle and that Hodgson was acting as an investment advisor to Tethys Trading in obtaining the loan from Fussle. Meyer made these accusations in order to pressure Hodgson into agreeing to take on a portion of the unpaid obligation on the 2014 Promissory Note and thereby reduce Tethys Trading's indebtedness to Fussle.

(b) In a later email of November 26, 2016 (at 11:47 a.m.) from Meyer to Hodgson, after Hodgson took issue with Meyer's false accusations regarding the propriety of Fussle's loan to Tethys Trading, Meyer restated or expanded his false accusations, this time to include Kadakia and to level sarcastic innuendo at Hodgson implying that Hodgson had been dishonest with Fussle (despite that the dishonesty and deception of Fussle came from Meyer alone):

> Sadly, it has fallen to me to speak to disappointed folks, many of whom

> dealt primarily or exclusively with Ruchir or in this case you. I appreciate your thanks for doing so, it is largely a thankless job.
>
> Good luck with lunch [with Fussle]. A bit of unsolicited advice I would give you in advance is for you to be completely candid and honest with him and Claudia at all times.

Significantly, at the outset of this same email from Meyer to Hodgson, Meyer acknowledged the closeness of his relationship with R.P. Small, but disclosed nothing to Hodgson about the details of discussions or agreements reached with Small Corp.:

> … The RP Small loan is secured, but has suffered the same fate as Reinhold's. I know all about the RP Small note as I was driving that bus, so to speak. Mr. Small has been informed and kept up to speed throughout the process. We speak weekly, as a matter of fact, I am meeting with him again in person Monday.

(c) Meyer's communications with Hodgson and Fussle, including the referenced emails, led to communications regarding the modification of Fussle's 2014 Promissory Note and Hodgson's agreement to pay to Fussle the principal and interest due to Fussle which was not included in the Revised Fussle Note delivered by Tethys Trading. By email of Meyer to Hodgson on December 1, 2016 (at 2:34 p.m.), Meyer this time levelled false allegations against Kadakia (while suggesting that Meyer and Finnegan were working to come to some acceptable resolution with Small Corp. and falsely indicating a lack of knowledge of the whereabouts of the proceeds of the loans to Tethys Trading from Small Corp. and Fussle) stating:

> I spoke with our Creditor Counsel and he said we need to see something from you as to how your proposal will work in order to incorporate it into a workout arrangement with Reinhold.
>
> Essentially, I believe you want Reinhold to release Tethys Trading from $100k of his note and then put in place a new note or some other payment arrangement with you, perhaps?
>
> In fairness, have you told Ruchir about your contribution? Seems like if you are doing this and Rob and I are doing what we are doing, in fairness, Ruchir should come in for 25% as well. You expressed an

> [sic] lack of understanding about the use of the loan proceeds (that would be something to add to your list of things we have in common). Nobody could possibly know more about all that than Ruchir the CEO.
>
> Please let me know your thoughts. In the meantime, I will reach out to Reinhold and tell him we are working out some details in advance of proposing a revised agreement.

(d) By email dated July 17, 2018 (at 4:40 a.m.), Reinhold Fussle wrote by electronic mail to Meyer advising that the quarter ending June 30, 2018 had just ended and that Fussle had not yet received the interest payment on the Revised Fussle Note. By way of emailed response (July 17, 2018 at 2:19 p.m.), Meyer purported to remind Fussle that, at the time of Hodgson and Kadakia's departure from Tethys Trading, Tethys Trading was insolvent with $6 million to $10 million of debt senior to the Revised Fussle Note, with the only material assets being claims against third-parties. Meyer concluded by stating, "… I will huddle with Rob and see about how to cover the Tethys Trading LLC obligation to you for the last quarter."

(e) By email on July 20, 2018 (at 1:08 p.m.) from Meyer to Fussle, Meyer advised that he was unable to have Tethys Trading wire the June 30, 2018 quarterly interest payment due to Fussle, but that he would mail a Bank check to Fussle if Fussle would provide a current mailing address.

(f) By email dated January 2, 2019 (at 4:56 p.m.) from Fussle to Meyer, Fussle advised that Hodgson [Hodgson Capital] had made the final payment to Fussle on, and satisfied in full, the Hodgson Capital Note (delivered in connection with the 2017 restructuring and reduction of Tethys Trading's original obligations under the Fussle Note). Fussle stated further:

> I have not heard back from you since your last mail December 17 [2018]. What was that judgement [sic] for and what was the amount?
>
> When do you anticipate making the overdo interest payments? Do you have any update on your intentions for principal reduction on this loan?

I am not sure you realize that this Loan is a significant part of my IRA,
I very much am depending on it for my retirement years.

(g) By email dated January 2, 2019 (at 9:34 p.m.) from Meyer to Fussle, Meyer responded to Fussle with statements that he knew or should have known to be misleading or false, which included the statement that including the sums Fussle received from Hodgson [Hodgson Capital], together with the interest paid by Tethys Trading (which as of then was in default and had paid only interest and no principal on the Revised Fussle Note), "you have already received a greater amount of principal and interest returned to you than any other Tethys Trading similarly situated creditor. The largest Tethys Trading creditor [presumably referring to Small Corp.], whose notes are senior to yours and are for a combined $10mn, has received no principal returned and has not been paid a cash interest payment in years." Meyer stated further that, "The Tethys Trading situation is extraordinary and I have done my best to unravel the complicated mess." Meyer next proceeded to disparage and falsely accuse Hodgson and Kadakia with "profiting on the intellectual property of Tethys Trading through … investments [in an Indiana refinery named Gladieux and other assets]", thereby "converting valuable Tethys assets representing a material source for the repayment of your loan and other similar Tethys creditors....," as well as "apparently" deleting information from the Tethys Trading server. In conclusion, Meyer stated in relevant part that "… it is my hope to make you a comprehensive settlement offer on your note as soon as details of the scale and disposition of the claim, we discussed in December are known to me. Until then I do not have the information necessary to give you more insight into the nature of what such an offer might look like…." **No such settlement offer was ever delivered to Fussle by Meyer or Tethys Trading, notwithstanding that arrearages in principal and interest payments by Tethys Trading to Fussle under the Revised Fussle Note continued to mount.**

(h) By email dated January 8, 2019 (at 7:36 p.m.) from Meyer to Fussle – after yet another quarterly payment to Fussle was missed – Meyer stated only that due to a government shutdown, there was a delay in the timely processing of a claim payment due to Tethys Trading. Meyer said nothing about the mounting arrearages, or about Tethys Trading's curing the default on the Revised Fussle Note, or any offer of resolution, or about Meyer's causing years early the transfer of millions of dollars in assets of Tethys Trading to other Tethys entities; Meyer added only that he would keep Fussle posted "….as events warrant."

(i) On March 18, 2019 (at 2:48 p.m.) – once again after Meyer had caused Tethys Trading to miss another quarterly interest payment due to Fussle under the Revised Fussle Note, Meyer transmitted an email to Fussle with the same essential non-information: "… no new developments to report … still waiting on the details related to the claim to be relayed to us including the scale of the net proceeds due to Tethys Trading. I will keep you posted as events warrant."

(j) On April 10, 2019 (at 8:57 a.m.), an upset and frustrated Fussle wrote by email to Meyer:

> Hello Jack,
>
> Almost another month has gone by with additional information. Also once again there was no interest payment for yet another quarter. I have been very patient with the belief that this situation would get resolve. That said I have reached out to Jeff [Hodgson] and Ruchir [Kadakia] to discuss the statements you made about them in January.
>
> *
> The truth is I'm not interested in he said/she said. If you or your counsel feel they have acted inappropriately than that is between you guys. I have only one data point and that is that Jeff took on a promissory note that was not his responsibility and made every payment per the contract. My concern is the recovery of my 400k that is still remaining. I also need to state very clearly that I never

agreed for my note to be subordinated to another lender. You made reference to this so I need to be clear about this. Again, I'm not interested in what arrangements were cut with what parties. I know my debt was first in and therefore has a first lien position.

I need to ask the following questions:

1. Were you the only one in charge of the capital movements of the company per the operating agreement?

2. Were any funds removed from the Tethys Trading operating account for the benefit of other businesses/lenders/shareholders hence making the company insolvent as you have described?

