# OPERATING AGREEMENT OF TETHYS TRADING, LLC AN OKLAHOMA LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT (the "Agreement") is entered into by and among the members named on the signature pages hereto (the "Members") of TETHYS TRADING, LLC, an Oklahoma limited liability company (the "Company"). In consideration of the covenants and conditions herein set forth, the Members hereby agree that the terms of the Operating Agreement governing the Company shall be as follows:

## ARTICLE I
## General

**Section 1.01. Formation.** The Company shall be formed as a limited liability company pursuant to the provisions of the Oklahoma Limited Liability Company Act (as hereinafter defined). The rights and obligations of the Members, and the affairs of the Company, shall be governed first by the mandatory provisions of the Act, second by the Company's Articles of Organization, third by this Agreement, and fourth by the optional provisions of the Act. In the event of any conflict among the foregoing, the conflict shall be resolved in the order of priority set forth in the preceding sentence.

**Section 1.02. Name.** The name of the Company shall be "**TETHYS TRADING, LLC**". It may operate under one or more trade names adopted from time to time by the Members.

**Section 1.03. Principal Office.** The principal place of business of the Company in the State of Oklahoma shall be located at 2900 Willowbridge Circle, Austin, Texas 78703. The name and address of its resident agent in the State of Oklahoma is R. Jay Chandler, Norman Wohlgemuth Chandler & Jeter, 2900 Mid-Continent Tower, 401 South Boston Ave., Tulsa, Oklahoma 74103-4023. The Company may also maintain offices at such other place or places as the Members deem advisable.

**Section 1.04. Term.** The Company shall commence on the 30th day of July, 2013, and its existence shall be perpetual unless sooner terminated as herein provided.

## ARTICLE II
## Definitions

**Section 2.01. Definitions.** For purposes of this Agreement, the following terms shall have the following meanings.

**A.** "Act" means the Oklahoma Limited Liability Company Act, 18 O.S. §§ 2000, *et seq.* as it may be amended from time to time, and any successor to such act.

**B.** "Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. As used in this definition of "Affiliate," the term "control" means either (i) the possession, directly or indirectly, of the power

to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, or (ii) a direct or indirect equity interest of ten percent (10%) or more in the entity.

C. "Agreement" means this Operating Agreement, as it may be amended or supplemented from time to time.

D. "Articles of Organization" means the articles of organization, as amended from time to time, filed by the Company under the Act.

E. "Assignee" means a Person to whom one or more Units have been transferred, by transfer or assignment or otherwise, in a manner permitted under this Agreement, and who has agreed to be bound by the terms of this Agreement but has not become a Substitute Member.

F. "Business Day" means Monday through Friday of each week, except legal holidays recognized as such by the United States of America or the State of Oklahoma.

G. "Capital Account" means each capital account maintained for a Member pursuant to Section 4.03. The initial amount in the capital account of each Member as of the date on which this Agreement is executed by the initial Members is set forth on Exhibit "A."

H. "Capital Contributions" means the sum of the total amount of cash, the value of property contributed, the value of services provided, and/or the amount of any promissory note or other binding obligation to contribute cash or property to the Company by all Members, or any one Member, as the case may be (or the predecessor holders of any Units of any such Members).

I. "Capital Gain" means the Company's allocable share of gain from the disposition by the Company of a capital asset as defined in the Code (including any portion of such gain treated as ordinary income).

J. "Cash Available for Distribution" means, with respect to any period, all cash receipts and funds received by the Company (except for Capital Contributions) minus (i) all cash expenditures and (ii) the Company's cash management fund representing such working capital or other reserves as the Manager deems appropriate.

K. "Code" means the Internal Revenue Code of 1986, as amended, as in effect from time to time.

L. "Company Property" means all property (tangible and intangible) owned, leased or acquired by the Company from time to time.

M. "Disqualified Member" has the meaning specified in Section 12.01.

N. "Event of Dissolution" has the meaning specified in Section 12.01.

O. "Income" and "Loss" mean an amount equal to the Company's taxable

income or loss (including capital loss) for each taxable year, determined in accordance with the applicable provisions of the Code.

P. "Majority Vote of the Voting Members" or a "Majority of the Voting Members" means the affirmative vote of the holders of a majority of the Outstanding Voting Units held by the Members, except to the extent that the text hereof refers to a majority or majority vote of the *surviving* members (in Section 10.03, for example, in which case the deceased Member's interest would be excluded from the vote), and except to the extent that the text refers to a Super Majority Vote of the Voting Members or Super Majority of the Voting Members, which are defined below.

Q. "Managers" mean those persons appointed as managers of the Company pursuant to Section 6.01.

R. "Mandatory Provisions of the Act" means those provisions of the Act which may not be waived by the Members acting unanimously or otherwise.

S. "Member" means those persons executing this Agreement as Members of the Company on the signature pages hereto and any Substitute Members, as defined in and as admitted pursuant to the provisions of this Agreement. When this Agreement refers to a "Member" without further description or modification, the reference, unless otherwise stated, shall be to a Member owning an Equity Unit (as opposed to a Voting Unit).

T. "Opinion of Counsel" means a written opinion of counsel (who shall be regular counsel to the Company).

U. "Outstanding" means the number of Units issued by the Company as shown on the Company's books and records, less any Units held by the Company.

V. "Person" means a natural person, partnership, domestic or foreign limited partnership, domestic or foreign limited liability company, trust, estate, association, corporation, or any other legal or commercial entity.

W. "Record Holder" means the Person in whose name such Unit is registered on the books and records of the Company as of the close of business on a particular Business Day.