3. Can you provide me with details of the settlement that you referenced, including the case number and in what state?

4. Can you tell me what companies still exist under the Tethys brand/umbrella where you or Robert Finnegan have interests? I have read of at least two companies from basic internet searches.

5. Again, I am not a litigious person nor am I looking for any form of conflict. I would hope that you would see me as a reasonable person but at this point my patience is running out. I look forward to your answers and better yet a settlement offer to put this behind us. That said I am aware of my rights, and am seeking my principal back. As I have made clear my wife and I are relying on those funds for our retirement. I need clear answers about who had control, what decisions were made, and what is going on currently in other businesses where funds may have been commingled. I look forward to hearing from you and a clean resolution to this matter by month end.

(k) Meyer's response, by email dated April 10, 2019 (at 1:57 p.m.) was rife with knowing and intentional falsehoods, in all events aimed at furthering the RICO Defendants' fraudulent scheme of shielding the fraudulently transferred Tethys Trading assets from a claim by Fussle under the Revised Fussle Note and attempting through misinformation to induce Fussle to write the Revised Fussle Note off as an uncollectable loan:

Thanks for your inquiry. Let me see if I can address your questions.

If I am mistaken on the issue of subordination, I apologize. I thought we replaced your note in 2017? In any event, as the company [Tethys Trading] lacks the money to pay you or anyone else back[.] it is likely an inconsequential distinction.

The Company was driven into insolvency through a contractual agreement to lease oil storage facilities along with unauthorized trading losses made by Ruchir Kadakia. This all occurred before he left the Company and he knows these facts very well, indeed far better than I.

**I am unaware of any money of yours being used for the benefit of any shareholder [or] [sic] other businesses or lenders, as I mentioned in an earlier email you are the only lender to have been paid interest in years, that is a fact [emphasis added].**

**I did move money to pay bills, but I never did so independently**. Each move was at the request of Ruchir who assumed to [sic] role of CEO and who made commitments on behalf of the Company or our accountants, etc. **Each and every transfer is preceded by and every move transfer is proceeded [sic] by an emailed request or it did not occur [emphasis added].**

**I did not sign or negotiate the Terminal Agreement that doomed the Company or have any knowledge of the tradings losses until after the fact. I was living in Incline Village, Nevada the entire time, all business activity was conducted in Chicago. The business decisions and related contractual obligations made tanked [sic] the company and more salient issues to explore post mortem than who was directed to pay associated bills [emphasis added].**

There is no Tethys umbrella per se. There are separate entities with separate investors and capital structures in which Rob and I own an interest.

Ruchir and Jeff gave you cleverly evasive answers to an utterly unrelated question. The question is of their conversion of Company assets. Yes they cashed out of Tethys to a degree when new investors came in. I did not, for what that is worth. Those facts are not responsive to the question posed.

I'll see if I can gets some detail on the settlement. It is a commercial settlement related to the long ago exporting business activity of the Company called "Duty Drawback"[.] [sic] it is not a settlement of a civil lawsuit.

**I do not wish this to sound anything other than factual. If you were litigious, it would not change anything I have done or will do. If you decide to sue that is your right. Other creditors have elected to not throw good money after bad. Your decision is yours alone. I think you are a reasonable person, never thought otherwise, but I understand if you feel you are better served by pursuing legal action. I have nothing to hide or fear from such a thing [emphasis added].**

**Be that as it may, the Company has no money with which to settle until we see the pending commercial settlement come in, [sic] when that takes place, I will reach out to you in a good faith effort to settle this matter on behalf of the Company [emphasis added].**

(l) On May 18, 2019 (at 7:41 p.m.), Meyer wrote as follows by email to Fussle:

I wanted to let you know we are still waiting for the Gov't on the duty drawback payment. I am sorry for the delay. Unfortunately, there is nothing I can do to expedite.

We have retained Oklahoma bankruptcy Counsel to represent Tethys Trading should it be necessary to file for Bankruptcy due to legal action/claims of creditors or otherwise. On the matter of subordination, his initial cursory opinion is that should the Company file for Bankruptcy, your loan would be treated on a pro-rata basis with the other remaining known creditor, neither of you would be senior to the other.

The other Creditor is owned $10mn by Tethys Trading. If the attorney is correct, in a Bankruptcy proceeding, after all of the expenses of the Receiver and the Bankruptcy filing, the pending duty drawback would be split 96% to the other creditor, 4% to you. This ratio is assuming that no other creditors make valid claims.

Rob and I have spent the past several years working to avoid the Bankruptcy of Tethys Trading by settling with all Creditors on a collaborative basis as we believed, while it was the far more difficult path for us. It was in the best interest of the creditors. Having had the unfortunate experience of being a creditor of a Bankruptcy proceeding more than once myself, I observed an inefficient process with legal fees consuming the lion's share of the scarce remaining distributable assets.

> I hope in the case of Tethys Trading, this trend of cooperative settlements will continue with you and the remaining creditor of which we are aware and the windup of Tethys Trading will be completed soon.
>
> Once again we apologize for the delay and I hope to hear something on the Tethys Trading duty drawback settlement in the near future.

(m) Meyer wrote again to Fussle by email dated June 14, 2019 (at 2:27 p.m.) providing a purported "update" regarding receipt by Tethys Trading of the Duty Drawback settlement/approved claim. The "update" reported by Meyer was more delays – this time due to the matters of tariffs, border issues, etc. adversely impacting departmental response time. Once again, Meyer purported to assure Fussle that Tethys Trade's claim is being processed for payment, but that he does not know when Tethys Trading will receive its money. Meyer concluded this email by providing an electronic link on the Internet to a cursory, general explanation of Duty Drawbacks.

(n) Upon information and belief, the RICO Defendants have committed a number of other acts of mail fraud and wire fraud in violation of the federal statutes, including but not limited to the receipt or transmittal of bank accounts statements and other financial records, and related communications, of Tethys Trading and the other Tethys entities (*e.g.*, bank account statements in or about 2015 and other years reflecting the transfer of cash assets of Tethys Trading (including millions of dollars of proceeds of loans extended by Small Corp. and Fussle out of the segregated Tethys Trading bank accounts for administration of said loans).

68. The various predicate acts of mail fraud and wire fraud constituting the "pattern of racketeering activity" were related in that they were conceived, undertaken, and perpetrated with the intention of (a) concealing the fraudulent transfer(s) of millions of dollars of assets of Tethys Trading to other Tethys-denominated entities; and/or (b) inducing Fussle to defer, delay or

dispense with litigation or other activities to enforce his rights under the Fussle Note or Revised Fussle Note.

69. The aforementioned predicate acts of mail fraud and wire fraud were undertaken and committed by RICO Defendants Meyer and Finnegan through their direct or indirect management, control or operation of the RICO Enterprise.

70. RICO Defendants have engaged in the foregoing racketeering activity on a regular and repeated basis since the fraudulent scheme was devised in or about 2015.

71. The foregoing predicate acts are part and parcel of, or consistent with, the regular, ordinary or usual means by which the RICO Enterprise has conducted its business.

72. In engaging in the foregoing predicate acts of wire fraud and mail fraud, RICO Defendants purposefully directed their communications to Fussle with the intent of misleading Fussle and/or causing him to defer, delay or dispense with litigation to enforce his rights, all in furtherance of RICO Defendants' fraudulent scheme. This conduct by Meyer and Finnegan had the intended effect of causing Fussle to defer, delay or not pursue litigation.

*C. Standing, Injury and Proximate Cause*

73. Absent the Assignment, Fussle would have standing to assert the violations of 18 U.S.C. §1962(c). Prior to the Assignment, as a direct and proximate result of the aforementioned violations of 18 U.S.C. §1962(c), Fussle suffered injury in his business or property in an ascertainable amount, including but not limited to principal, interest, and other losses attributable to the default of Tethys Trading with respect to the Revised Fussle Note.

74. Separate and apart from the Assignment, Hodgson Capital has suffered injury in its business or property in an ascertainable amount, including but not limited to principal, interest, and other losses attributable to the reduction and restructuring of the original 2014 Fussle Note.