X. "Substitute Member" means a transferee of a Unit who is admitted as a Member to the Company pursuant to Section 11.01 in place of and with all the rights of a Member.

Y. "Super Majority Vote of the Voting Members" or "Super Majority of the Voting Members" means Members owning in the aggregate a total of at least 75% of the Voting Units outstanding on the date of determination.

Z. "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company for federal tax purposes, as separately stated and calculated pursuant to the Code.

**AA.** "Tax Matters Partner" means the person designated pursuant to Section 9.02.

**BB.** "Equity Unit" or "Unit" means a Unit (and any fraction thereof) representing an equity interest in the Company as set forth in Section 4.01 hereof.

**CC.** "Voting Unit" means a Unit (and any fraction thereof) representing a voting interest in the Company, as set forth in Section 4.08 hereof.

**DD.** "Vote" means a vote of the Voting Members.

## ARTICLE III
## Purpose

**Section 3.01. Purpose of the Company.** The purpose of the Company shall be as stated in the Articles of Organization.

## ARTICLE IV
## Capital Contributions

**Section 4.01. Equity Units.** There shall be an aggregate of One Thousand (1000) equity Units in the Company, including fractional Units, which are allowed.

Upon the execution of this Agreement, the following represents the Equity Unit ownership of the Members of the Company:

| Name | Equity Units |
|---|---|
| John E. Meyer, Jr. | 275 |
| Jeffrey T. Hodgson | 255 |
| Ruchir A. Kadakia | 255 |
| Legasea Group, LLC (c/o Robert Finnegan) | 170 |
| John Meyer Family, LLC, | 45 |

When this Agreement refers to a Unit (without a further description or modification), the reference, unless otherwise stated, shall be to an Equity Unit.

**Section 4.02. Capital Contributions.** Each Member shall contribute his cash or property, as set forth on Exhibit "A" from time to time.

**Section 4.03. Capital Accounts.**

**A.** The Company shall maintain for each Member a separate Capital Account. The Term "Capital Account" shall mean as to any Member and as to any Units held by that Member the amount of the initial Capital Contribution attributable to the Units held by that Member, which amount shall be (i) increased by subsequent Capital Contributions by such

Member, and Capital Gain and Income allocated to such Member pursuant to Section 5.02 and (ii) decreased by distributions to such Member pursuant to Section 5.01, Losses allocated to such Member pursuant to Section 5.02, and reductions or deductions allocated to such Member pursuant to Section 6.07 or any other provisions by which a Member's capital interest (as defined in the Act) may be reduced. Distributions shall be debited to Capital Accounts in the year containing the record date for such distribution.

**B.** In the event any in-kind contributions are ever made subsequent to the initial contributions, the Capital Account of the Member shall be increased by the fair market value of the property or services contributed by such Member as reasonably determined by the Managers.

**C.** The foregoing definition of Capital Accounts, and the implementation of all provisions in this Agreement relating thereto and to Tax Items, shall be determined by the Managers in accordance with the Code and all regulations promulgated thereunder.

**Section 4.04. Interest.** Unless otherwise specifically authorized by this Agreement, no interest shall be paid by the Company on Capital Contributions, on balances in a Member's Capital Account, or on any other funds distributed or distributable under this Agreement.

**Section 4.05. No Withdrawal.** Except as otherwise required under any Mandatory Provisions of the Act or the provisions of this Agreement, no Member shall, without the written consent of all remaining Members of the Company, have (i) any right to resign voluntarily or otherwise to withdraw from the Company, or (ii) any right to the withdrawal or reduction of any part of his Capital Contribution.

**Section 4.06. Loans.** Loans by a Member to the Company shall not be considered Capital Contributions. The Company shall not, without a Majority Vote of the Voting Members, make any loans to any Member or any Affiliate of any Member.

**Section 4.07. Additional Capital Contributions.** In the event that the Managers determine that additional Capital Contributions by the Members are required to pay current operating expenses, current indebtedness, or any other item (including capital items reasonably necessary to the operation of the Company), each Member (hereafter a "Contributing Member") shall contribute in cash to the capital of the Company an amount equal to his *pro rata* share of the aggregate additional Capital Contribution called for (according to the number of Units held by each, with all Outstanding Units being treated alike), in the time and manner determined by the Managers. In the event a Member shall fail to make the required additional Capital Contribution, the other Members shall have the right, but not the obligation, to make the contribution which would otherwise have been made by the non-contributing Member. The amount of any such additional contribution shall be added to the Capital Account of the Contributing Member and any such additional contribution shall, if requested by the Contributing Member, be repaid, together with interest thereon at the rate of 6% *per annum*, to the Contributing Member prior to any other distribution to a Member.

Section 4.08. **Voting Units and Voting Members.** Anything in this Agreement to the contrary notwithstanding, there shall be an aggregate of one hundred (100) Voting Units in the

company, including fractional Voting Units, which are allowed. As of the date hereof, those 100 Voting Units are held as follows:

| Name | Voting Units | Voting Percentage |
|---|---|---|
| John E. Meyer, Jr. | 25 | 25% |
| Jeffrey T. Hodgson | 25 | 25% |
| Ruchir A. Kadakia | 25 | 25% |
| Legasea (Voting by Robert Finnegan as its representative) | 25 | 25% |

Such Voting Units are non-transferrable. If one or more of such Voting Members dies, ceases to exist (in the case of Legasea), or is no longer a Voting Member of the Company, his or its Voting Units shall be distributed immediately upon any such event to the remaining Voting Members proportionately in accordance with their respective voting percentages at the date of determination. Any amendment or change to this Section regarding votes, voting, and the Voting Members proportionately shall require a unanimous vote of the Voting Members as of the date of determination.