75. In furtherance of the Assignment, for good and valuable consideration, Hodgson Capital has acquired all rights, title, interests, and claims arising out of or relating to Revised Fussle Note. Additionally Hodgson Capital has suffered direct injury in connection with its expenditure of principal and interest totaling $126,850.00 in payment of sums to Fussle in connection with Fussle's compromise of rights and claims under the Fussle Note and acceptance of the Revised Fussle Note.

76. Pursuant to the civil remedy provisions of 18 U.S.C. §1964(c), Hodgson Capital is entitled to recover treble damages, together with costs of prosecuting these claims and reasonable attorneys' fees.

WHEREFORE, Intervenor Hodgson Capital requests judgment on this Second Count of the Intervenor Third-Party Complaint against Third-Party Defendants John E. Meyer, Jr. and Robert Finnegan, and that it be awarded compensatory damages, trebled compensatory damages pursuant to 18 U.S.C. §1964(c), punitive damages, costs, attorney fees pursuant to 18 U.S.C. §1964(c), interest and such other relief as may be just and proper.

**THIRD COUNT**
**[*Intervenor Third-Party Complaint Against Meyer and Finnegan; and Intervenor Counterclaim Against Small Corp.*]**
**Violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(d)**

77. Intervenor Hodgson Capital repeats the allegations of paragraphs 1 through 76 of the Intervenor Third-Party Complaint above as though herein set forth at length.

78. The Counterclaim Defendant, Small Corp., is a "RICO person" (or a "RICO Defendant") within the meaning of 18 U.S.C. §1961(3) because Small Corp. is a "person" under law capable of holding a legal or equitable interest in property.

79. The three (3) RICO Defendants – Meyer, Finnegan and Small Corp. – have unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to

violate 18 U.S.C. §1962(c) as alleged above, in violation of 18 U.S.C. §1962(d), which section makes it unlawful for any person to conspire to violate any of sections (a), (b) or (c) of 18 U.S.C. §1962.

80. By and through their close business relationships with each other, including relationships as co-members of Tethys Trading and other Tethys-denominated entities (and as to Meyer and Finnegan, co-participants in management of Tethys Trading and numerous other Tethys entities), as well as their negotiation, execution, delivery and performance of one (1) or more “swap agreements” pursuant to which Small Corp. received equity interests and/or other financial or economic benefits or other value relating to one or more Tethys entities, Meyer, Finnegan and Small Corp. had knowledge of the financial and business condition of the RICO Enterprise, Tethys Trading, and the creditor claims and potential creditor claims that were or would be directed against Tethys Trading and its assets.

81. Meyer, Finnegan and Small Corp. reached an agreement and understanding as to the development and implementation of a wrongful scheme to perpetrate one or more acts of fraudulent transfer of millions of dollars of assets of Tethys Trading to one or more other Tethys entities. Similarly, Meyer, Finnegan and Small Corp. agreed, connected and coordinated as it related to the actions of Meyer and Finnegan in operating and managing Tethys Trading through a “pattern of racketeering activity.

82. As such, the three (3) RICO Defendants have engaged in a conspiracy to conduct the affairs of the RICO Enterprise by committing a “pattern of racketeering activity” 18 U.S.C. §1962(d).

WHEREFORE, Intervenor Hodgson Capital requests judgment on this Third Count of the Intervenor Third-Party Complaint against Counterclaim Defendant R.P. Small Corp. and against

Third-Party Defendants John E. Meyer, Jr. and Robert Finnegan, and that it be awarded compensatory damages, trebled compensatory damages pursuant to 18 U.S.C. §1964(c), punitive damages, costs, attorney fees pursuant to 18 U.S.C. §1964(c), interest and such other relief as may be just and proper.

**FOURTH COUNT**
***Intervenor Counterclaim Against Small Corp. and***
***Intervenor Third-Party Complaint Against Meyer and Finnegan and Tethys Entities***
**[Civil Conspiracy]**

83. Intervenor Hodgson Capital repeats the allegations of paragraphs 1 through 82 of the Intervenor Third-Party Complaint above as though herein set forth at length.

84. R.P. Small Corp., through its owners, officers, employees, and agents, intentionally acted in combination with Third-Party Defendants Meyer and Finnegan and other Tethys-denominated entities owned and controlled by Meyer, Finnegan and R.P. Small Corp., (a) to perpetrate one or more unlawful and wrongful transfers of assets of Tethys Trading, and/or (b) to engage in other or additional conduct for the unlawful purposes of facilitating the unlawful transfer or transfers of assets of Tethys Trading.

85. The conduct of Meyer, Finnegan and R.P. Small Corp., together with the Tethys entities, constitutes a wrongful civil conspiracy involving an unlawful purpose and/or unlawful means undertaken.

86. Intervenor Hodgson Capital has been injured as a proximate result of the foregoing wrongful civil conspiracy.

WHEREFORE, Intervenor Hodgson Capital requests judgment on this Fourth Count of the Intervenor Third-Party Complaint against Counterclaim Defendant R.P. Small Corp. and Third-Party Defendants John E. Meyer, Jr. and Robert Finnegan; Tethys Trading, LLC; Tethys Supply and Marketing, LLC; Tethys Biofuels, LLC; Tethys Capital, LLC; Tethys Latin America,

LLC; Tethys Partners, LLC; Tethys Derivatives, LLC; Tethys Shipping, LLC; and Tethys Energy, LLC, and John Doe 1 though John Doe 10 and Jane Doe 1 through Jane Doe 10, and that it be awarded compensatory damages, punitive damages, costs, attorney fees, interest and such other relief as may be just and proper.

**FIFTH COUNT**

***Intervenor Third-Party Complaint Against Tethys Trading***

**[Breach of Revised Fussle Note; Exercise of Default and Acceleration Rights]**

87. Intervenor Hodgson Capital repeats the allegations of paragraphs 1 through 86 of the Intervenor Third-Party Complaint as though herein set forth at length.

88. Tethys Trading has failed to make multiple quarterly calendar payments of interest under the Revised Fussle Note (a true copy of which is annexed hereto as Exhibit "1").

89. Tethys Trading has committed one or more events of default of the Revised Fussle Note by failing to make quarterly calendar payments as and when due under the Revised Fussle Note.

90. Under the Revised Fussle Note, upon the occurrence of a default as defined in the Revised Fussle Note, the holder of the said Note has the option, without further notice or demand, to declare the Revised Fussle Note in default, in which case all indebtedness due and owing thereunder, including the entire unpaid principal balance and interest shall be due and payable immediately.

91. Hodgson Capital, as assignee under the Assignment, declares the Revised Fussle Note in default and demands payment of the outstanding principal balance of $400,000.00, plus interest thereon at the stated rate of four (4%) simple interest, together with all costs of collection (including reasonable attorneys' fees) as provided under the Revised Fussle Note.

92. Third-Party Defendant Tethys Trading is liable to Hodgson Capital for breach of the Revised Fussle Note.

WHEREFORE, Intervenor Hodgson Capital requests judgment on this Fifth Count of the Intervenor Third-Party Complaint against Third-Party Defendant Tethys Trading, LLC, and that it be awarded compensatory damages, costs, attorney fees, interest and such other relief as may be just and proper.

**SIXTH COUNT**
***Third-Party Complaint Against Meyer***
**[Common Law Fraud]**

93. Intervenor Hodgson Capital repeats the allegations of paragraphs 1 through 92 of the Intervenor Third-Party Complaint as though herein set forth at length.

94. In furtherance of a wrongful scheme to conceal fraudulent transfers of assets and to induce Fussle to delay, defer or dispense with a collection lawsuit, Meyer made multiple false statements of fact and material omissions of fact (notwithstanding a duty under law to make full and accurate disclosures to Fussle). The materially false and misleading statements include but are not limited to electronic mails to Fussle in 2018 and 2019 in which, among other things, Meyer falsely attributed a manufactured liquidity crisis at Tethys Trading on actions of Kadakia when, to the contrary, the cause was the transfer of millions of dollars in cash assets of Tethys Trading to other Tethys entities at the direction of Meyer and Finnegan.

95. Meyer's false statements and misleading omissions were knowingly false, and made with the intent that Fussle rely thereon, which Fussle reasonably did to his detriment.