## ARTICLE V
## Allocations and Distributions

**Section 5.01. Distribution of Cash Available for Distribution.** Distribution of all Cash Available for Distribution shall be made as determined by the Managers. Any distribution of property shall be treated as a distribution of cash in the amount of the fair market value of such property as determined by the Managers. Distributions shall be made to the Members by the Company pro rata, according to their respective Capital Accounts as of the date of distribution.

**Section 5.02. Allocation of Income and Loss.**

**A.** All Tax Items shall be allocated to all Members and Assignees in accordance with their respective Capital Accounts, as determined from time to time by the Managers.

**B.** All items of Income and Loss shall be accounted for in accordance with the applicable provisions of the Code, as determined from time to time by the Managers.

## ARTICLE VI

## Management and Operation of Business

**Section 6.01. Management by Managers.** The management of the Company is hereby vested in one or more Managers, who may but need not be Members and who shall be appointed by a Super Majority Vote of the Members. The Members hereby appoint **John E. Meyer, Jr.** as the initial Manager and he may be removed, with or without cause, only by the unanimous vote of all Members until John E. Meyer, Jr. and John Meyer Family, LLC (or any other entity in which Meyer is an owner or with which he is affiliated) have, in the reasonable business

judgment of John E. Meyer, Jr., been paid in full by each of the other Members of the Company, and that all obligations have been fulfilled, regarding any debt or expenses due to John E. Meyer, Jr., including without limitation (a) that certain Promissory Note in the original principal amount of $1.8 Million and all security documents executed in connection therewith, (b) that certain Fee Agreement dated on or about the date hereof and executed by the Members, (c) that certain Memorandum of Understanding dated on or about the date hereof and executed by the Members and the Company, (d) any other debt or obligations owed to John E. Meyer, Jr. by any other Member hereof, and (e) this Agreement, from and after which the initial Manager may be removed upon the Superior Majority Vote of the Voting Members. All of the business and affairs of the Company shall be conducted by the Managers. Any third person may rely absolutely upon the act, deed, and/or signature of the Managers as being the act of the Company and no third person shall be obliged or privileged to inquire into or to otherwise ascertain whether the act of the Managers has been duly authorized under the terms of this Agreement.

**Section 6.02.** **Limitations on Authority of Members.** Notwithstanding any other provision hereof, the Manager may, in his sole discretion and authority and with no other approval necessary, do any or all of the following acts, but no other Member shall have the authority to do any or all of the following acts without the unanimous vote of all Members:

**A.** Borrow money in excess of $25,000.00;

**B.** Sell any Company Property, other than in the ordinary course of business, having a fair market value in the amount of $25,000.00 or more;

**C.** Enter into any contract, which is not terminable at will, involving an anticipated total expenditure in the amount of $25,000.00 or more; or

**D.** Compromise any claim in the amount of $25,000.00 or more.

Moreover, no Member may do any act which would make it impossible to carry on the ordinary business of the Company, or knowingly perform any act that would subject a Member to personal liability.

**Section 6.03.** **Company Funds.** The funds of the Company shall be deposited in an account or accounts designated by the Managers and shall not be commingled with any other funds. All withdrawals from or charges against these accounts shall be made by the Managers or authorized officers or agents of the Managers or the Company.

**Section 6.04.** **Outside Activities.** Each Member and such Member's Affiliate may have business interests and engage in business activities in addition to those relating to the Company, including, without limitation, business interests and activities in direct competition with the Company for such Member's or such Member's Affiliate's own account or for the account of others, and no provision of this Agreement shall be deemed to prohibit such Member or such Member's Affiliate from conducting such businesses and activities. Neither the Company nor the other Members shall have any rights by virtue of this Agreement or the relationship contemplated herein in any business venture of such Member or such Member's Affiliate.

**Section 6.05.** **Services by Affiliate.** The Company may retain an Affiliate of any

Member to provide services to the Company, but such Affiliate shall be paid no amount greater than that which would have been paid to a third party not affiliated with a Member.

**Section 6.06. Organization and Other Expenses.** The Company shall reimburse any Member, Manager, or Tax Matters Partner for any reasonable expenses or costs incurred by him in the organization or operation of the Company.

**Section 6.07. Operating Expenses of Company.** The operating expenses of the Company shall be paid from the Company's operating revenue unless such revenue is insufficient, in which event additional Capital Contributions may be required pursuant to Section 4.07, *provided* that in lieu of such additional Capital Contributions, the Managers may require, upon ten days' notice, each Member to pay his proportionate share (based upon the Capital Accounts at the time) of any such expense. If any Member fails to pay any of its share of the costs and expenses set forth in this Section 6.07, then that Member's Capital Account shall be reduced by an amount equal to the amount of such costs and expenses not paid by such Member. In such event, such Member's "Membership Interest", as defined in the Act, shall be reduced proportionately so that such Member's share of the profits of the Company, and the right to receive distributions of the Company's funds and other assets, shall be reduced proportionately.

## ARTICLE VII
## Rights and Obligations of the Members

**Section 7.01. Limits of Liability.** Anything herein to the contrary notwithstanding, except as otherwise expressly agreed in writing, a Member (including a Manager who is also a Member) shall not be personally liable for any debts, liabilities, or obligations of the Company, whether to the Company, to any of the other Members, or to creditors of the Company, beyond the Capital Account of the Member, together with the Member's share of the assets and undistributed profits of the Company. For the avoidance of doubt, and without limiting the generality of the foregoing, no Member or Manager shall have any personal liability for breach of any duty provided for in Section 2016 or any other Section of the Act, except that no Member or Manager shall be absolved from, and may be subject to liability for, the acts and omissions referred to in Section 2017.B. of the Act.