96. As a proximate result of Meyer's fraud, Fussle has suffered quantifiable injury.

97. As assignee of Fussle under the Assignment, Hodgson Capital is entitled to recover damages.

WHEREFORE, Intervenor Hodgson Capital requests judgment on this Sixth Count of the Intervenor Third-Party Complaint against Third-Party Defendant John E. Meyer, Jr., and that it be awarded compensatory damages, punitive damages, costs, attorney fees, interest and such other relief as may be just and proper.

Respectfully submitted,

*/s/ Evan G. E. Vincent*
Evan G.E. Vincent, OBA #22325
CROWE & DUNLEVY, P.C.
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, OK 73102
(405) 235-7700
(405) 239-6651 (Facsimile)
evan.vincent@crowedunlevy.com

**ATTORNEYS FOR INTERVENING COUNTERCLAIMANT AND THIRD-PARTY PLAINTIFF JT HODGSON CAPITAL, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2019, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

R. Brent Blackstock
Lacey L. Shirley
Mid-Continent Tower, Suite 500
401 South Boston Avenue
Tulsa, OK 74103

R. Richard Love III
4000 One Williams Center
Tulsa, OK 74172-0148

s/ *Evan G. E. Vincent*
Evan G.E. Vincent

# ASSIGNMENT OF PROMISSORY NOTE AND SECURITY AGREEMENT AND ASSIGNMENT OF CLAIMS AND RIGHTS AGREEMENT

THIS ASSIGNMENT OF PROMISSORY NOTE AND SECURITY AGREEMENT and ASSIGNMENT OF CLAIMS AND RIGHTS AGREEMENT (which, inclusive of exhibits attached, is referred to below as the **"Assignment Agreement"** or **"Agreement"**), made and entered into as of the close of business on October 29, 2019 (the **"Effective Date"**), among the following parties (at times, individually, **"Party"** or collectively, **"Parties"**):

**REINHOLD FUSSLE**, an individual with a residential address of 2035 S. 75th East, Warsaw, Indiana 46850-7415 (at times referred to as **"Assignor"** or **"Fussle"**);

and

**JT HODGSON CAPITAL, LLC**, a Delaware limited liability company, with a principal address of 127 Berry Street, Suite 1200, Fort Wayne, Indiana 46802 (at times referred to as **"Assignee"** or **"Hodgson Capital"**).

In return for good and valuable consideration set forth in this Assignment Agreement, the sufficiency of which is hereby acknowledged, and the Parties' execution of this Agreement, together with the covenants and promises expressly set forth in this Assignment Agreement, the Parties hereby agree as follows:

1. **Acknowledged Facts**. Assignor and Assignee acknowledge the following as fact:

1.1. Fussle was Payee of a certain written "Promissory Note" in the principal amount of $500,000.00, dated January 17, 2014 and delivered to Fussle by Tethys Trading, LLC ("**Tethys Trading")**, an Oklahoma limited liability company, as Maker (**"2014 Promissory Note"**) [true copy annexed as *Exhibit "A"*]. The amounts due under the 2014 Promissory Note were secured by a written "Pledge and Security Agreement" dated January 17, 2014 and executed and delivered by Tethys Trading in favor of Fussle (**"2014 Security Agreement"**) [true copy annexed as *Exhibit "B"*], pursuant to which Tethys Trading pledged to Fussle the accounts receivable of Tethys Trading resulting from any transaction by which Tethys Trading used the proceeds of the 2014 Promissory Note to fund margin requirements associated with Tethys Trading's business activities, and all proceeds thereof.

1.2. In furtherance of the 2014 Security Agreement, Fussle filed a Form UCC-1 financing statement (the "**Financing Statement**") with the UCC Central Filing Office, located in the Offices of the Oklahoma County Clerk [true copy with official stamped filing date annexed as *Exhibit "C"*].

1.3. The 2014 Promissory Note was amended in part by written "First Amendment to Promissory Note" executed effective as of December 31, 2014 ("**2014 Note Amendment"**) [true copy annexed as *Exhibit "D"*]; and, pursuant to Section 2. of the 2014 Note Amendment, except

as expressly modified, the terms of the 2014 Promissory Note remained in full force and effect (as did the 2014 Security Agreement).

1.4. The 2014 Promissory Note was replaced, in part, by (a) a written "Promissory Note" dated January 1, 2017 (**"2017 Promissory Note"**) in the principal amount of $400,000.00 delivered by Tethys Trading to Fussle [true copy annexed as *Exhibit "E"*], *and* (b) a written "Promissory Note" dated December 27, 2016 delivered by Hodgson Capital, a Delaware limited liability company owned and managed by Jeffrey T. Hodgson, who was at the time also a member of Tethys Trading, in the principal amount of $100,000.00 (**"Hodgson Note"**) [true copy annexed as *Exhibit "F"*]. The 2017 Promissory Note provides, in part, that the amounts due thereunder shall be secured by the 2014 Security Agreement, pursuant to which Tethys Trading pledged to Fussle "accounts receivable resulting from any transaction by which Maker [Tethys Trading] used the proceeds of the Original Note [the 2014 Promissory Note] to fund margin requirements."

1.5. Hodgson Capital has made payment of $126,850.00 to Fussle, constituting payment in full (as, when, or prior to due date) of all principal and interest payments, and any other sums payable to Fussle as provided under the Hodgson Note. The Hodgson Note is, or has been, extinguished, satisfied, and discharged by performance of Hodgson Capital.

1.6. As of the Effective Date, Tethys Trading has breached interest and principal payment obligations to Fussle under the 2017 Promissory Note and is in default (whether or not formally noticed or declared); and John E. Meyer, Jr., as managing member of Tethys Trading, has communicated to Fussle, in sum and substance, that Tethys Trading is without sufficient assets or operating income to pay, as and when due, interest or principal obligations to Fussle under the 2017 Promissory Note.

1.7. Fussle acknowledges and understands the uncertainty associated with performance by Tethys Trading of its obligations under the 2017 Promissory Note, as well as the costs and expenditure of time and other resources which may be necessitated in connection with enforcement of Fussle's rights under the 2017 Promissory Note and 2014 Security Agreement.

1.8. Assignee desires to acquire from Assignor, and Assignor desires to assign and irrevocably transfer to Assignee, in accordance with the terms of this Assignment Agreement, certain specified contracts and contract rights, together with other rights, interests, claims and remedies arising under contract, federal or state statute or regulation, common law or equity, construed in the broadest sense allowable by law, which Fussle has or may have relating to the specified contracts, and the acts, omissions, persons and entities referenced herein.

1.9. It is agreed and understood that this Assignment shall be construed or interpreted (to the extent necessary), and enforced, with the view of effectuating to the greatest extent provided by law the transfer of all rights, interests, and claims of Assignor to Assignee, to the extent that they arise out of, or relate to, Tethys Trading, LLC or any other Tethys-denominated entity.

2. **Assignment and Irrevocable Transfer**. As of the Effective Date, Fussle hereby assigns and irrevocably transfers and conveys to Assignee, any and all of Fussle's rights, title

and interests, whether arising out of contract, federal or state statute or regulation, common law or equity, in or to the following:

2.1. the 2017 Promissory Note;

2.2. the 2014 Security Agreement; and

2.3. any claims or remedies, whether known or unknown, existing now or at any time in the future, of, to or for the benefit of Fussle or Fussle's heirs or estate, arising under law or equity, in any way associated with, related or relating to, or arising out of any one or more of the following –

2.3.1. the 2017 Promissory Note, including but not limited to acts or omissions preceding its execution or delivery, or in any way relating to the non-performance or breach of same;

2.3.2. the 2014 Promissory Note, including but not limited to acts or omissions preceding its execution or delivery, or in any way relating to the non-performance or breach of same;

2.3.3. the 2014 Security Agreement, including but not limited to acts or omissions preceding its execution or delivery, or in any way relating to the non-performance or breach of same;

2.3.4. the transfer of assets or income of any kind, or rights or claims associated therewith, of Tethys Trading;

2.3.5. the business, operations, or management, or any act or omission, of Tethys Trading or any affiliate of Tethys Trading (including but not limited to, Tethys Supply and Marketing, LLC; Tethys Capital, LLC; Tethys Biofuels, LLC; Tethys Latin America, LLC; Tethys Partners, LLC; Tethys Derivatives, LLC; or Tethys Energy, LLC); and

2.3.6. any act or omission of or by John E. Meyer, Jr., Robert Finnegan, R.P. Small Corp., Richard Small, or Norma Small, or any of their affiliated entities, or any person acting or purporting to act on behalf of any of them.