**Section 7.02. Rights of Member Relating to the Company.**

**A.** Subject to the restrictions of Section 7.03, this Agreement may be amended only by the unanimous vote of all Members.

**B.** In addition to other rights provided by this Agreement or by applicable law, a Member shall have the right upon demand and at such Member's own expense:

1. To obtain any and all information regarding the status of the business and financial condition of the Company;

2. To obtain a copy of the Company's federal, state, and local income tax returns for each year, promptly after becoming available;

3. To have furnished to him a current list of the name and last known business, residence or mailing address of each Member;

4. To obtain information regarding the Capital Contribution made by each Member;

5. To have furnished to him a copy of this Agreement and the Articles of Organization and all amendments hereto and thereto, together with copies of any powers of attorney pursuant to which this Agreement, the Articles of Organization, and all amendments hereto and thereto have been executed; and

6. To inspect and copy any of the Company's books and records and obtain such other information regarding the affairs of the Company.

**Section 7.03. Restrictions on Powers.** Except as otherwise provided herein or by the Mandatory Provisions of the Act, and without prior authorization as determined by a Majority Vote of the Members, a Member shall not have the authority or power to act on behalf of or to bind the Company or any other Member, and a Member shall not have the right or power to take any action which would change the Company to a general partnership, change the limited liability of a Member, or affect the status of the Company for federal income-tax purposes.

**Section 7.04. Indemnification.**

**A. Company Indemnification.** To the maximum extent permitted by law, the Company shall indemnify and hold harmless all Managers, Members (including those who are Managers), their respective Affiliates, and the employees and agents thereof and of the Company (each an "Indemnitee") from and against any and all losses, claims, demands, costs, damages, liabilities (joint and several), expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements, penalties and other expenses actually and reasonably incurred by the Indemnitee in connection with any and all claims, demands, actions, suits, or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise, by reason of the fact that the Indemnitee is or was a Member or Manager of the Company or is or was an employee or agent of the Company, including Affiliates of the foregoing, arising out of or incidental to the business of the Company, *provided* (i) the Indemnitee's conduct did not constitute willful misconduct or recklessness, (ii) the action is not based on a breach of this Agreement, (iii) the Indemnitee acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company and within the scope of such Indemnitee's authority, and (iv) with respect to a criminal action or proceeding, the Indemnitee had no reasonable cause to believe that his conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere*, or its equivalent, shall not, in and of itself, create a presumption or otherwise constitute evidence that the Indemnitee acted in a manner contrary to that specified above.

**B. Advancement of Expenses.** Expenses incurred by an Indemnitee in

defending any claim, demand, action, suit or proceeding subject to this Section 7.04 may, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified as authorized in this Section 7.04.

**C.** **Non-Exclusivity.** The indemnification provided by this Section 7.04 shall be in addition to any other rights to which the Indemnitee may be entitled under any agreement, the vote of a Majority of the Members, as a matter of law or equity, or otherwise, and shall inure to the benefit of the successors, assignees, heirs, personal representatives and administrators of the Indemnitee.

**D.** **Insurance.** The Company may purchase and maintain insurance, at the Company's expense, on behalf of any Indemnitee against any liability that may be asserted against or expense that may be incurred by an Indemnitee in connection with the activities of the Company regardless of whether the Company would have the power to indemnify such Indemnitee against such liability under the provisions of this Agreement.

## ARTICLE VIII
## Books, Records, Accounting, and Reports

**Section 8.01. Books and Records.** Appropriate books and records with respect to the Company's business, including, without limitation, all books and records necessary to provide to the Members any information, lists and copies of documents required to be provided pursuant to Section 7.02, shall at all times be kept at the principal office of the Company or at such other places chosen by the Managers. Without limiting the foregoing, the following shall be maintained at the Company's principal office: (i) a current list of the full name and last known business address of each Member, (ii) copies of records that would enable a Member to determine the relative voting rights of the Members, (iii) a copy of the Articles of Organization, and any amendments thereto, (iv) copies of the Company's federal, state and local income-tax returns and reports, if any, for the three most recent years, and (v) copies of any financial statements of the Company for the three most recent fiscal years. Any records maintained by the Company in the regular course of its business may be kept on, or be in the form of, magnetic disk or tape, photographs or any other information-storage device, provided that the records so kept are convertible into clearly legible written form within a reasonable period of time.

**Section 8.02. Accounting.** The books of the Company for regulatory and financial-reporting purposes shall be maintained on the cash basis of accounting, unless required otherwise. The Company books for purposes of maintaining and determining Capital Accounts shall be maintained in accordance with the provisions of this Agreement, applicable provisions of the Code and, to the extent not inconsistent therewith, the principles described above for financial reporting and regulatory purposes.

## ARTICLE IX
## Tax Matters

**Section 9.01. Taxable Year.** The taxable year of the Company shall be the calendar

year, unless otherwise determined by Majority Vote of the Members.

**Section 9.02. Tax Controversies.** Subject to the provisions hereof, **John E. Meyer, Jr.** is designated the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Company, at the Company's expense, in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings. Each Member agrees to cooperate with the Tax Matters Partner and its agents and employees, and to do or refrain from doing any or all things reasonably required by the Tax Matters Partner to conduct such proceedings.

**Section 9.03. Taxation as a Partnership.** No election shall be made by the Company or any Member for the Company to be excluded from the application of any provision of Subchapter K, Chapter 1 of Subtitle A of the Code (as amended from time to time) or from any similar provisions of any state tax laws.