On or promptly following the Effective Date, Fussle shall tender physical possession of the original executed 2017 Promissory Note to Hodgson Capital, together with an allonge endorsement executed by Fussle in favor of Hodgson Capital in form mutually acceptable to the Parties and their counsel. In addition, Hodgson Capital is authorized to file an assignment of the Financing Statement in the Oklahoma UCC Central Filing Office on or after the Effective Date.

3. **<u>Consideration</u>**. Assignee agrees to pay to Assignor the total sum of $330,000.00, payable in eleven (11) equal installments of $30,000.00 (each payment referred to as **"Installment Payment"**) to be received by Assignee on each of the following **"Due Date(s)"**:

3.1. November 1, 2019;

3.2. January 2, 2020;

3.3. April 1, 2020;

3.4. July 1, 2020;

3.5. October 1, 2020;

3.6. January 2, 2021;

3.7. April 1, 2021;

3.8. July 1, 2021;

3.9. October 1, 2021;

3.10. January 2, 2022; and

3.11. April 1, 2022.

On each Due Date subsequent to November 1, 2019, in addition to the Installment Payment then due, Assignee shall pay to Assignor interest at the fixed rate of 1.68% per annum on the outstanding unpaid balance of Installment Payments, accrued from the prior Due Date to the current Due Date. Notwithstanding the foregoing, in the event that an Installment Payment is not received on or prior to its Due Date, interest instead shall accrue at a rate of ten percent (10%) simple interest from the Due Date until the date that the Installment Payment is received by Assignor. Any such interest accrued shall be due and payable on the next Due Date.

4. **Assignor's Disclaimer of Interest**. As of execution and delivery of this Agreement, and for all time thereafter, Assignor disclaims (a) any and all right, title or interest in or to any of the assets, contingent assets, claims or remedies set forth in Section 2. of this Assignment Agreement; and (b) any right to collect the proceeds of any of the assets, contingent assets, claims or remedies set forth in Section 2. of this Assignment Agreement; and (c) any right to control, or to demand input with respect to, the collection efforts, strategies, processes, or actions undertaken by Assignee to pursue judgment with respect to, or collection of, any of the assets, contingent assets, claims or remedies set forth in Section 2. of this Assignment Agreement.

5. **Representations and Warranties of Assignor**. As of the Effective Date, Assignor represents and warrants that the following facts are true, correct and complete, understanding that Assignee is relying upon same in entering into this Assignment Agreement:

5.1. Assignor is the exclusive owner and holder of the 2017 Promissory Note.

5.2. The 2017 Promissory Note and 2014 Security Agreement remain in full force and effect, without amendment or modification.

5.3. Assignor has the right, power and authority to enter into this Assignment Agreement.

5.4. The execution and delivery of this Assignment Agreement does not conflict with, or cause a breach of, any contract, agreement or understanding between Assignor and any other person or entity.

6. **Acceptance, Undertaking, and Indemnification**. Assignee hereby accepts the assignment and transfer of rights, interests and claims provided by this Assignment Agreement. Assignee undertakes to bear all costs and expenses incurred by Hodgson Capital associated with, or arising from, the assertion, prosecution, enforcement or litigation of the rights, interests and claims of Fussle assigned and transferred to Hodgson Capital in accordance with this Assignment Agreement. Assignee agrees to reimburse, indemnify and hold harmless Fussle against, from, and with respect to, any reasonable costs or expenses, or liabilities, including reasonable counsel fees, incurred by Fussle arising out of or relating to (a) the preparation, execution and delivery of this Assignment Agreement, and (b) the litigation of any claims or defenses asserted by or against Hodgson Capital with respect to the rights, claims and interests that are the subject of this Assignment Agreement. Assignee acknowledges that Assignor makes no representation or warranty (and, for clarity, Assignor hereby disclaims any such representation or warranty) as to (x) the collectability of the 2017 Promissory Note or any other claims assigned hereunder, and (y) the priority of the security interest under the 2014 Security Agreement relative to the rights of any other secured creditors of Tethys Trading.

7. **Assignor's Duty of Continuing Cooperation**. Assignor covenants that Assignor shall provide such cooperation to Assignee, on reasonable Notice (as provided in this Agreement), as may be reasonably necessary to assist and facilitate Assignor's efforts to enforce, and to secure collection of, the rights, interests, claims and remedies that are the subject of this Assignment Agreement.

8. **Governing Law; Forum Selection**. This Agreement shall be governed by and construed under the laws of the State of Delaware, without regard to conflicts of laws principles that would require the application of any other law. The Parties specifically acknowledge and agree that the provisions of 6 Del. C. § 2708 apply, and are intended to apply, to this Section 8. and further that the provisions of this Section 8. have been specifically bargained for between the Parties. Any litigation or other proceeding arising out of or relating to this Agreement or any aspect of the transactions contemplated herein shall be brought in the courts of the State of Delaware sitting in Wilmington, Delaware, or, if it has or can acquire jurisdiction, in the United States District Court for the district in which Wilmington, Delaware, is located, and each of the Parties irrevocably submits to the exclusive jurisdiction of each such court in any such proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of such matters shall be heard and determined only in any such court and agrees not to bring any action arising out of or relating to this Agreement or any of the transactions contemplated herein in any other court. The Parties agree that any of them may file a copy of this Section 8. with any court as written evidence of the knowing, voluntary and bargained for agreement between the Parties to waive irrevocably any objections to venue or to convenience of forum. Process in any action referred to in this Section 8. may be served on any Party anywhere in the world.

9. **Assignment; Binding Effect.** This Agreement and all rights and obligations of Hodgson Capital hereunder may be assigned and delegated by Hodgson Capital and his successors and assigns at any time and from time to time without prior notice to, or any requirement of consent from, Fussle. This Agreement shall be binding upon and inure to the benefit of the Parties hereto for themselves and their respective heirs, affiliates, trustees, executors, administrators, representatives, successors and assigns.

10. **Entire Agreement/Amendments**. This Agreement constitutes the entire agreement by, between and among the Parties with respect to the subject matters referred to herein and supersedes any other prior written or verbal understanding or agreement by, between or among them. There are no promises, inducements, representations, warranties, understandings, undertakings or agreements, oral or written, express or implied, by, between or among the Parties, except as specifically set forth herein. This Agreement may not be amended, canceled, revoked or otherwise modified except by written agreement subscribed by all of the Parties. If any portion of this Agreement is found to be unenforceable for any reason, then the Parties desire that all other portions of this Agreement shall remain fully and validly enforceable.

11. **No Waiver**. The failure of any of the Parties to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof nor deprive such Party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

12. **Headings and Syntax**. The headings set forth in this Agreement are for convenience and reference only and are not intended to modify, limit, describe or affect in any way the content, scope or intent of this Agreement. All references made and pronouns used shall be construed in the singular or the plural and in such gender as common sense and circumstances require.

13. **Construction**. Each of the Parties agrees that the Party has participated in the drafting and negotiation of this Agreement, with the assistance of counsel, and no rule of construction (including the rule to the effect that any ambiguities are to be resolved against the drafting party) shall be employed in the interpretation of this Agreement or invoked by any Party.

14. **Notice**. Any notice contemplated or required under this Agreement ("**Notice**") (a) shall be in writing; and (b) shall be delivered by [i] hand delivery by a reputable courier service, or [ii] overnight or next-day delivery by Federal Express or United Parcel Service or United States Postal Service, to the Party at the address set forth at inception of this Agreement, or such other address as the Party or Parties confirm by Notice in accordance with this Section 14. Such Notice shall be deemed effective upon actual receipt of the Notice by receiving Party.

15. **Execution and Delivery.** This Agreement may be executed in counterparts, which taken together shall comprise one and the same agreement. The executed Agreement may be delivered by fax or email.

* * *

The Parties knowingly and voluntarily sign this Agreement before a Notary Public, or other person authorized under law to administer oaths, on the date set forth.