## ARTICLE X
## Transfer of Units

**Section 10.01. Transfer.**

**A.** The term "transfer", when used in this Article X with respect to a Unit, shall be deemed to refer to a transaction by which the Member assigns all or a portion of his Units, or any interest therein, to another Person, or by which the holder of a Unit assigns the Unit to another Person as Assignee, and includes a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, transfer by will or intestate succession, exchange, or any other disposition.

**B.** No Units shall be transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Article X. Any transfer or purported transfer of any Units not made in accordance with this Article X shall be null and void. If for any reason any such transfer is not null and void, then the Assignee shall not be a Substitute Member, and shall have no right to participate in the Company's affairs as a Member thereof, but instead shall be entitled to receive only the share of profits or other compensation by way of income and the return of contributions to which the transferring Member would otherwise be entitled at the time such transferring Member would be entitled to receive the same.

**C.** If any Member transfers (as defined herein) any of its Units or interests therein for the purpose of securing any debt or other obligation, and if such transaction is approved in accordance with the provisions of this Article X, the Person to whom the Units or interests were transferred, as the Assignee, shall not be a Substitute Member, and shall have no right to participate in the Company's affairs or use the assets of the Company as a Member thereof, but instead shall be entitled to receive only the share of profits or other compensation by way of income to which the transferring Member would otherwise be entitled to receive the same, even if such Assignee has foreclosed its security interest in the Units or other interests. Moreover, such Assignee shall be obligated for the proportionate share of contributions and expenses of the transferring Member from and after the date of transfer.

**Section 10.02. Transfer of Units by a Member.**

A. Except as stated below in Section 10.03 (with respect to the death of a natural Person), no Units may be transferred by a Member unless the following conditions are first satisfied:

1. The consent of each Member has been obtained, which may be granted or withheld in each Member's sole discretion, such consent to be evidenced by a written instrument, dated and signed by the Member;

2. The transferee and each Member execute and file all documents necessary for the transferee to be a Substitute Member and to be bound by the terms hereof and such transferee is admitted as a Substitute Member; and

3. The Company receives an Opinion of Counsel that such transfer would not materially adversely affect the classification of the Company as a partnership for federal and state income-tax purposes.

B. The transfer restrictions on Company Units shall be conspicuously noted in an appropriate legend on any Unit certificates issued.

C. In no event shall any Unit be transferred to a minor or any incompetent person except by will or intestate succession.

D. The Company need not recognize, for any purpose, the transfer of all or any fraction of a Unit unless there shall have been filed with the Company and recorded on the Company's books a duly executed and acknowledged counterpart of the instrument of assignment and such instrument evidences the written acceptance by the Assignee of all of the terms and provisions of this Agreement and represents that such assignment was made in accordance with all applicable laws and regulations.

E. Any holder of a Unit (including a transferee thereof) shall be deemed conclusively to have agreed to comply with and be bound by all terms and conditions of this Agreement, with the same effect as if such holder had executed an express acknowledgment thereof, whether or not such holder in fact has executed such an express acknowledgment.

**Section 10.03. Transfer upon Death of Natural-Person Member.**

A. Upon the death of any natural-person Member, the surviving Members shall have the option of (a) permitting such deceased Member's estate or personal representative or any person to whom he has bequeathed his interest (collectively the "Estate") to continue as a Member in the Company (without voting rights, as more particularly discussed herein), or (b) redeeming all of such deceased Member's interest in the Company. Whether the Company permits the Estate to continue as a Member of the Company, or whether the Company redeems all of the deceased Member's interest in the Company, shall be determined by a Majority Vote of

the surviving Members, and the Company shall notify the Estate of the Company's election within sixty (60) days after the date of such Member's death. If the Company exercises its option to redeem all of the deceased Member's interest in the Company, the redemption price therefor (which shall be the fair market value of the deceased Member's interest in the Company) shall be determined as follows:

(i) The Estate and the Company shall attempt to arrive by mutual agreement at the fair market value of the deceased Member's interest in the Company as of the date on which the Company notified the Estate of the Company's exercise of its option to redeem such interest (the "Effective Date"). If the fair market value of the deceased Member's interest is not determined by mutual agreement within sixty (60) days after the Effective Date, the fair market value of such interest as of the Effective Date shall be determined by appraisal as follows;

(a) Within ninety (90) days after the Effective Date, the Estate shall appoint an appraiser and the Company shall appoint an appraiser. Those two appointed appraisers shall, within fifteen (15) days after the appointment of the last of them, select a third. Each appraiser must be a certified public accountant licensed in the State of Oklahoma. If either the Estate or the Company fails or refuses to appoint an appraiser within ninety (90) days after the Effective Date, or if the two appointed appraisers are unable to agree upon a third appraiser within fifteen (15) days after the appointment of the last of those two, the selection of an appraiser for the party who has failed to appoint an appraiser, or the selection of a third appraiser, as the case may be, shall be made by the Presiding Judge of the District Court of Tulsa County, Oklahoma (or another District Judge of such District Court if such Presiding Judge cannot or will not make such selection), all pursuant to an application, petition, or other applicable pleading presented by one or both parties. In any event, after the selection of the third appraiser (however such selection occurs), all decisions of such appraisers shall be made by a majority vote;

(b) The appraisers shall determine such fair market value within a period not to exceed sixty (60) days after the selection of the third appraiser. The decision of a majority of the appraisers shall be final and unappealable; and

(c) Each party shall pay the fee of its appraiser, and the fee of the third appraiser shall be divided equally between the Estate and the Company. If any court action is required to determine the third appraiser or the redemption price, or to settle any other dispute arising under this Article X, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees from the non-prevailing party.