**ASSIGNOR:** DL 8924-16 2240

By: Reinhold Fusse
Reinhold Fussle

NOTARY PUBLIC OF STATE OF ~~INDIANA~~: Florida

MATTHEW R. PASCONE II
MY COMMISSION # FF 962218
EXPIRES: February 18, 2020
Bonded Thru Budget Notary Services

10/29/2019

**ASSIGNEE:**

JT HODGSON CAPITAL, LLC

By: ______________________________
Jeffrey T. Hodgson
Managing Member

NOTARY PUBLIC OF STATE OF INDIANA:

______________________________

* * *

The Parties knowingly and voluntarily sign this Agreement before a Notary Public, or other person authorized under law to administer oaths, on the date set forth.

**ASSIGNOR:**

By: ______________________________
Reinhold Fussle

NOTARY PUBLIC OF STATE OF INDIANA:

______________________________

**ASSIGNEE:**

JT HODGSON CAPITAL, LLC

By: ______________________________
Jeffrey T. Hodgson
Managing Member

NOTARY PUBLIC OF STATE OF INDIANA:

DAVID P LAZZER
Seal
Notary Public – State of Indiana
Allen County
My Commission Expires Feb 28, 2025

______________________________

*Exhibit "A"*

**PROMISSORY NOTE**

$500,000 January 17, 2014
Chicago, Illinois

FOR VALUE RECEIVED, **TETHYS TRADING, LLC**, an Oklahoma limited liability company ("Maker"), promises to pay to Reinhold Fussle ("Payee"), at Payee's address at 2035S 75 East, Warsaw, Indiana 46580, the principal amount of up to $500,000, plus interest thereon at the rates set forth below (collectively the "Note Rate"). The Note Rate shall apply to the outstanding principal amount of this Note received by Maker from Payee or used by Maker as set forth below. Interest shall be payable monthly beginning on the 30th day following the date of this Note and every 30 days thereafter. Principal and all accrued and unpaid interest shall be due and payable on or before December 31, 2014 (hereafter the "Maturity Date"). This Note may be paid at any time without penalty or additional interest.

The purpose of this Note is to fund, in whole or in part, margin requirements for Maker's trades in Distillates-Light Ends. The proceeds of this Note shall be placed by Maker, upon initial receipt, in a segregated account maintained at Morgan Stanley, and such proceeds shall not be co-mingled with any of Maker's own funds until they are removed from such segregated account, the notice of which shall be made by Maker to Payee as of the date on which such funds are removed from such segregated account. While the proceeds of this Note are maintained in such segregated account, the outstanding principal amount of this Note maintained in such account shall accrue interest at the rate of 6% *per annum*, which interest shall be payable by Maker to Payee as set forth herein. From and after the date on which the principal amount of this Note is removed by Maker from such segregated account and used with any margin requirement for its business, such amount so removed from such account shall then accrue interest at the rate of 10% *per annum*, payable in accordance with the terms hereof.

The amounts due under this Note shall be secured by that certain Pledge and Security Agreement executed by Maker (as debtor) in favor of Payee (as secured party) by which Maker pledges to Payee Maker's accounts receivable resulting in any transaction by which Maker uses the proceeds of this Note to fund margin requirements as discussed herein.

Interest on the principal amount of this Note shall be calculated on the basis of the actual number of days elapsed in the period for which the calculation is being made based on 360-day year. On the Maturity Date, all principal and interest shall be due and payable without notice or demand.

The interest payable upon the indebtedness evidenced by this Note shall not at any time exceed the maximum rate of interest permitted under the laws of the State of Oklahoma for loans of the type and character evidenced by this Note.

All payments under this Note shall be made in lawful currency of the United States of America at Payee's residence or office (as set forth above).

From time to time the Maturity Date of this Note may be extended or this Note may be renewed, in whole or in part, or a new note of different form may be substituted for this Note and/or the rate of interest may be changed, or changes may be made in consideration of loan extensions, and Payee, from time to time, may waive or surrender, either in whole or in part, any rights, guarantees, security interests or liens given for the benefit of Payee in connection with

payment of this Note or any security therefor; but no such occurrences shall in any manner affect, limit, modify or otherwise impair any rights, guaranties or security of Payee not specifically waived, released or surrendered in writing, nor shall any maker, guarantor, endorser or any person who is or might be liable hereon, either primarily or contingently, be released from liability by reason of the occurrence of any such event. Payee, from time to time, shall have the unlimited right to release any person who might be liable hereon, and such release shall not affect or discharge the liability of any other person who is or might be liable hereon.

If (a) any payment required by this Note is not made within five (5) business days after the due date and receipt by Maker of Notice from Payee, (b) any default occurs under any other instrument related hereto or under the provisions of any security agreement, pledge agreement or other document or agreement which provides security for the indebtedness evidenced by this Note, or (c) Maker applies for or consents to the appointment of a receiver, trustee, or liquidator of itself or of all or a substantial part of its assets, or admits in writing its inability to pay its debts as they fall due, or makes a general assignment for the benefit of creditors, or is adjudicated a bankrupt or insolvent, or a petition or other proceeding (voluntary or otherwise) is filed by or with respect to Maker in which a reorganization or an arrangement with Maker's creditors is sought or by which any creditor of Maker or Maker itself seeks to take advantage of any insolvency, bankruptcy, reorganization, arrangement, or other similar proceeding, Payee may, at its option, without further notice or demand, declare this Note in default and all indebtedness due and owing hereunder shall be due and payable immediately. In the event of a default, the entire balance (principal and interest) shall be due and payable immediately. All makers, endorsers, guarantors and sureties hereby severally waive protest, presentment, demand, and notice of protest and nonpayment in case this Note or any payment due hereunder is not paid when due; and they agree to any renewal of this Note or to any extension, acceleration or postponement of the time of payment, or any other indulgence, to any substitution, exchange or release of collateral and to the release of any party or person primarily or contingently liable, without prejudice to Payee and without notice to any maker, endorser, guarantor or surety. Maker hereof, and any guarantor, endorser, surety or any other person who is or may become liable hereon shall, on demand, pay all costs of collection, including reasonable attorney fees, Payee in attempting to enforce payment of this Note and for defending the validity of any document securing this Note.

This Note is given for an actual loan of money for business purposes and not for personal, agricultural or residential purposes, and is executed and delivered in the State of Oklahoma and shall be governed by and construed in accordance with the laws of the State of Oklahoma. The state or federal courts sitting within Tulsa, Oklahoma shall have exclusive jurisdiction over any disputes which arise hereunder and the parties acknowledge that venue is proper only in such courts.

**TETHYS TRADING, LLC, an Oklahoma limited liability company**

By: ______________________________
**John E. Meyer, Jr., Manager**

*Exhibit "B"*

# PLEDGE AND SECURITY AGREEMENT

This Pledge and Security Agreement (this "Agreement"), is entered into effective this 17th day of January, 2014 between **Tethys Trading LLC,** an Oklahoma limited liability company ("Debtor" or "Pledgor") and Reinhold Fussle ("Secured Party" or "Pledgee").

## RECITALS:

A. Effective as of the date hereof, Pledgor executed in favor of and delivered to Pledgee a certain Promissory Note (the "Note") by which Pledgor promised to pay to Pledgee, in accordance with the terms and conditions of the Note, the principal amount of up to $500,000;

B. In order to secure the obligations of Pledgor under the Note, Pledgor agreed to pledge to Pledgee certain accounts receivable; and

C. A copy of the Note may be attached hereto as **Exhibit "A"** but in any event the terms and conditions contained therein are incorporated into this Agreement as if fully set forth herein. All capitalized terms used in this Agreement which are not otherwise defined shall have the same meaning as set forth in the Note.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, for $10.00, and for other valuable consideration the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. **Security Interest.**

(a) **Grant of Security Interest.** Pledgor hereby grants to Pledgee, as Secured Party, a security interest in all of the Collateral described on the cover page hereto, as continuing collateral security for the payment of all amounts and all liabilities, present or future, absolute or contingent, direct or indirect, for which Pledgor is now or may at any time and from time to time hereafter be indebted or liable to Pledgee under or in connection with (a) the Note, and all renewals, replacements, substitutions, amendments, variations and supplements thereto or therefor, (b) this Agreement, and (c) all other instruments related to, evidencing or securing the Note (collectively the "Debt Instruments"). All of the foregoing obligations may be referred to hereafter as the "Obligations".