(ii) Within thirty (30) days after the fair market value of the deceased Member's interest in the Company has been determined, and subject to the receipt of insurance proceeds in accordance with Section 10.03.B below, that interest shall be redeemed by the Company as follows:

(a) Fifty percent (50%) of such value, plus an amount equal to interest on the entire fair market value (accrued from the Effective Date to the date of

such first payment) at the prime rate of interest of Bank of Oklahoma, N.A., in Tulsa, Oklahoma, or its successor in effect on the Effective Date (the "Prime Rate"), shall be paid to the Estate in cash; and

(b) The fifty percent (50%) balance of such determined value shall be paid in the form of an unsecured promissory note (the "Note") dated as of the date of the cash payment, payable by the Company to the Estate. The principal amount of the Note shall be payable on the anniversary date of the Note, together with accrued and unpaid interest on the principal balance at the Prime Rate. The Note shall provide that the Company has the right to pre-pay the Note at any time and from time to time, in whole or in part, without premium or penalty, and that interest shall be charged only on the principal balance outstanding from time to time. The Note shall contain other provisions which are customary for an interest-bearing, unsecured promissory note such as the Note.

**B.** For the purpose of funding the redemption price or a portion thereof, and as determined from to time by a Majority Vote of the Members, the Company may purchase key-man life insurance by which the life of any natural-person Member is insured (to the extent that such person is insurable) in the amount and upon the terms and conditions established by such Majority Vote of the Members. The Company shall pay the premiums for any such policy, shall be the owner thereof, and shall be the beneficiary. Upon the death of the insured, and if the surviving Members have elected to redeem the deceased Member's interest pursuant to Section 10.03.A, the Company shall use such insurance proceeds to pay the redemption price established by the provisions of Section 10.03.A as follows:

(i) If the amount of such insurance proceeds is equal to or greater than the redemption price established in accordance with Section 10.03.A, then, notwithstanding anything to the contrary contained in such Section 10.03.A, the redemption price shall be paid in full to the Estate within five (5) days after the receipt by the Company of such insurance proceeds in good or immediately-available funds. Any amount of insurance proceeds in excess of such redemption price shall be retained by the Company for the purpose of compensating itself for the loss of the services of such deceased Member, it being acknowledged by the Members that the death of any natural-person Member would or could constitute a financial burden on the Company; and

(ii) If the amount of such insurance proceeds is less than the redemption price as established in accordance with Section 10.03.A, then the Company shall, within five (5) days after its receipt of such insurance proceeds (in good or immediately-available funds), pay all of such proceeds to the Estate, and the remainder of the redemption price shall be paid to the Estate in the form of a Note in the manner set forth in Section 10.03.A.

C. Anything in this Agreement to the contrary notwithstanding, no deceased Member's estate, personal or legal representative, nor any other person or entity has any voting rights as a result of the acquisition of any Units or other interests as a result of such death, it being acknowledged that such acquisition shall allow the transferee to share in profits or other compensation by way of income to which the deceased Member would

otherwise be entitled to receive the same, but such transferee shall be entitled to no vote as a Member nor may he, she or it participate in the Company's affairs nor use the assets of the Company as a Member.

**D.** Anything in this Agreement to the contrary notwithstanding, the Members agree that the Equity Units (45) held as of the date hereof by John Meyer Family, LLC are subject to that certain Memorandum of Understanding dated effective as of the date of this Agreement and signed by all Equity Members, the result of which is that such 45 Equity Units are not governed by Article X or IX regarding transfers, the right-of-first refusal or the Substitute Members until and unless any of such Units is or are acquired by another Member in accordance with such Memorandum of Understanding, after which such acquired Units are subject to all provisions of this Agreement.

**Section 10.04. Restrictions on Transfer.** Notwithstanding the other provisions of this Article X, no transfer of any Unit of any Member in the Company shall be made if the transfer (i) would violate applicable federal or state securities laws or rules and regulations of the Securities and Exchange Commission or state securities commissions or any other governmental authority with jurisdiction over the transfer, (ii) would materially adversely affect the classification of the Company as a partnership for federal or state income-tax purposes or (iii) would affect the Company's qualification as a limited liability company under the Act.

**Section 10.05. Issuance of Certificates.** The Company may issue one or more Certificates in the name of the Member evidencing the number of Units issued to that Member. Upon the transfer of a Unit in accordance with Article X, the Company shall, if certificates have been issued, issue replacement Certificates. All Certificates shall contain legends required by this Agreement or otherwise required by law.

**Section 10.06. Lost, Stolen or Destroyed Certificates.** The Company shall issue a new Certificate in place of any Certificate previously issued if the Record Holder of the Certificate: (i) makes proof by affidavit that a previously issued Certificate has been lost, stolen, or destroyed; (ii) requests the issuance of a new Certificate before the Company has notice that the Units evidenced by such Certificate have been acquired by a purchaser for value in good faith and without notice of an adverse claim; and (iii) if required by the Company, delivers to the Company a bond with surety or sureties acceptable to the Company, to indemnify the Company against any claim that may be made on account of the alleged loss, destruction or theft of the Certificate. The Company shall be entitled to treat each Record Holder as the Member or Assignee in fact of any Units and, accordingly, shall not be required to recognize any equitable or other claim or interest in or with respect to the Units on the part of any other Person, regardless of whether it has actual or other notice thereof.