(b) **Continuing Security.** This security is to be a continuing security, notwithstanding any intermediate payment or settlement of accounts or any other matter whatsoever, for the payment and satisfaction of the Obligations referred to above and is to be in addition and without prejudice to any other security which Pledgee may now or hereafter hold in respect of such Obligations.

(c) **Definition of "Collateral".** For the purpose of this Agreement, the term "Collateral" shall mean:

(i) the accounts receivable referred to on the cover page hereof, and

(ii) all benefits, proceeds and entitlements arising from or attaching to any of the accounts receivable.

2. **Enforcement.**

(a) Pledgee shall be entitled to enforce the security constituted hereby upon the occurrence of an event of default under any Debt Instrument.

(b) In connection with the enforcement of the security constituted hereby, Pledgee shall have, following the occurrence of an event of default, without limitation, all the rights and remedies of a secured party under the Uniform Commercial Code (the "UCC") as adopted in the State of Oklahoma (as the same may be amended, revised or consolidated from time to time) and, without limitation of and in addition to the foregoing, Pledgee may:

(i) realize upon the Collateral by directing each creditor of an account to pay such account amount to Pledgee, and Pledgor shall take or cause to be taken all necessary action to cause such collection to be completed; and

(ii) exercise all rights of ownership of and all other rights attaching to the Collateral, or any of it, as if Pledgee were the absolute owner thereof.

(c) With respect to the actions described above, Pledgor hereby constitutes and appoints Pledgee as Pledgor's attorney-in-fact, with full power of substitution, and acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable until all of the Obligations are paid and performed in full.

3. **Pledgor as Trustee.**

All accounts received by Pledgor at any time after an event of default and the enforcement of the security constituted hereby shall be received by Pledgor as trustee for Pledgee and shall be forthwith paid over to Pledgee to be dealt with in accordance with the terms hereof. So long as Pledgor is paying or complying with all Obligations and has committed no event of default, it may collect the Collateral and treat the same as its property.

4. **Application of Proceeds.**

Any accounts collected by Pledgee on or in respect of the Collateral in connection with the exercise of any rights or remedies of Pledgee shall be applied in the following order:

(a) to the payment of all expenses of realization and enforcement;

(b) to the payment of interest, if any, accrued but unpaid in respect of any of the Obligations secured hereby;

(c) to the payment of principal outstanding and unpaid in respect of any of the Obligations secured hereby;

(d) to the payment of all other amounts owing but unpaid in respect of any of the

Obligations secured hereby; and

(e) the balance, if any, shall be returned to Pledgor.

5. **Representations, Warranties and Covenants of Pledgor.**

Pledgor represents, warrants and covenants to and in favor of Pledgee that:

(a) it has and will at all times have good and marketable title to, and is and will at all times be the sole beneficial owner of, the Collateral free from any liens other than the security constituted under this Agreement (unless approved in writing by Pledgee); and

(b) it will not create, attempt to create or suffer to exist any lien (other than in favor of Pledgee, without Pledgee's written consent) on or over any or all of the Collateral.

6. **Notice.**

Any communication under or in connection with the matters contemplated by this Agreement, except as otherwise provided in this Agreement, shall be addressed to the recipient and sent:

(i) if to Pledgor, to Tethys Trading, LLC c/o John E. Meyer, Jr., Manager, 954 West Washington Blvd., Suite 250, Chicago, Illinois 60607 ;

with a copy to R. Jay Chandler, Norman Wohlgemuth Chandler and Jeter at 401 S. Boston Ave, Suite 2900, Tulsa, Oklahoma 74103

; and

(ii) if to Pledgee, to Reinhold Fussle, at 2035S 75 East, Warsaw, Indiana 46580

or in any such case to such other address and/or copied to such other person as the parties may designate in writing. Unless otherwise provided herein, any notice or other communication to be given or made pursuant to this Agreement may be made by letter delivered personally or sent electronically or by registered first class postage.

7. **Law and Jurisdiction.**

(a) This Agreement and the rights of the parties hereunder shall be construed and interpreted in accordance with the laws of the State of Oklahoma and the federal laws of the United States of America applicable therein.

(b) The parties irrevocably agree that, given that Pledgor is an Oklahoma limited liability company, any Oklahoma State or Federal court sitting in the City of Tulsa is to have exclusive jurisdiction to settle any disputes which may arise out of or relating to this Agreement and that, accordingly, any suit, action or proceeding relating to this Agreement (hereinafter referred to as "Proceedings") may be brought only in such courts.

(c) Pledgor and Pledgee each irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any Proceedings in any such court referred to herein and any claim that any such Proceedings have been brought in an inconvenient forum, and further irrevocably agrees that a judgment in any Proceedings brought in any such court shall be conclusive and binding upon it and may be enforced in the courts of the United States of America or the State of Oklahoma (or any other courts to the jurisdiction of which it is or may be subject).

(d) In the event that any provision of this Agreement is deemed to be invalid by reason of the operation of any law, the validity, legality and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affected or impaired thereby, all of which shall remain in full force and effect, and the affected term or provision shall be modified to the minimum extent permitted by law so as to achieve most fully the intention of this Agreement.

8. Miscellaneous.

(a) Counterparts; Benefits. This Agreement may be signed in any number of counterparts, each of which shall be an original and all of which taken together shall constitute a single agreement, with the same effect as if the signature thereto and hereto were upon the same instrument. This Agreement is hereby made binding upon and shall inure to the benefit of the parties and their respective heirs, personal and legal representatives, successors and assigns.

(b) Modification. Any modification or waiver of any provision of this Agreement, or any consent to any departure from any provision hereof, shall not be effective in any event unless the same is in writing and signed the parties hereto.

(c) Further Assurances. Pledgor agrees that at any time, and from time to time, after the execution and delivery of this Agreement, Pledgor, upon the request of Pledgee, will execute and deliver promptly such further documents and do such further acts and things as Pledgee reasonably may request in order to effect fully the purposes of this Agreement.

DATED as of the 17 day of January, 2014.

"DEBTOR" AND "PLEDGOR"

Tethys Trading, LLC, an Oklahoma limited liability company

By: [signature]
John E. Meyer, Jr.
Manager

"SECURED PARTY" AND "PLEDGEE"

Reinhold Fussle

By: [signature]
Reinhold Fussle

*Exhibit "C"*

20190822020871400
08/22/2019 11:54:07 AM
Bk: Pg:0 Pgs:1 UC1
State of Oklahoma
County of Oklahoma
Oklahoma County Clerk
David B. Hooten

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Wanzalle Beck (405) 235-7764)

B. E-MAIL CONTACT AT FILER (optional)
wanzalle.beck@crowedunlevy.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Crowe & Dunlevy, A Professional Corporation
324 N. Robinson Avenue, Suite 100
Oklahoma City, OK 73102

20190822020871400
Filing Fee: $10.00

08/22/2019 11:54:07 AM
UC1

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME<br>Tethys Trading, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS<br>954 W. Washington Blvd, Suite 250 | CITY<br>Chicago | STATE<br>IL | POSTAL CODE<br>60607 | COUNTRY<br>USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME<br>Reinhold Fussle | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS<br>2305 S. 75 East | CITY<br>Warsaw | STATE<br>IN | POSTAL CODE<br>46850-7415 | COUNTRY<br>USA |

4. COLLATERAL: This financing statement covers the following collateral:

All accounts receivable resulting from any transaction in which Debtor utilized the proceeds of a January 17, 2014, loan from Secured Party to fund margin requirements, and all benefits, proceeds and entitlements arising from or attaching to any such accounts receivable.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
47109-00801 (OK County Clerk

*Exhibit "D"*

**FIRST AMENDMENT TO PROMISSORY NOTE**

THIS FIRST AMENDMENT TO PROMISSORY NOTE is executed effective as of this 31st day of December, 2014 by Tethys Trading, LLC, and Oklahoma limited liability company ("Maker") and Reinhold Fussle ("Payee").

**RECITALS**

A. Maker executed a Promissory Note dated January 17, 2014 payable to and in favor of Payee, and a copy of that Promissory Note is attached hereto and incorporated herein by reference;

B. Maker and Payee wish to amend the Promissory Note by, among other things, extending the Maturity Date from December 31, 2014 to December 31, 2015.