**Section 10.07. First Right of Refusal.**

**A. Notice of Offer and Right of First Refusal.** If any Member receives a *bona fide* offer from a third party to buy any or all of that Member's Units, or if a Member wishes to sell any or all of its Units to a third party and such third party has agreed in writing to

buy the same in accordance with an offer from that Member (in either case the "Affected Units" and a "Third-Party Offer", respectively), then that Member (the "Offering Member") shall immediately notify the other Members (each an "Offeree Member") in writing of such Third-Party Offer, stating therein the name of the third party and all terms and conditions of the Third-Party Offer. Each Offeree Member shall then have ten (10) days from the receipt of such notice to advise the Offering Member in writing whether that Offeree Member will exercise his right of first refusal granted herein and meet the terms and conditions of the Third-Party Offer.

B. **Failure to Exercise Right.** If an Offeree Member does not, within such ten-day period, notify the Offering Member in writing of the Offeree Member's election to meet the Third-Party Offer, the Offeree Member shall be deemed to have elected to not meet the terms thereof. If no Offeree Member elects to exercise his right in accordance herewith, the Offering Member shall be free to proceed to sell the Affected Units pursuant to the terms of the Third-Party Offer. If any of the Affected Units subject to the Third-Party Offer are not transferred under the terms of such Third-Party Offer, the Offeree Members shall have a continuing right of first refusal as to any subsequent offer or offers to sell or purchase those Affected Units.

C. **Exercise of Right.** If an Offeree Member notifies the Offering Member within such ten-day period that such Offeree Member exercises his rights hereunder and wishes to meet such Third-Party Offer and purchase the Affected Units on the same terms and conditions contained therein, the Offering Member shall prepare all necessary agreements and other instruments to effect the sale of such Affected Units to such Offeree Member, the latter of whom shall proceed forthwith to close the purchase within the time and on the terms and conditions contained in the Third-Party Offer. If more than one Offeree Member so exercises his right of first refusal, then each shall purchase a portion of the Affected Units proportionately according to his ownership interest in the Company relative to the interests of all Offeree Members so purchasing.

## ARTICLE XI
## Admission of Substitute and Additional Members

**Section 11.01. Admission of Substitute Members.**

A. Upon a transfer of a Unit by a Member in accordance with Article X (but not otherwise), the transferor shall have the power to give, and by transfer of any Certificate issued shall be deemed to have given, the transferee the right to apply to become a Substitute Member with respect to the Unit acquired, subject to the conditions of and in the manner permitted under this Agreement. An Assignee with respect to the transferred Unit (whether or not such transferee is a Member or Substitute Member with respect to other previously acquired Units) shall not become a Substitute Member with respect to those assigned Units unless and until all of the following conditions are satisfied:

1. The instrument of assignment sets forth the intentions of the Assignor that the Assignee succeed to the Assignor's interest as a Substitute Member in his place;

2. The Assignor and Assignee shall have fulfilled all other requirements of this Agreement;

3. The Assignee shall have paid all reasonable legal fees and filing costs incurred by the Company in connection with his substitution as a Member, and

4. The Members shall have unanimously approved such substitution in writing, which approval may be granted or withheld by each Member in his sole and absolute discretion and may be arbitrarily withheld, and the books and records of the Company have been modified to reflect the admission.

The admission of an Assignee as a Substitute Member with respect to a transferred Unit shall become effective on the date the Members give their unanimous written consent to the admission and the books and records of the Company have been modified to reflect such admission. Any Member who transfers all of his Units with respect to which he had been admitted as a Member shall cease to be a Member of the Company upon a transfer of such Units in accordance with Article X and the execution of a counterpart of this Agreement by the transferee, and he shall have no further rights as a Member in or with respect to the Company (whether or not the Assignee of such former Member is admitted to the Company as a Substitute Member).

**Section 11.02.** **Admission of Additional Members.** Additional Units may be authorized and issued by the Company upon such terms and conditions as may be approved by the unanimous vote of all Members and the written consent of the Manager.

## ARTICLE XII
## Dissolution and Liquidation

**Section 12.01.** **Disqualification of Member.** Except as allowed by the provisions of this Article XII, upon the death or termination of employment with the Company (in the case of a natural-person Member), expulsion, bankruptcy or dissolution of a Member (such Member being hereinafter sometimes referred to as "Disqualified Member"), or the occurrence of any other event which terminates the continued membership of a Member in the Company (any of such events being referred to herein as an "Event of Dissolution"), the Company shall dissolve and its affairs shall be wound up (and the Company shall thereafter conduct only activities necessary to wind up its affairs) unless there is at least one (1) remaining Member and, within ninety (90) days after the occurrence of an Event of Dissolution, all the remaining Members unanimously agree to continue the Company. If an election to continue the Company is made, then:

**A.** The remaining Members may elect, within thirty (30) days of the decision to continue the Company, to purchase the Disqualified Member's Units upon such terms and conditions as the remaining Members and the Disqualified Member or the legal representative of the Disqualified Member may agree. In the event the remaining Members and the Disqualified Member (or such legal representative) do not agree upon the terms and conditions for a purchase of the Units of the Disqualified Member, the remaining Members shall have an option (to be

exercised within ninety (90) days after the occurrence of the Event of Dissolution, by giving notice to the Disqualified Member, or such legal representative) to purchase the Units for a cash purchase price equal to the book value of the Units (determined by the Company's CPA in accordance with the Company's books and records using GAAP consistently applied) as of the date of disqualification.

**B.** The Company shall continue until the expiration of the term for which it was formed or until the occurrence of another Event of Dissolution, in which event any remaining Members shall again elect whether to continue the Company pursuant to this Section 12.01.

**Section 12.02. Dissolution and Liquidation.** The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following: (i) the term of the Company stated in the Articles of Organization expires; (ii) there are no Members; (iii) if, upon the occurrence of an Event of Dissolution, the remaining Members fail to continue the Company pursuant to Section 12.01; or (iv) all Members vote to dissolve the Company.