NOW, THEREFORE, in consideration of the extension of the Maturity Date of the Promissory Note, and other valuable consideration all of which is adequate, the Promissory Note is hereby amended as follows:

1. The second grammatical paragraph of the Promissory Note is hereby deleted and replaced by the following:

> The purpose of this Note is to fund, in whole or in part, margin, hedging and related financial and operational requirements for Maker's trades in crude oil and crude oil refined products. The outstanding principal amount of this Note shall accrue, from and after December 31, 2014, at the interest rate equal to 8% *per annum*, which interest shall be payable by Maker to Payee as set forth herein.

2. Except as modified hereby, the terms of the original Promissory Note dated January 17, 2014, shall remain in full force and effect.

Dated effective as this 31st day of December, 2014.

MAKER:

**TETHYS TRADING, LLC** an Oklahoma limited liability company

PAYEE:

REINHOLD FUSSLE

*Exhibit "E"*

# PROMISSORY NOTE

$400,000 January 1, 2017

FOR VALUE RECEIVED, **TETHYS TRADING, LLC,** an Oklahoma limited liability company ("Maker"), promises to pay Reinhold Fussle ("Payee"), at Payee's address at 75 East, Warsaw, Indiana 46580, the principal amount of $400,000 plus interest thereon at 4% per annum (the "Note Rate"). The Note Rate shall apply to the outstanding principal amount of this Note. Interest shall be payable quarterly beginning on the 31st day of March, 2017 and on the last day of each succeeding quarter. Principal and all accrued and unpaid interest shall be due and payable on December 31, 2021 (hereinafter the "Maturity Date"). This Note may be pre-paid at any time without penalty or additional interest.

The purpose of this Note is to replace, in part, that certain Promissory Note dated January 17, 2014 in the principal sum of $500,000 between Tethys Trading, LLC as Maker and Reinhold Fussle as Payee (the "Original Note").

The amounts due under this Note shall be secured by that certain Pledge and Security Agreement executed by Maker (as debtor) in favor of Payee (as secured party) by which Maker pledged to Payee Maker's accounts receivable resulting from any transaction by which Maker used the proceeds of the Original Note to fund margin requirements.

Interest on the principal amount of this Note shall be calculated on the basis of the actual number of days elapsed in the period for which the calculation is being made based on 360-day year. On the Maturity Date, all principal and interest shall be due and payable without notice or demand.

The interest payable upon the indebtedness evidenced by this Note shall not at any time exceed the maximum rate of interest permitted under the laws of the State of Oklahoma for loans of the type and character evidenced by this Note.

All payments under this Note shall be made in lawful currency of the United States of America at Payee's residence or office (as set forth above)..

If (a) any payment required by this Note is not made within five (5) business days after the due date and receipt by Maker of Notice from Payee. (b) any default occurs under any other instrument related hereto or under the provisions of any security agreement, pledge agreement or other document or agreement which provides security for the indebtedness evidenced by this Note, or (c) Maker applies for or consents to the appointment of a receiver, trustee, or liquidator of itself or of all or a substantial part of its assets, or admits in writing its inability to pay its debts as they fall due, or makes a general assignment for the benefit of creditors, or is adjudicated a bankrupt or insolvent, or a petition or other proceeding (voluntary or otherwise) is filed by or with respect to Maker in which a reorganization or an arrangement with Maker's creditors is sought or by which any creditor of Maker or Maker itself seeks to take advantage of any insolvency, bankruptcy, reorganization, arrangement, or other similar proceeding, Payee may, at

its option, without further notice or demand, declare this Note in default and all indebtedness due and owing hereunder shall be due and payable immediately. In the event of a default, the entire balance (principal and interest) shall be due and payable immediately. All Makers, endorsers, guarantors and sureties hereby severally waive protest, presentment, demand, and notice of protest and nonpayment in case this Note or any payment due hereunder is not paid when due; and they agree to any renewal of this Note or to any extension, acceleration or postponement of the time of payment, or any other indulgence, to any substitution, exchange or release of collateral and to the release of any party or person primarily or contingently liable, without prejudice to Payee and without notice to any Maker, endorser, guarantor or surety. Maker hereof, and any guarantor, endorser, surety or any other person who is or may become liable hereon shall, on demand, pay all costs of collection, including reasonable attorney fees, Payee in attempting to enforce payment of this Note and for defending the validity of any document securing this Note.

This Note is given for business purposes and not for personal, agricultural or residential purposes, and is executed and delivered in the State of Oklahoma and shall be governed by and construed in accordance with the laws of the State of Oklahoma. The state or federal courts sitting within Tulsa, Oklahoma shall have exclusive jurisdiction over any disputes which arise hereunder and the parties acknowledge that venue is proper only in such courts.

**TETHYS TRADING, LLC, an Oklahoma limited liability company**

By: ______________________
Jack Meyer
Manager

RCF Holdings LLC

______________________
Reinhold Fussle
Manager

4071504v2

*Exhibit "F"*

# PROMISSORY NOTE

$100,000.00 December 27, 2016

The undersigned, JT Hodgson Capital, LLC, a Delaware limited liability company (the “Maker”), promises to pay to the order of RCF Holdings, LLC, an Indiana limited liability company (the “Payee”) at the address of the Payee shown below the principal sum of One Hundred Thousand and 00/100 Dollars ($100,000.00), together with interest at the rate of fifteen percent (15%) per annum on the unpaid principal amount outstanding from time to time from the date hereof. The interest thereon shall be paid in eight (8) consecutive quarterly installments due and payable commencing March 31, 2017, and continuing on the same day of each third month thereafter to and including December 31, 2018. Any unpaid principal balance shall be paid by December 31, 2018.

The unpaid principal balance of this Note may be prepaid, in whole or in part, at the option of the Maker at any time and from time to time, without penalty or premium; provided, however, that any partial prepayments shall be applied against installments in the inverse order of their maturity.

If any one or more of the following events of default shall occur:

(a) The Maker shall default in the payment of all or any part of the principal of or interest on this Note when due and such default continues for a period of thirty (30) business days following written notice of such default;

(b) The Maker liquidates or dissolves or ceases the conduct of substantially all of its business activities; or

(c) The Maker shall admit in writing its inability to pay its debts as they mature or shall have made a general assignment for the benefit of creditors or shall have filed a voluntary petition in bankruptcy or for a reorganization or to effect a plan or other arrangement of creditors; or shall have filed an answer to a creditor’s petition or other petition filed against it (admitting the material allegations thereof) for an adjudication in bankruptcy or for a reorganization; or shall have applied for or permitted the appointment of a receiver, trustee, or custodian for any of its property or assets; or an order shall be entered and shall not be dismissed or stayed within sixty (60) days after its entry approving any petition for reorganization of the Maker.

Then, upon the occurrence of any one or more of such events of default, any holder of this Note may immediately declare the unpaid principal balance of and all interest accrued on this Note to be immediately due and payable, and the unpaid principal balance of and accrued interest on this Note shall thereupon be due and payable without further demand, presentation, protest, or further notice of any kind, all of which are hereby waived. Also, notwithstanding anything contained herein to the contrary, during any period following an event of default and for so long as such event of default is ongoing, the unpaid principal balance shall bear interest at a rate which is equal to four percentage points over the "Prime Rate". The Prime Rate shall be that rate of interest equal to the prime rate as it appears in the Wall Street Journal from time to time.

The Maker shall pay on demand all costs reasonably incurred by the holder hereof in effecting the collection of the principal of and interest on this Note, including the fees and disbursements of counsel.

No delay or omission on the part of the holder hereof in exercising any right, power or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude other or further exercise thereof or the exercise of any other right, power or privilege.

The rights and powers granted and evidenced hereby shall extend to any holder of this Note and shall be binding upon the Maker and shall be applicable to this Note and to all renewals and/or extensions thereof. This Note shall be governed by the laws of the State of Indiana.

The Maker hereby waives presentment, demand, notice of dishonor and notice of protest.

The Maker also provides a personal guaranty by its Managing Member, Jeffrey T. Hodgson in the event Maker is unable to meet its obligations as set forth in this Note.

JT Hodgson Capital, LLC

By: ______________________________
Its: Managing Member

Address of the Payee:

RCF Holdings, LLC
2035 S 75 East
Warsaw, IN 46580