**Section 12.03. Method of Winding Up.** Upon dissolution of the Company pursuant to Section 12.02, the Company shall immediately commence to liquidate and wind up its affairs. The Members shall continue to share profits and losses during the period of liquidation and winding up in the same proportion as before commencement of winding up and dissolution. The proceeds from the liquidation and winding up shall be applied in the following order of priority:

**A.** To creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Company other than liabilities to Members on account of their Capital Contributions or on account of a Member's withdrawal from the Company or pursuant to a withdrawal of capital; and

**B.** The balance, to the Members in accordance with their Capital Accounts. All distributions may be made in cash or other property as determined by a Majority Vote of the Members.

**Section 12.04. Filing Articles of Dissolution.** Upon the completion of the distribution of Company Property as provided in Section 12.03, Articles of Dissolution shall be filed as required by the Act, and each Member agrees to take whatever action may be advisable or proper to carry out the provisions of this Section.

**Section 12.05. Return of the Capital.** The return of the Capital Contributions shall be made solely from Company Property.

## ARTICLE XIII
## Amendment of Agreement; Meetings; Record Date

**Section 13.01. Amendments.** All Amendments to this Agreement shall require the unanimous vote of all Members.

**Section 13.02. Limitations on Amendments.** Notwithstanding any other provision of this Agreement, no amendment to this Agreement without unanimous approval of the Members

may (i) enlarge the obligations of any Member under this Agreement, or (ii) amend Sections 7.03, 13.01 or 13.02.

**Section 13.03.** **Meetings.** Meetings may be called by any Member, by giving at least ten (10) days' prior notice of the time, place and purpose of the meeting to all Members.

**Section 13.04.** **Adjournment.** When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting, if the time and place thereof are announced at the meeting at which the adjournment is taken, unless such adjournment shall be for more than forty-five days. At the adjourned meeting, the Company may transact any business which might have been transacted at the original meeting. If the adjournment is for more than forty-five (45) days, a notice of the adjourned meeting shall be given in accordance with this Section 13.04.

**Section 13.05.** **Waiver of Notice; Consent to Meeting; Approval of Minutes.** The transactions of any meeting of the Company, however called and noticed, and whenever held, are as valid as though had at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, but not present in person or by proxy, approves by signing a written waiver of notice or an approval to the holding of the meeting or an approval of the minutes thereof. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at the meeting shall constitute a waiver of notice of the meeting, except when such Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included, if the objection is expressly made at the meeting.

**Section 13.06.** **Quorum.** The holders of at least sixty-six percent (66%) of the Units entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to participate at such meeting until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by the requisite percentage of Units of Members specified in this Agreement. In the absence of a quorum, any meeting of Members may be adjourned from time to time by a Majority Vote of the Members represented either in person or by proxy entitled to vote, but no other matters may be proposed, approved or disapproved, except as provided in Section 13.04.

**Section 13.07.** **Action Without a Meeting.** Any action that must be taken by any vote of the Members may be taken without a meeting if a consent to such action is signed by Members holding Units representing not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted. Prompt notice of the taking of any action without a meeting shall be given to those Members who have not consented in writing. **THE FOREGOING NOTWITHSTANDING, NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS REQUIRING ANY MEETINGS OF THE MEMBERS WITH RESPECT TO ANY ACTION (UNLESS REQUIRED BY THE ACT), NOR AS LIMITING THE RIGHTS OF THE MANAGER OR MANAGERS IN ACCORDANCE WITH THIS AGREEMENT AND WITH THE ACT.**

## ARTICLE XIV
## General Provisions

**Section 14.01. Notices.** Any notice, demand, request or report required or permitted to be given or made to a Member under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class mail to the Member at his last known address. Any notice, payment, or report to be given or sent to a Member hereunder shall be deemed conclusively to have been given or sent, upon mailing of such notice, payment, or report to the address shown on the records of the Company, regardless of a claim of any Person who may have an interest in the Unit by reason of an assignment or otherwise.

**Section 14.02. Captions.** All articles and section captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

**Section 14.03. Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and *vice versa*.

**Section 14.04. Further Action.** The parties to this Agreement shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**Section 14.05. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assignees.

**Section 14.06. Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**Section 14.07. Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**Section 14.08. Counterparts.** This Agreement may be executed in counterparts, all of which together shall constitute an agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing his signature hereto, independently of the signature of any other party.

**Section 14.09. Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Oklahoma, without regard to its principles of conflict of laws.

Section 14.10. Invalidity of Provisions. If any provision of this Agreement is or becomes invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein shall not be affected thereby.

Section 14.11. Conveyances. All of the assets of the Company shall be held in the name of the Company, unless the Members shall determine that any Member may hold title to any property as nominee for the Company. Any deed, bill of sale, mortgage, lease, contract of sale or other instrument purporting to convey or encumber the interest of the Company in all or any portion of the assets of the Company shall be sufficient if signed on behalf of the Company by the Manager or Managers or by Members owning a majority of the Units. No person shall be required to inquire into the authority of any individual to sign any instrument which is executed pursuant to the provisions of this Section 14.11.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the 30th day of July, 2013.

INITIAL MEMBERS:

________________________
John E. Meyer, Jr.

________________________
Jeffrey T. Hodgson

________________________
Ruchir A. Kadakia

Legasea Capital LLC, an Illinois Limited Liability Company

By: ________________________
Robert Finnegan

John Meyer Family, LLC, a Oklahoma Limited Liability Company

By: ________________________
John E. Meyer, Sr., Manager