**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **R.P. SMALL CORP.,**<br>**Plaintiff,**<br>**v.**<br><br>**RUCHIR A. KADAKIA,**<br>**Defendant**<br><br>**and**<br><br>**RUCHIR A. KADAKIA, individually and on behalf of Tethys Trading,**<br>**Counterclaimant and Third-Party Plaintiff,**<br><br>**v.**<br><br>**R.P. SMALL CORP.,**<br>**Counterclaim Defendant,**<br><br>**and**<br><br>**JOHN E. MEYER, JR.; et al.,**<br>**Third-Party Defendants.** | ) | **CASE NO. 19-CV-271-CVE-JFJ**<br>redacted version |

**PLAINTIFF'S RESPONSE TO**
**RUCHIR KADAKIA'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff R.P. Small Corp. ("RPS") for its response objecting to Ruchir A. Kadakia's Motion and Supporting Brief for Summary Judgment, filed under seal, Dkt. 90, states as follows:

## INTRODUCTION

By now, this Court is well familiar with the facts of the case. The simple issue is whether Ruchir A. Kadakia's ("Kadakia") obligation under his Guaranty (Exhibit 6) is triggered when the Borrower, Tethys Trading, LLC, did not pay back what is owed under the Promissory Note (Exhibit 3). As of March 2016, the original balance on the Promissory Note has not been paid in full, but Tethys Trading, LLC did make partial payments as shown on Exhibit 1. Kadakia's

insistence that no "Event of Default" occurred on the 2014 Promissory Note is simply wrong. Kadakia also insists that there is no "Event of Default" because of the 2019 Workout Agreement. Kadakia ignores the language of the Guaranty that waives his ability to claim that any agreements between the Lender and the Borrower would affect his obligations in any way. *See* Guaranty, Exhibit 6, ¶ 3. Further, Oklahoma case law makes clear that the obligations under a guaranty are vastly different from the obligations under a Promissory Note. *See Lum v. Lee Way Motor Freight*, 1987 OK 112, ¶ 13, 757 P.2d 810, 814. The Workout Agreement (Exhibit 10) affects the obligations under the Promissory Note and does not implicate Kadakia's obligations under the Guaranty.

Next, Kadakia insists that litigation is barred by the statute of limitations. However, Oklahoma case law states: "Partial payments made by him to this creditor will stop the running of the statute of limitations and mark the time from which the statute then begins to run." *Keota Mills & Elevator v. Gamble*, 2010 OK 12, ¶ 15, 243 P.3d 1156. Default began the moment Tethys Trading, LLC failed to make its first payment in full and continues to this day, but the statute of limitations, according to Oklahoma law, did not start until the last partial payment was received in 2016, at which time the causes of action against Tethys Trading and the guarantors began to accrue. The five year statute of limitations period will end next year, in 2021, unless another payment is made before then. Furthermore, under the holding in *Apache* and *Manolakis*, *infra*, that "Generally, a guarantor is not discharged merely because the cause of action against a debtor is barred" prohibits Kadakia's defense of the statute of limitations. This litigation was filed before that time period and is not barred by the statute of limitations as set forth in 12 O.S. § 95(1). Additionally, the independent nature of the obligations under a guaranty changes the application of the statute

of limitations to the causes of action against a guarantor. As such, Kadakia's Motion for Summary Judgment should be denied.

## RPS'S RESPONSES TO KADAKIA'S STATEMENT OF MATERIAL FACTS

As the respondent to a motion for summary judgment, RPS is entitled to every reasonable inference supported by plausible evidence that Kadakia's statement of material facts are controverted. In support, RPS submits the affidavit of Richard P. Small, attached as Exhibit 12 and the evidence attached hereto as Exhibits 1 to 13. The Exhibits contradict some of the "facts" Kadakia presents. Given the presumption of truth that must be given to any plausible fact asserted by the non-movant to a motion for summary judgment, all of RPS's facts must be presumed to be true.

## RPS'S RESPONSES TO KADAKIA'S STATEMENT OF FACTS

1. Admitted.

2. Admitted.

3. Denied. *See* spreadsheet attached hereto as **Exhibit 1** and RPS BOK bank statements attached hereto as **Exhibit 2**.

4. Admitted.

5. Neither admitted nor denied as the document speaks for itself.

6. Neither admitted nor denied as the document speaks for itself.

7. Neither admitted nor denied as the document speaks for itself.

8. Neither admitted nor denied as the document speaks for itself.

9. Neither admitted nor denied as the document speaks for itself.

10. Neither admitted nor denied as the document speaks for itself. Admitted that the Workout Agreement related to the Borrower's Obligations, a separate and unique obligation from the obligations under a guaranty.

11. Neither admitted nor denied as the document speaks for itself.

12. Neither admitted nor denied as the document speaks for itself.

13. Neither admitted nor denied as the document speaks for itself.

14. Neither admitted nor denied as the document speaks for itself.

## RPS's Statement of Material Facts

15. In March 2014, Tethys Trading, LLC and RPS entered into a Promissory Note ("Note") for a loan to Tethys Trading, LLC in the amount of $6 million. *See* attached **Exhibit 3**.

16. Pursuant to the Guaranty executed by Kadakia, he agreed to be jointly and severally liable for breach of the Note and waived all rights to defenses or claims. *See* Kadakia's Guaranty attached as **Exhibit 6**.

17. An extension to the Maturity Date was granted on the original Note for a period of twelve (12) months after March 27, 2015 until March 27, 2016. *See* attached **Exhibit 7.**

18. On November 12, 2015, Meyer, principal for Tethys Trading, emailed Richard Small, principal for RPS, acknowledging that Tethys Trading was in default and owed RPS money under the Note. *See* attached **Exhibit 8**.[1]

19. From approximately May 2014, until October 2016, Tethys Trading, LLC made partial payments applied to interest and two payments that were applied to principal. Since 2016, no payments have ever been made against the Note. *See* **Exhibits 1 & 2**.

[1] RPS notes that although many discussions occurred regarding the proposals presented by Jack Meyer in this email and others, no agreements were ever entered into between March 2015, when the extension to the Maturity Date was granted and the 2019 Workout Agreement.

20. On May 17, 2019, a demand letter was mailed to counsel for Meyer and Finnegan notifying them that Tethys Trading was in default and demanding that the guarantors pay off the Promissory Note. *See* attached **Exhibit 9.**

21. On May 20, 2019, this litigation was filed against Kadakia. *See* Complaint, Dkt. 001.

22. On December 19, 2019, five months after this case was filed, Meyer, Finnegan and Tethys Trading entered into a Workout Agreement (**Exhibit 10)** with RPS related to Tethys Trading's obligations under the Promissory Note and the guarantors' obligations under their guaranties.

23. Under the Workout Agreement, [redacted] 2019 Workout Agreement, ¶ C. *See* attached **Exhibit 10.**

24. Paragraph 9 states: [redacted]."

25. The Workout Agreement was entered into for the sole purpose of protecting RPS and ensuring that some funds will be paid to the balance due and owing on the Note. [redacted] Workout Agreement, Exhibit 10, at ¶ 6.

26. To date, despite the Workout Agreement, no additional payments or non-monetary benefits have been made to RPS by either Tethys Trading or Meyer and Finnegan. *See* Affidavit of Richard P. Small, attached hereto as **Exhibit 12**.

## ARGUMENTS AND AUTHORITIES

The movant bears a heavy burden in its quest for summary judgment. "Summary judgment should not be granted unless it is clear that a trial is unnecessary." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2, 106 S. Ct. 2548, 2556 (1986) (citing to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985)). According to the *Celotex* court, "In determining whether a moving party has met its burden of persuasion, the court is obliged to take into account the entire setting of the case and must consider all papers of record as well as any materials prepared for the motion." *Id.* "Any doubt for as to the existence of a genuine issue for trial should be resolved against the moving party." *Celotex* at 330 n.2 (citing to *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159 (1970)). The movants cannot obtain a summary judgment where "there is any evidence in the record from any source from which a reasonable inference in [RPS's] favor may be drawn." *Id*.

*Celotex* places an obligation on the court to resolve all inferences with regard to controverted facts in favor of the non-movant, RPS. For the purposes of ruling on Kadakia's motion for summary judgment, the court must infer from the controverted facts that (1) Tethys Trading, LLC is in default and remains in default as to the Note; (2) the final partial payment received from Tethys Trading, LLC occurred in 2016, when the statute of limitations began to accrue; and (3) Kadakia executed an unconditional guaranty and because of Tethys Trading's ongoing default, Kadakia's obligations are activated. Based on these facts, Kadakia's motion for summary judgment should be denied.

## RPS' RESPONSE TO KADAKIA'S SECTION B

**1. Default Occurred Upon Non-Payment of the Note.**

On March 27, 2016, according to the terms of the Extension of the Note, (Exhibit 7)[2], "Principal and all accrued unpaid interest shall be due or payable." Note, p.1, Exhibit 3. Tethys Trading, LLC did not pay the principal and all accrued interest at that time. An event of default is described in the Note at page 2, paragraph 4:

> If (a) any payment required by this Note is not made within five (5) business days after the due date and receipt by Maker of Notice from Payee, (b) any default occurs under any other instrument …, or (c) Maker… admits in writing its inability to pay its debts as they fall due,…Payee **may, at its option**, without further notice or demand, declare this Note in default and all indebtedness due and owing hereunder shall be due and payable immediately. (emphasis added).

Note, Exhibit 3 and Kadakia's MSJ, filed under seal, Dkt. 90, at p. 9.

Tethys Trading, LLC failed to pay its agreed upon payments so RPS filed this case against Kadakia and subsequently entered into a Workout Agreement with Meyer and Finnegan, which is now also in breach as will be discussed below.

Kadakia incorrectly defines the three "preconditions"[3] to Kadakia's liability. Kadakia's alleged "precondition" numbers 2 and 3 are incorrect. Kadakia's second "precondition" states that the *only* way to declare default is with notice, but that very same paragraph in the Promissory Note also defines default as when "Maker…admits in writing its inability to pay debts as they fall due." *See* Exhibit 8, where Meyer admits Tethys Trading no longer has any funds. There is more than one road to the "event of default" - the main one being Tethys Trading [Maker] fails to make a payment when due. Kadakia's alleged third "precondition" states that as a condition to Kadakia's liability, RPS is "require[d]" "to exercise its option to declare the 2014 Promissory Note in default,

[2] The Extension states that "All other terms and conditions of the Promissory Note shall remain in full force and effect."
[3] Kadakia's Motion for Summary Judgment, filed under seal, Dkt. 90, at p.9.

whereupon and all indebtedness is due and owing immediately." However, as emphasized above, this is not a "condition" that is required. The actual language in the Note provides for a RPS's discretion through the use of the words "may" and "option" to declare the balance due and owing immediately. *See* opinion of David Russell, U.S. District Judge for the Western District of Oklahoma in *GKC Beard Invs., LLC v. Beard Oil Co.*, No. CIV-17-562-R, 2019 U.S. Dist. LEXIS 170811, 2019 WL 4862180 (W.D. Okla. Oct. 2, 2019)[4]. RPS did not have to declare it a default immediately but was entitled to do so upon his choice. RPS called it due and owing after March 27, 2016 at which time Tethys Trading failed to pay the full balance due and owing. Tethys Trading is in default and has never cured the default.

**2. The 2019 Workout Agreement is Evidence of the Default**.

The 2019 Workout Agreement is evidence of the very breach and event of default that Kadakia claims never happened. The 2019 Workout Agreement developed and was executed as a result of a demand to Meyer and Finnegan to pay the balance in full or litigation would occur.[5] Meyer and Finnegan chose to pursue a settlement with RPS instead of having a lawsuit filed against them. Kadakia correctly cites Paragraph 9 of the 2019 Workout Agreement, yet disregards that the Agreement is related to obligations under the Promissory Note. The Promissory Note and Guaranty both permit potential settlement with the Borrower while not inhibiting the obligations of the guarantors which is why Meyer and Finnegan were so keen to reach a settlement. They know they are also liable for the entire balance. [redacted]. What the

[4] "Where a contract contains an option to accelerate, the statute of limitations for an action on the whole indebtedness due begins to run from the time the creditor takes positive action indicating that the creditor has elected to exercise that option." *GKC Beard* at *7 (citing to *City of Lincoln v. Hershberger*, 272 Neb. 839, 725 N.W.2d 787 (Neb. 2007)).
[5] Paragraph 22, *infra*.

Workout Agreement does not do is modify the obligations of Kadakia under his own Guaranty.[6] Oklahoma case law makes clear that the obligations of the principal under a Promissory Note are "independently and separately enforceable" from the obligations of a guarantor under a Guaranty. *Lum v. Lee Way Motor Freight*, 1987 OK 112, ¶ 13, 757 P.2d 810, 814. The creditor is free to pursue multiple avenues of collection for a default. *See Founders Bank & Trust Co. v. Upsher*, 1992 OK 35, ¶ 18, 830 P.2d 1355, 1364-65 (stating "Where there is joint and several liability, as is the case here, a judgment creditor may pursue all possible avenues of recovery simultaneously until the judgment is satisfied. The possibility of collecting a judgment's unpaid balance from other's jointly liable does not diminish a judgment debtor's present liability for the full amount of the unsatisfied balance.").

Kadakia states that "There cannot be both (a) an "Event of Default" as required to impose liability on the Kadakia Guaranty, and (b)[redacted]Kadakia's Motion for Summary Judgment, filed under seal, Dkt. 90, p. 10. Kadakia is incorrect. This possibility is addressed within the Guaranty. Kadakia waived the ability to forego his obligations *even in the event of a settlement with the Borrower,* and Kadakia also agreed "to any renewal" of the Note[7]. Guaranty, Exhibit 6, ¶ 3(a) and Note, Exhibit 3 at page 2, paragraph 4.

The present case has a similar fact situation to the one in *Founders Bank & Trust Co. v. Upsher, supra*. Founders Bank loaned money to a partnership that was secured by a mortgage and

[6] Kadakia and RPS's counsel briefly broached the subject of a settlement, but it got no further than an initial discussion because Kadakia informed RPS that he had no money. This cannot be true based on the number of attorneys he has employed in this case and in other cases against him at the moment.

[7] The Note states: "All makers, endorsers, guarantors and sureties hereby severally waive protest, presentment, demand, and notice of protest and nonpayment in case this Note or any payment due hereunder is not paid when due; and they agree to any renewal of this Note or to any extension, acceleration or postponement of the time of payment, or any other indulgence…and to the release of any party or person primarily or contingently liable, without prejudice to Payee and without notice to any maker, endorser, guarantor or surety." Note, Exhibit 3 at page 2, paragraph 4

five guarantors in separate agreements. The partnership defaulted, and the bank filed suit on the promissory note and to enforce the guaranties and to foreclose the mortgage. The bank received an agreed judgment against the principal and each co-guarantor, jointly and severally. The co-guarantors brought a plea for credit to offset in the full amount of the fair market value of the property. The trial court denied the credit and the appeals court reversed. The Supreme Court vacated the court of appeal's opinion and reinstated the trial court's post-confirmation orders. The Oklahoma Supreme Court narrowly read the language of the guaranty at issue stating: "The precise terms of the guarantor's undertaking and the extent of the given promise govern the breadth of the obligation." *Id.* at ¶ 10. According to Oklahoma jurisprudence and the principles applied by the Court, "[O]bligations of a private-law guarantor are purely contractual." *Id.* The Court upheld the terms of the guaranty stating that "the legal effectiveness of a guaranty is not dependent on the continued existence of the principal's debt. Rather, it is co-extensive in its breadth and sweep with the terms of the guarantor's enforceable promise." *Id*. at ¶ 13. After analyzing the contractual obligations as put forth in the guaranties, the Court ultimately held that the guarantors would remain liable "***although the principal's debt may be eligible for reduction***." *Id*. at ¶ 14. (emphasis added). Here, just as in *Founders Bank*, Kadakia waived his rights to be released based on "extension, renewal, settlement, indulgence, compromise, waiver or release of or with respect to any of Borrower's Obligations." Guaranty, Exhibit 6 at ¶ 3(a).

Until the balance has been paid in full, all parties are subject to the creditor's rights, thus the purpose of the 2019 Workout Agreement. RPS has every right as the creditor to pursue this case *and* to also enter into a settlement with the principal and other guarantors, because Tethys Trading defaulted when it *never* paid the balance due and owing in full, plus the interest that has

accrued. Until that moment in time, when the balance is paid in full, the guarantors are liable for "full, prompt" payment to RPS.

[redacted] It did not extend the "Maturity Date" of the 2014 Promissory Note. The "Maturity Date" was extended once to March 27, 2016. Even if the 2019 Workout Agreement did extend the date of the loan to the principal, his obligations under the Guaranty are not changed nor released because he contractually waived his right for them to be affected by an extension to the Borrower. Guaranty, Exhibit 6 at ¶ 3(a); *also see Founders Bank v. Upsher* at ¶ 13. (*Also see First Nat's Bank & Trust Co. v. Kissee*, 1993 OK 96, ¶ 17, 859 P.2d 502 "A guarantor is not discharged if he consents to an extension of time for payment, or when he has expressly agreed that the time for payment may be extended without notice.").[9]

Moreover, even if Kadakia is correct that Tethys Trading is not in default because of the 2019 Workout Agreement, then the 2019 Workout Agreement must also not be in default. On April 7, 2020, Finnegan contacted RPS to propose a settlement independent of Tethys Trading. In this email, Finnegan made statements attesting to the value of Tethys and the value in his own capital account. *See* attached Exhibit 11. [redacted].[10] *See* 2019 Workout Agreement, Exhibit

[8] Kadakia's Motion for Summary Judgment, filed under seal, Dkt. 90, p.10.
[9] Footnote 7, *supra*.
[10] *See* attached Exhibit 13 as an example of the type of report from TGH that should have been forwarded to RPS upon receipt by Meyer or Finnegan. RPS has never received this report from Meyer and only received it from Finnegan after several months and upon request.

10, p.4, ¶ 4. [redacted]. *See* Affidavit of Richard P. Small, Exhibit 12. RPS has had to resort to filing a motion in this case compelling TGH to respond to a subpoena requiring the production information regarding Meyer and Finnegan's distributions. *See* Motion to Compel, Dkt 95. It is fair, logical and necessary for the purposes of this motion for the Court to infer (1) that Finnegan has received the information he summarized in his email and (2) that RPS did not receive it as required. As such, the 2019 Workout Agreement is also in breach. All guarantors are obligated to pay the balance due according to their unconditional guaranties. Kadakia is obligated under his unconditional guaranty to a "full, prompt" payment of the entire balance due. Kadakia's motion for summary judgment should be denied.

**3. RPS's Claim is Allowed by Oklahoma Law.**

As noted above in *Founders Bank v. Upsher*, the court stated that a creditor may pursue "all avenues of recovery simultaneously." *Id.* at ¶ 18. Kadakia points to the premise found in *Lum v. Lee Way Motor Freight*, Inc. that a guarantor's secondary liability is conditioned on the existence of a default. 1987 OK 112, ¶ 13, 757 P.2d 810, 814. There is no doubt that the default has occurred. Kadakia never denied that Tethys Trading has not paid the balance in full on the Promissory Note as set forth in RPS's Statement of Material Facts. The 2019 Workout Agreement is an effort to collect on the debt that the *Borrower and other guarantors* owe. Kadakia's obligations are "joint and several" and collateral to the obligations of the Borrower. In *Lum*,[11] the principal defaulted, and the claimant was allowed to "press his claim against the guarantor." *Id.* at ¶ 35. The Court stated "If the guaranty's effect is to place the guarantor in the shoes of the primary obligor upon

[11] Although the guaranty in *Lum* is a statutory guaranty, the principals of guaranty jurisprudence analyzed in this case are similar to the analysis of private-law guaranties.

the latter's default and if the primary obligor defaults on his continuing obligation to pay compensation then [the guarantor]…must step into [the primary obligor's] shoes and assume the continuing obligation to pay." *Lum* at ¶ 31.

There is no doubt that the personal guaranty Kadakia executed was to place him in the shoes of Tethys Trading in the event that Tethys Trading defaulted on its obligation. Tethys Trading never paid the balance due, a fact upon which all parties agree. Tethys Trading is in default. Kadakia's insistence that a settlement agreement affects his obligations under the Guaranty ignores Oklahoma common law, statutory jurisprudence and the terms of his personal guaranty.

As Kadakia emphasizes, "default (as defined in the principal obligation) as a perquisite [sic] to a guarantor's liability is well established in Oklahoma law."[12] In each of the cases Kadakia cites (except *Borges*, which had nothing to do with default on a promissory note), the principal defaulted, and the guarantors were held liable. In *JPMorgan Chase Bank, N.A. v. Specialty Restaurants*, 2010 OK 65, 243 P.3d 8, JPMorgan Chase loaned Specialty Restaurants money to purchase its property. The mortgage was secured by the property and guarantees from three co-guarantors. The restaurant failed; the bank foreclosed, and judgment was entered against the principal and the guarantors. The property was sold, and the bank entered a deficiency judgment. The bank asserted that the guarantors were only entitled to a credit to their debt of the proceeds of the sale, but the trial court credited the full fair market value. The bank appealed and the Court of Civil Appeals affirmed. The Supreme Court overturned holding "Our determination is supported by the plain, clear, unmistakable, unambiguous, and unequivocal language of the respective guaranty agreements which is sufficient to waive the right of a fair market value setoff to the

[12] Kadakia's Motion for Summary Judgment, filed under seal, Dkt. 90 at p.11.

guarantor's debts." *Id.* at ¶ 1. The waivers in the guaranties in *JP Morgan Chase* are similar to that in Kadakia's Guaranty. The *Chase* guaranties stated:

> Guarantor also waives any and all rights or defenses arising by reason of…(d) any defenses given to guarantors at law or in equity other than actual payment and performance of the indebtedness…**Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under the Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right**. (emphasis added).

*Id.* at ¶ 2, n.5.

The Kadakia Guaranty states:

> Until repayment and performance of all of Borrower's Obligations, the Guarantor hereby irrevocably **waives and relinquishes any and all statutory, contractual, common law, equitable or other claims and rights (a) to seek reimbursement, contribution, indemnification, set-off or other recourse** from or against the Borrower in connection with any payments made by the Guarantor under this Guaranty Agreement. (emphasis added).

Kadakia Guaranty, Exhibit 6, ¶ 7.

Just like the guarantors in *Chase*, Kadakia also waived all rights to any form of set-off or reimbursement. In *Chase*, the court upheld the principles of contract and guaranty jurisprudence and refused to allow the Guarantors to limit their obligations. The court repeated the language in the guaranty was "plain, clear, unmistakable, unambiguous, and unequivocal language." *Chase* at ¶1, ¶6, ¶13, ¶ 19, & ¶ 20. The Court further noted: "Guarantors are bound by the unambiguous terms of the contract although the result may be harsh." *Id*. at ¶ 19.

Kadakia's introduction of the 2019 Workout Agreement is improper because it is "extrinsic evidence."

> The parties' intent in executing a guaranty contract is gathered from the entire instrument. Extrinsic evidence need not be introduced when the language is clear and explicit. If the contract is complete in itself and, viewed in its entirety unambiguous, its language is the only legitimate evidence of intent. The courts decide, as a matter of law, whether a contract provision is ambiguous.

*Chase* at ¶ 9.

Here, the language in Kadakia's Guaranty is clear, unambiguous and unmistakable – that "in the event any of the Borrower's Obligations shall not be paid or performed according to their terms, the Guarantor shall immediately pay or perform the same, this Guaranty being an absolute, irrevocable and unconditional guaranty of full payment and performance and not a guaranty of collection." Guaranty, Exhibit 6, ¶ 2. It cannot be any clearer than this – Tethys Trading did not pay the Promissory Note according to its terms, and Kadakia shall "immediately pay or perform the same." *Id.* No other documents affect the obligations under this Guaranty -- not a settlement agreement and not a transfer agreement. Nothing else matters when the Guaranty is "clear, unambiguous and unmistakable." Kadakia's claims that no "Event of Default" occurred is not credible because (1) he has never denied that Tethys Trading has failed to perform its obligations under the Note; (2) because an "Event of Default" by its very nature is a singular event, and future events or agreements cannot change the past event (once defaulted the only cure is to pay the balance in full which has never happened); and (3) his only evidence is "extrinsic" and may only be presented in the event the Guaranty is ambiguous in some way.

In *First Nat. Bank and Trust Co. v. Kissee*, 1993 OK 96, 859 P.2d 502, 506, the bank sued the guarantor on an absolute and unconditional guaranty given to the bank as security on a Note between the bank and guarantor's brother (debtor). The debtor defaulted, bank invoked the guaranty and guarantor refused to pay. Bank filed suit against the guarantor. The court notes immediately that the guaranty is "plain and unambiguous" and that the guarantor "unconditionally promised payment of debtor's principal contract on default." *Id.* at ¶ 10. Similar to the present litigation, the court in *Kissee* pointed out "The undisputed evidence shows the bank pleaded a legally cognizable claim against guarantor by establishing a valid and subsisting debt owed by

guarantor on an absolute and unconditional guaranty." *Id*. Here, there is undisputed evidence that RPS pled a legally cognizable claim against Kadakia by establishing the "valid and subsisting debt" that is owed by Kadakia under Kadakia's unconditional guarantee. Tethys Trading never paid the balance due and owing; RPS invoked the guaranty, and the guarantor, Kadakia, continues to refuse to pay. As such, Kadakia's Motion for Summary Judgment should be denied.

Further, even if the 2019 Workout Agreement acts "as an extension of time for payment of the original indebtedness,"[13] it would not discharge Kadakia's obligations under the Guaranty because "he has expressly agreed that the time for payment may be extended without notice."[14] The Kadakia Guaranty states:

> The obligations of the Guarantor hereunder shall be unconditional and absolute and…shall not be released, discharged or be a defense to or otherwise affected by: (a) any ***extension,*** renewal, settlement, indulgence, compromise, waiver or release of or with respect to any of the Borrower's Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of the Borrower's Obligations.

Guaranty, Exhibit 6, ¶ 3(a).

The language in Kadakia's Guaranty is very similar to the language in the guaranty in *Kissee*.

> An extension of time for payment of the debtor's obligation is expressly authorized in the guaranty agreement in the case at bar. Specifically, guarantor agreed that "renewals or extensions…of said indebtedness or any part thereof may be made by you from time to time without notice to the undersigned and without impairing or releasing the liability of the undersigned."

*Kissee* at ¶ 18.

The Court in *Kissee* concluded that the bank's extension of time did not discharge the guarantor from liability. *Id.* Further, in Kadakia's Guaranty, Kadakia expressly "waive[d] notice of…any of the Borrower's Obligations to which it may apply, and waives notice of default, non-payment,

[13] Kissee at ¶ 17.
[14] *Id.*

partial payment, presentment, demand, protest, notice of protest or dishonor or all other notices to which the Guarantor might otherwise be entitled." Guaranty, Exhibit 6, ¶ 2. Kadakia and the *Kissee* guarantor are both held to the same standards as expressly noted in their guaranties. In *Kissee,* the court granted the banks summary judgment assessing a judgment against the guarantor. Kadakia's motion for summary judgment should fail; RPS's claims allowed to stand, and the guarantor be required to step into the shoes of Tethys Trading to pay the Promissory Note.

In *Riverside Nat'l Bank v. Manolakis,* 1980 OK 72, 613 P.2d 438, the guarantor, like in all the other cases cited by Kadakia, was not released from his obligations.

> A guarantor's undertaking…creates a collateral obligation independent and separately enforceable from that of the principal debtor. . . The obligation of a guaranty is contractual, and the inquiry must, in each case, focus on the precise terms of the guarantor's undertaking – the dimension or breadth of the promise. Oklahoma has long recognized the independent nature of the guarantor's obligation. It has long held that the running of the statute of limitations on the principal debt does not operate to bar an action against the debtor's guarantor.

*Manolakis* at ¶ 9.

In *Manolakis*, the guarantor, just like Kadakia, "promised full and prompt payment of the debtor's obligation and waived certain statutory defenses." *Id*. at ¶ 13. The court further noted that "the law [in Oklahoma] is clear that the terms of a guaranty agreement should be read in favor of the one who has parted with property in reliance on the collateral promisor and hence against the guarantor." *Id*. Based on the above analysis, the court reversed and remanded the trial court's ruling which had granted summary judgement in favor of the guarantor. Despite Kadakia's attempts to avoid his obligations under the Guaranty, Oklahoma law requires interpretation of its terms in favor of the enforceability of the guaranty. RPS gave up millions of dollars on Tethys Trading's promise to pay it back with interest. RPS secured its loan with the personal guaranties executed by Meyer, Finnegan and Kadakia. Tethys Trading failed to perform as promised having

*never* paid back the full balance due and owing. RPS invoked the guaranties as was its right. RPS's claims are legal and valid and Kadakia's motion for summary judgment should be denied, just like Manolakis' was.

Kadakia's reliance on *Borges v. Waller*, 2011 OK CIV APP 127, 270 P.3d 202 is unfounded. In *Borges*, there was no guaranty of full and prompt payment, nor was there ever an event of default. In *Borges*, where there were guaranteed payments on a lease, the Court refused to hold the guarantor liable for the difference between the rent agreed to in the terms of the first lease with that of the rent agreed to in the modified lease. The tenant *never* missed a payment and had continued to pay as required by the lease. This is factually distinct from the issues here in the present litigation. Tethys Trading never paid the balance in full. Kadakia cannot apply the principles found in *Borges* because the tenant never failed to pay rent whereas, here, Tethys Trading clearly failed to pay back the loan under the Note.

Kadakia also relies on *Stuart C. Irby Co. v. Wire Nuts Elec. Inc.*, because it cites *Borges.* However, the events in *Irby* are similar to the facts presented here in Kadakia. In *Irby*, Irby offered a credit application to Wire Nuts. McGill, and two others "jointly and severally…unconditionally guarantee[d] to [Irby] the payment of all existing indebtedness of the Applicant, together with any and all amounts that the Applicant shall at any future time owe to [Irby]." *Id.* at *2. The principal defaulted. McGill, by that time had left her employment at Irby but failed to revoke her personal guaranty. McGill believed that her guaranty was limited to $2,500. There was no dispute that the principal was in default. Irby invoked McGill's guaranty for the full amount of Wire Nut's indebtedness, an amount substantially larger than $2,500. In its analysis, the Court cites the same principles of guaranty jurisprudence as referred to above, i.e. that a guaranty is contractual, collateral, and independent to the principal's obligations and "the intent of the parties to a

guaranty" is held "most strongly against the Guarantor." *Id*. at *7. The court held that "[t]he language of the guaranty is clear and unambiguous that McGill agreed to pay the full amount of Wire Nuts' indebtedness for credit extended under the Application, and her subjective belief that the guaranty extended only up to the amount of $2,500 is inadmissible. Thus, this does not give rise to a genuine dispute of material fact." *Id*. at *11. Just as in *Irby*, Kadakia was a former employee who failed to revoke his personal guaranty. The parties do not dispute that Tethys Trading never paid the balance due and owing under the Note, and Kadakia is now liable for the full amount due under his personal guaranty. Furthermore, just as in *Irby*, this Court should deny Kadakia's motion for summary judgment because RPS is entitled to its claims on its breach of guaranty against Kadakia.

**RPS'S RESPONSE TO KADAKIA'S SECTION C**

Kadakia statement that RPS's claims are time barred by the five year statute of limitations is incorrect. As noted above, the statute of limitations on the Borrower begins to accrue at the last partial payment of the Borrower[15]; however Oklahoma "has long held that the running of the statute of limitations on the principal debt does not operate to bar an action against the debtor's guarantor."[16] Further, as noted, *infra*, "[T]he statute of limitations for an action on the whole indebtedness due begins to run from the time the creditor takes positive action indicating that the creditor has elected to exercise the option." *GKC Beard* at *7. Kadakia's breach began when he refused to acknowledge or perform upon his obligations under the guaranty when RPS invoked those obligations. The statute of limitations for Kadakia's breach began in 2019 when the demand letters went out to the guarantors. Kadakia's motion for summary judgment, based on his allegations that RPS's claims are time barred, should be denied.

---

[15] *Keoto Mills* at ¶15.
[16] *Manolakis* at ¶ 9.

Kadakia's contention that RPS's claim of a breach of guaranty is time barred is similar to the assertions of the guarantor in *Manolakis*. In *Manolakis*, the plaintiff guarantor asserted, and the trial court (citing *Apache Lanes, Inc. v. National Educators Life Ins. Co.*, 1974 OK 106, 520 P.2d 984) erroneously held that the principal debt became satisfied under operation of 12 O.S. § 686 when the creditor bank failed to file a deficiency judgment motion within 90 days of the foreclosure sale. The court in *Manolakis* declined to broaden its holding in *Apache* where it had "held that the creditor's failure to seek a deficiency may not only extinguish the principal debt by force of § 686 but could also discharge the guarantor's obligation." *Manolakis* at ¶ 6; *Apache* at ¶13. The *Manolakis* court refused to broaden the *Apache* ruling to imply that the anti-deficiency statute's automatic discharge provisions could extend to all guarantors. The court stated:

> We cannot ascribe to our holding in *Apache* the broad sweep contended for it by guarantor. Were we to do so, the legal effectiveness of guaranty would be made totally dependent on the continued existence of the principal debt rather than be regarded as co-extensive in its breadth and sweep with the terms of the guarantor's valid and hence enforceable promise.

*Manolakis* at ¶ 8.

The court distinguished the differences between a security owner who allows a lien to be impressed on her property and a guarantor. The court noted that "The lien cannot survive the life of the obligation it secured." *Manolakis* at ¶ 9. The court continues with its comparison stating: "A guarantor's undertaking, on the other hand – because it differs so vastly from the rights of a nonobligor who provides security for another person's debt – creates a collateral obligation independent and separately enforceable from that of the principal debtor." *Id.* The independent nature of a guaranty is what changes the statute of limitations as it applies to either the obligations of the principal or the obligations of the guarantor.

> Generally, a guarantor is not discharged merely because the cause of action against a debtor is barred. And, while there is a conflict of authority, the majority view is

> that an action to recover on a contract of guaranty cannot be defended by showing that the claim against the original debtor has been barred by the statute of limitation…Therefore the guarantor has in his own hands the means of protecting himself by paying the debt and then suing the debtor for restitution.

*Apache* at ¶¶ 11, 12.

Here, just as in *Manolakis* and *Apache*, RPS's claims against Kadakia, the guarantor, is not time barred, even if the claim against Tethys Trading was, which it is not. Kadakia's obligation of "full and prompt payment" under the Guaranty are "independently and separately enforceable" from the obligations of Tethys Trading. The statute of limitations on RPS's breach of guaranty claims against Kadakia began from the time RPS invoked Kadakia's obligations under the Guaranty, and therefore, cannot be time barred currently. Kadakia wants to claim that the statute of limitations began accruing immediately when the principal defaulted under 15 O.S. § 332, 12 O.S. § 95(1)[17]; however, he waived this defense under the Guaranty when he waived his right to defense of Lender's "failure or omission to enforce any right, power or remedy with respect to …any obligation of any other guarantor of any of the Borrower's Obligations." Guaranty, Exhibit 6, ¶ 3(a).

Even if Kadakia is correct that the statute of limitations began to accrue immediately when the principal defaulted, his calculation of when the default occurred is incorrect. The default did not occur until after March 27, 2016, the extended "Maturity Date" granted to Tethys by RPS. In

[17] Kadakia also cited *Cadle Co. v. Bianco*, 1992 OK CIV APP 175, 842 P.2d 437 summarizing it to say "summary judgment upheld for guarantor on basis of statute of limitations", but the summary is incorrect. *Cadle* actually upholds the limitations on causes of action where a previous judgment had already been entered. The trial court stated: "[To grant Plaintiff's motion for leave to amend its petition] would permit the plaintiff to revive an otherwise dormant judgment." *Id*. at ¶ 9. The Court of Civil Appeals upheld the trial court's ruling and would not permit the plaintiff to amend its petition to include a cause of action pertaining to the six year old judgment and granted summary judgment in favor of guarantor defendants. This is factually different from the case at hand – there is no previous judgment against the principal, the statute of limitations did not begin accruing against the principal until August 2016 at the time of the last partial payment, and the independent nature of the guaranty does not allow a statute of limitations on the principal to time bar an action against a guarantor. Kadakia is obligated under the guaranty and RPS's claims are not time barred; therefore, Kadakia's motion for summary judgment should be denied.

his opinion, Judge Russell distinguishes *Cadle Co*. because the "case against the guarantors was not pursued until five years after the judgment was entered against the underlying debtors." *GKC Beard* at *6. This is a factually distinct issue that removes the holding in *Cadle Co.* from application to the current case, which is more similar to the case cited by Judge Russell, *City of Lincoln*. In *City of Lincoln*, the Supreme Court of Nebraska held that the statute of limitations for an action on the whole indebtedness began to run from the time the creditor took positive action to exercise its option under an acceleration clause. The city of Lincoln loaned money to a company which failed to pay its debt. The city took action against the guarantors who claimed that the claims were barred under the five year statute of limitations. The Nebraska Supreme Court analyzed the same issue presented here: "At what point in time did the statute of limitations begin to run on the [creditor's] claim against the [guarantors]?" *City of Lincoln v. Hershberger* 725 N.W.2d 787, 790 (2007). In analyzing the financing agreement, the Nebraska Supreme Court noted that it contained an acceleration clause which is different from an installment contract stating: "[W]here a contract contains an option to accelerate, the statute of limitations for an action on the whole indebtedness due begins to run from the time the creditor takes positive action indicating that the creditor has elected to exercise the option." *Id*. at 791. The Nebraska Supreme Court noted that this principle would apply equally to the original debtor and the guarantor of the same debt. *Id*. In March 2015, RPS granted an extension on the "whole indebtedness" extending the Maturity Date to March 27, 2016. It was not until after March 2016, that RPS insisted the entire debt be paid in full. Clearly, RPS attempted to come to some agreement with the principal of Tethys, but when they were unable or unwilling to reach an agreement with RPS, it sent out demand letters in April and May 2019. Regardless of which date the "creditor took action" either March 2016 or April 2019, the claims, filed in May 2019, cannot be time barred. Just as the court in *City of Lincoln* and the court in *GKC*

*Beard* held, "The guarantor stepped into the debtor's shoes and therefore, the same analysis applied, and the statute of limitations began to run when the creditor exercised its right to accelerate the debt." *GKC Beard* at *7; *see also Lum* at ¶ 31 and *City of Lincoln* at 791. Here, Kadakia, as a guarantor steps into the shoes of the creditor Tethys, and the statute of limitations would begin to run, in this case, at the date the creditor took positive action to accelerate the debt. Five years from either date has not passed yet; as such, RPS's claims against Kadakia for a breach of the guaranty are not time barred. Therefore, Kadakia's Motion for Summary Judgement should be denied.

## CONCLUSION

WHEREFORE, R.P. Small Corp., based on the above reasoning, respectfully requests this Court deny Kadakia's Motion for Summary Judgment, grant attorney's fees, and such other relief as may be just.

Respectfully submitted,

By: /s/ Lacey L. Shirley
R. Brent Blackstock, OBA No. 00839
Lacey L. Shirley, OBA No. 33269
401 S. Boston Ave., Suite 500
Tulsa, OK 74103
(918) 383-0777, (918) 699-0325 (fax)
lacey@brentblackstock.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE BY ECF

I hereby certify that today I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to counsel of record.

By: /s/ Lacey L. Shirley
Lacey L. Shirley

EXHIBIT 1
PAGE 1 OF 2

Tethys Promissory Note
Interest Accrued since April 2014

| | A | B | C | E | F | G | H | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Date | balance in MS acct | interest at 6% in MS acct | Date of payments | payments | balance | interest on balanc | interest total | Interest total cumu | Total Balance by Month |
| 2 | | $ 6,000,000.00 | $ 30,000.00 | | | | | $ 30,000.00 | | $ 6,030,000.00 |
| 3 | 4/1/2014 | $ 4,200,076.93 | $ 21,000.38 | | $ - | $ 1,799,923.07 | $ 14,999.36 | $ 35,999.74 | $ 35,999.74 | $ 6,065,999.74 |
| 4 | 5/1/2014 | $ 4,200,076.93 | $ 21,000.38 | Monday, May 5, 2014 | $ 34,000.00 | $ 1,799,923.07 | $ 14,999.36 | $ 1,999.74 | $ 37,999.49 | $ 6,067,999.49 |
| 5 | 6/1/2014 | $ 4,700,155.55 | $ 23,500.78 | Tuesday, June 3, 2014 | $ 67,666.67 | $ 1,299,844.45 | $ 10,832.04 | $ (33,333.86) | $ 4,665.63 | $ 6,034,665.63 |
| 6 | 7/1/2014 | $ 21.35 | $ 0.11 | | $ - | $ 5,999,978.65 | $ 49,999.82 | $ 43,433.60 | $ 48,099.23 | $ 6,078,099.23 |
| 7 | 8/1/2014 | $ 21.35 | $ 0.11 | Thursday, August 7, 2014 | $ 6,566.33 | $ 5,999,978.65 | $ 49,999.82 | $ 43,433.60 | $ 91,532.83 | $ 6,084,298.05 |
| 8 | 9/1/2014 | $ 21.35 | $ 0.11 | Friday, September 5, 2014 | $ 43,801.11 | $ 5,999,978.65 | $ 49,999.82 | $ 6,198.82 | $ 97,731.65 | $ 6,090,496.87 |
| 9 | 10/1/2014 | $ 21.35 | $ 0.11 | Thursday, October 2, 2014 | $ 34,180.00 | $ 5,999,978.65 | $ 49,999.82 | $ 15,819.93 | $ 113,551.58 | $ 6,106,316.80 |
| 10 | 11/1/2014 | $ 21.35 | $ 0.11 | Wednesday, November 5, 2014 | $ 31,190.00 | $ 5,999,978.65 | $ 49,999.82 | $ 18,809.93 | $ 132,361.51 | $ 6,125,126.73 |
| 11 | 12/1/2014 | $ 21.35 | $ 0.11 | Friday, December 12, 2014 | $ 32,372.34 | $ 5,999,978.65 | $ 49,999.82 | $ 17,627.59 | $ 149,989.09 | $ 6,142,754.31 |
| 12 | 1/1/2015 | $ 21.35 | $ 0.11 | Wednesday, January 7, 2015 | $ 34,460.00 | $ 5,999,978.65 | $ 49,999.82 | $ 15,539.93 | $ 165,529.02 | $ 6,158,294.24 |
| 13 | 2/1/2015 | $ 21.35 | $ 0.11 | Tuesday, February 3, 2015 | $ 63,647.78 | $ 5,999,978.65 | $ 49,999.82 | $ (13,647.85) | $ 151,881.17 | $ 6,144,646.39 |
| 14 | 3/1/2015 | $ 21.35 | $ 0.11 | Monday, March 2, 2015 | $ 68,031.00 | $ 5,999,978.65 | $ 49,999.82 | $ (18,031.07) | $ 133,850.10 | $ 6,126,615.32 |
| 15 | 4/1/2015 | $ 21.35 | $ 0.11 | Monday, April 13, 2015 | $ 13,912.00 | $ 5,999,978.65 | $ 49,999.82 | $ 36,087.93 | $ 169,938.03 | $ 6,162,703.25 |
| 16 | 5/1/2015 | $ 21.35 | $ 0.11 | Monday, May 4, 2015 | $ 13,500.62 | $ 5,999,978.65 | $ 49,999.82 | $ 36,499.31 | $ 206,437.34 | $ 6,199,202.56 |
| 17 | 6/1/2015 | $ 21.35 | $ 0.11 | Friday, June 5, 2015 | $ 13,918.19 | $ 5,999,978.65 | $ 49,999.82 | $ 36,081.74 | $ 242,519.08 | $ 6,235,284.30 |
| 18 | 7/1/2015 | $ 21.35 | $ 0.11 | Wednesday, July 15, 2015 | $ 13,564.81 | $ 5,999,978.65 | $ 49,999.82 | $ 36,435.12 | $ 278,954.20 | $ 6,271,719.42 |
| 19 | 8/1/2015 | $ 21.35 | $ 0.11 | Tuesday, August 4, 2015 | $ 14,033.89 | $ 5,999,978.65 | $ 49,999.82 | $ 35,966.04 | $ 314,920.24 | $ 6,307,685.46 |
| 20 | 9/1/2015 | $ 21.35 | $ 0.11 | Wednesday, September 9, 2015 | $ 14,114.81 | $ 5,999,978.65 | $ 49,999.82 | $ 35,885.12 | $ 350,805.35 | $ 6,343,570.57 |
| 21 | 10/1/2015 | $ 21.35 | $ 0.11 | Tuesday, October 6, 2015 | $ 13,748.40 | $ 5,999,978.65 | $ 49,999.82 | $ 36,251.53 | $ 387,056.88 | $ 6,379,822.10 |
| 22 | 11/1/2015 | $ 21.35 | $ 0.11 | Friday, November 6, 2015 | $ 14,005.36 | $ 5,999,978.65 | $ 49,999.82 | $ 35,994.57 | $ 423,051.45 | $ 6,415,816.67 |
| 23 | 12/1/2015 | $ 21.35 | $ 0.11 | Thursday, December 3, 2015 | $ 13,663.88 | $ 5,999,978.65 | $ 49,999.82 | $ 36,336.05 | $ 459,387.50 | $ 6,452,152.72 |
| 24 | 2015 tax benefit | | | | $ 248,000.00 | | $ - | | | $ 6,204,152.72 |
| 25 | | | | | | | | | | $ 6,204,152.72 |
| 26 | 1/1/2016 | $ 21.35 | $ 0.11 | | $ - | $ 5,999,978.65 | $ 49,999.82 | $ 115,503 | | $ 6,254,152.65 |
| 27 | cash payment applied to interest | | | | $ 300,000.00 | 0 | $ - | $ (250,000) | | $ 5,954,152.65 |
| 28 | 2/1/2016 | $ 21.35 | $ 0.11 | Monday, February 1, 2016 | $ 15,647.86 | $ 5,999,978.65 | $ 49,999.82 | $ 149,855.47 | | $ 5,988,504.72 |
| 29 | 2/3/2016 | $ 21.35 | $ 0.11 | Wednesday, February 3, 2016 | $ 16,071.23 | $ 5,999,978.65 | $ 49,999.82 | $ 199,432.03 | | $ 6,022,433.42 |
| 30 | 3/1/2016 | $ 21.35 | $ 0.11 | Thursday, February 25, 2016 | $ 16,628.85 | $ 5,999,978.65 | $ 49,999.82 | $ 249,324.48 | | $ 6,056,254.65 |
| 31 | 4/1/2016 | $ 21.35 | $ 0.11 | Monday, March 28, 2016 | $ 16,178.70 | $ 5,999,978.65 | $ 49,999.82 | $ 299,836.32 | | $ 6,090,587.79 |
| 32 | 5/1/2016 | $ 21.35 | $ 0.11 | Tuesday, April 26, 2016 | $ 15,666.79 | $ 5,999,978.65 | $ 49,999.82 | $ 349,337.50 | | $ 6,124,422.17 |
| 33 | 6/1/2016 | $ 21.35 | $ 0.11 | Wednesday, June 1, 2016 | $ 16,165.54 | $ 5,999,978.65 | $ 49,999.82 | $ 399,337.43 | | $ 6,158,256.56 |
| 34 | 7/1/2016 | $ 21.35 | $ 0.11 | Tuesday, June 28, 2016 | $ 15,869.92 | $ 5,999,978.65 | $ 49,999.82 | $ 449,632.98 | | $ 6,192,386.57 |
| 35 | 8/1/2016 | $ 21.36 | $ 0.11 | Monday, August 1, 2016 | $ 28,922.18 | $ 5,999,978.64 | $ 49,999.82 | $ 486,580.65 | | $ 6,213,464.32 |
| 36 | 9/1/2016 | $ 21.36 | $ 0.11 | Tuesday, August 30, 2016 | $ 16,757.69 | $ 5,999,978.64 | $ 49,999.82 | $ 548,745.07 | | $ 6,246,706.56 |
| 37 | 10/1/2016 | $ - | $ - | Wednesday, August 17, 2016 | $ 2,660.67 | $ 6,000,000.00 | $ 50,000.00 | $ 547,337.55 | | $ 6,294,045.89 |
| 38 | 11/1/2016 | $ - | $ - | Tuesday, October 4, 2016 | $ 19,036.21 | $ 6,000,000.00 | $ 50,000.00 | $ 580,962.01 | | $ 6,325,009.68 |
| 39 | 12/1/2016 | $ - | $ - | Monday, October 31, 2016 | $ 19,277.40 | $ 6,000,000.00 | $ 50,000.00 | $ 630,720.82 | | $ 6,355,732.28 |
| 40 | 1/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 699,998.22 | | $ 6,405,732.28 |
| 41 | 2/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 749,998.22 | | $ 6,455,732.28 |
| 42 | 3/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 799,998.22 | | $ 6,505,732.28 |
| 43 | 4/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 849,998.22 | | $ 6,555,732.28 |
| 44 | 5/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 899,998.22 | | $ 6,605,732.28 |
| 45 | 6/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 949,998.22 | | $ 6,655,732.28 |
| 46 | 7/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 999,998.22 | | $ 6,705,732.28 |
| 47 | 8/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,049,998.22 | | $ 6,755,732.28 |
| 48 | 9/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,099,998.22 | | $ 6,805,732.28 |
| 49 | 10/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,149,998.22 | | $ 6,855,732.28 |
| 50 | 11/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,199,998.22 | | $ 6,905,732.28 |
| 51 | 12/1/2017 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,249,998.22 | | $ 6,955,732.28 |
| 52 | 1/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,299,998.22 | | $ 7,005,732.28 |
| 53 | 2/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,349,998.22 | | $ 7,055,732.28 |
| 54 | 3/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,399,998.22 | | $ 7,105,732.28 |
| 55 | 4/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,449,998.22 | | $ 7,155,732.28 |
| 56 | 5/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,499,998.22 | | $ 7,205,732.28 |
| 57 | 6/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,549,998.22 | | $ 7,255,732.28 |
| 58 | 7/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,599,998.22 | | $ 7,305,732.28 |
| 59 | 8/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,649,998.22 | | $ 7,355,732.28 |

EXHIBIT 1
PAGE 1 OF 2

Tethys Promissory Note
Interest Accrued since April 2014

| | A | B | C | E | F | G | H | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|
| 60 | 9/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,699,998.22 | | $ 7,405,732.28 |
| 61 | 10/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,749,998.22 | | $ 7,455,732.28 |
| 62 | 11/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,799,998.22 | | $ 7,505,732.28 |
| 63 | 12/1/2018 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,849,998.22 | | $ 7,555,732.28 |
| 64 | 1/1/2019 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,899,998.22 | | $ 7,605,732.28 |
| 65 | 2/1/2019 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,949,998.22 | | $ 7,655,732.28 |
| 66 | 3/1/2019 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 1,999,998.22 | | $ 7,705,732.28 |
| 67 | 4/1/2019 | $ - | $ - | | $ - | $ 6,000,000.00 | $ 50,000.00 | $ 2,049,998.22 | | $ 7,755,732.28 |
| 68 | total interest due | | $ - | | | | $ - | $ 2,049,998.22 | | $ 7,755,732.28 |
| 69 | total balance due | | $ - | | | | $ - | | | $ 7,755,732.28 |
| 70 | interest payments made | | $ - | | $ - | | $ - | | | $ 7,755,732.28 |
| 71 | 5/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,099,998.22 | | $ 7,805,732.28 |
| 72 | 6/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,149,998.22 | | $ 7,855,732.28 |
| 73 | 7/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,199,998.22 | | $ 7,905,732.28 |
| 74 | 8/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,249,998.22 | | $ 7,955,732.28 |
| 75 | 9/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,299,998.22 | | $ 8,005,732.28 |
| 76 | 10/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,349,998.22 | | $ 8,055,732.28 |
| 77 | 11/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,399,998.22 | | $ 8,105,732.28 |
| 78 | 12/1/2019 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,449,998.22 | | $ 8,155,732.28 |
| 79 | 1/1/2020 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,499,998.22 | | $ 8,205,732.28 |
| 80 | 2/1/2020 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,549,998.22 | | $ 8,255,732.28 |
| 81 | 3/1/2020 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,599,998.22 | | $ 8,305,732.28 |
| 82 | 4/1/2020 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,649,998.22 | | $ 8,355,732.28 |
| 83 | 5/1/2020 | $ - | $ - | | | $ 6,000,000.00 | $ 50,000.00 | $ 2,699,998.22 | | $ 8,405,732.28 |
| 84 | total interest due | | $ - | | | | $ - | | | $ 8,405,732.28 |
| 85 | total balance due | | | | | | $ - | | | $ 8,405,732.28 |

EXHIBIT 2

FILED UNDER SEAL

**PROMISSORY NOTE**

$6,000,000.00 March 27, 2014
Tulsa, Oklahoma

FOR VALUE RECEIVED, **TETHYS TRADING, LLC**, an Oklahoma limited liability company ("Maker"), promises to pay to the order of R.P. Small Corp. or successors and assigns ("Payee"), at Payee's address at 1585 E. 22nd St., Tulsa, OK 74114-1305, the principal amount of up to Six Million Dollars ($6,000,000.00), plus interest thereon at the rates set forth below (collectively the "Note Rate"). The Note Rate shall apply to the outstanding principal amount of this Note received by Maker from Payee or used by Maker as set forth below. Interest shall be payable monthly beginning on the 30th day following the date of this Note and every 30 days thereafter. Principal and all accrued and unpaid interest shall be due and payable on or before March ____, 2015 (hereafter the "Maturity Date"). This Note may be paid at any time without penalty or additional interest.

The foregoing notwithstanding, Maker may extend the Maturity Date for four (4) successive 12-month periods, upon written notice to Payee not less than five (5) days prior to the end of the then-impending Maturity Date or the applicable extension period, so long as Maker is then not in default under the terms of this Note. If one or more extensions occur, the other terms and conditions of this Note shall remain in full force and effect during such extension or extensions.

The purpose of this Note is to fund, in whole or in part, margin requirements for Maker's trades in Distillates-Light Ends. The proceeds of this Note shall be placed by Maker, upon initial receipt, in a segregated account maintained at Morgan Stanley, and such proceeds shall not be co-mingled with any of Maker's own funds until they are removed from such segregated account, the notice of which shall be made by Maker to Payee as of the date on which such funds are removed from such segregated account. While the proceeds of this Note are maintained in such segregated account, the outstanding principal amount of this Note maintained in such account shall accrue interest at the rate of 6% *per annum*, which interest shall be payable by Maker to Payee as set forth herein. From and after the date on which the principal amount of this Note is removed by Maker from such segregated account and used with any margin requirement for its business, such amount so removed from such account shall then accrue interest at the rate of 10% *per annum*, payable in accordance with the terms hereof.

The amounts due under this Note shall be secured by that certain Pledge and Security Agreement executed by Maker (as debtor) in favor of Payee (as secured party) by which Maker pledges to Payee Maker's accounts receivable resulting in any transaction by which Maker uses the proceeds of this Note to fund margin requirements as discussed herein.

Interest on the principal amount of this Note shall be calculated on the basis of the actual number of days elapsed in the period for which the calculation is being made based on 360-day year. On the Maturity Date, all principal and interest shall be due and payable without notice or demand.

The interest payable upon the indebtedness evidenced by this Note shall not at any time

exceed the maximum rate of interest permitted under the laws of the State of Oklahoma for loans of the type and character evidenced by this Note.

All payments under this Note shall be made in lawful currency of the United States of America at Payee's residence or office (as set forth above).

From time to time the Maturity Date of this Note may be extended or this Note may be renewed, in whole or in part, or a new note of different form may be substituted for this Note and/or the rate of interest may be changed, or changes may be made in consideration of loan extensions, and Payee, from time to time, may waive or surrender, either in whole or in part, any rights, guarantees, security interests or liens given for the benefit of Payee in connection with payment of this Note or any security therefor; but no such occurrences shall in any manner affect, limit, modify or otherwise impair any rights, guaranties or security of Payee not specifically waived, released or surrendered in writing, nor shall any maker, guarantor, endorser or any person who is or might be liable hereon, either primarily or contingently, be released from liability by reason of the occurrence of any such event. Payee, from time to time, shall have the unlimited right to release any person who might be liable hereon, and such release shall not affect or discharge the liability of any other person who is or might be liable hereon.

In the event that John E. Meyer, Jr. either resigns from his position as, is removed from his position of, or ceases to serve as sole Manager of Maker, Payee may, at its option, without further notice or demand, declare this Note in default and all indebtedness due and owing hereunder shall be due and payable immediately.

If (a) any payment required by this Note is not made within five (5) business days after the due date and receipt by Maker of Notice from Payee, (b) any default occurs under any other instrument related hereto or under the provisions of any security agreement, pledge agreement or other document or agreement which provides security for the indebtedness evidenced by this Note, or (c) Maker applies for or consents to the appointment of a receiver, trustee, or liquidator of itself or of all or a substantial part of its assets, or admits in writing its inability to pay its debts as they fall due, or makes a general assignment for the benefit of creditors, or is adjudicated a bankrupt or insolvent, or a petition or other proceeding (voluntary or otherwise) is filed by or with respect to Maker in which a reorganization or an arrangement with Maker's creditors is sought or by which any creditor of Maker or Maker itself seeks to take advantage of any insolvency, bankruptcy, reorganization, arrangement, or other similar proceeding, Payee may, at its option, without further notice or demand, declare this Note in default and all indebtedness due and owing hereunder shall be due and payable immediately. In the event of a default, the entire balance (principal and interest) shall be due and payable immediately. All makers, endorsers, guarantors and sureties hereby severally waive protest, presentment, demand, and notice of protest and nonpayment in case this Note or any payment due hereunder is not paid when due; and they agree to any renewal of this Note or to any extension, acceleration or postponement of the time of payment, or any other indulgence, to any substitution, exchange or release of collateral and to the release of any party or person primarily or contingently liable, without prejudice to Payee and without notice to any maker, endorser, guarantor or surety. Maker hereof, and any guarantor, endorser, surety or any other person who is or may become liable hereon shall, on demand, pay all costs of collection, including reasonable attorney fees incurred by Payee in attempting to enforce payment of this Note and for defending the validity of any



EXHIBIT 3
Page 2 of 3

document securing this Note.

This Note is given for an actual loan of money for business purposes and not for personal, agricultural or residential purposes, and is executed and delivered in the State of Oklahoma and shall be governed by and construed in accordance with the laws of the State of Oklahoma. The state or federal courts sitting within Tulsa, Oklahoma shall have exclusive jurisdiction over any disputes which arise hereunder and the parties acknowledge that venue is proper only in such courts.

**TETHYS TRADING, LLC, an Oklahoma limited liability company**

**By:** ______________________________
**John E. Meyer, Jr.,**
**Manager**



EXHIBIT 3
Page 3 of 3

There is no exhibit 4

or 5 referenced in brief

# GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty Agreement"), is made as of the 24 day of March, 2014, by **Ruchir A. Kadakia** ( "Guarantor") in favor of R.P. Small Corp., an Illinois corporation (the "Lender").

**RECITALS**:

WHEREAS, Tethys Trading, LLC, an Oklahoma limited liability company (the "Borrower"), made a certain promissory note, dated as of the date hereof (the "Note"), in favor of the Lender, pursuant to which the Lender made a loan to the Borrower in the amount of Six Million Dollars ($6,000,000.00) Dollars, together with interest thereon (the "Loan"); and

WHEREAS, the Note is secured by, among other things, certain Accounts Receivable and other collateral identified in the Pledge and Security Agreement, dated as of the date hereof (the "Borrower Collateral"), from the Borrower to the Lender; and

WHEREAS, as a condition precedent to the making of the Loan, *inter alia*, the Lender has required that the Guarantor, who has an equity ownership interest, whether direct or indirect, in the Borrower, and thus will directly or indirectly benefit from the Loan, unconditionally enter into and execute this Guaranty Agreement, hereby guaranteeing the full, prompt and unconditional payment when due of the Loan, and the full and complete performance of all other obligations of the Borrower with respect to the Loan (the "Borrower's Obligations"); and

WHEREAS, the Guarantor has determined that the execution, delivery and performance of this Guaranty Agreement directly benefits, and is in the best interests of, the Guarantor; and

WHEREAS, all words and terms not defined herein shall have the respective meanings and be construed herein as provided in the Note and Pledge and Security Agreement;

THEREFORE, in consideration of the Loan made to the Borrower and with knowledge that the Lender would not make the Loan but for the promises of the Guarantor hereunder, the Guarantor, hereby absolutely and unconditionally, represents, warrants and covenants as follows:

1. The Guarantor hereby irrevocably guaranties the full, prompt and unconditional payment when due, of the Borrower's Obligations due and owing to the Lender, when and as the same shall become due, whether at the stated maturity date, by acceleration or otherwise, and the full, prompt, and unconditional performance of each and every term and condition of any transaction to be kept and performed by the Borrower under the Note. This Guaranty Agreement is a primary obligation of the Guarantor and shall be a continuing inexhaustible Guaranty Agreement. In the event any of the Borrower's Obligations shall not be paid or performed according to their terms, the Guarantor shall immediately pay or perform the same, this Guaranty Agreement being an absolute, irrevocable and unconditional guaranty of full payment and performance and not a guaranty of collection.
2. The Guarantor waives all defenses based upon surety or impairment of collateral, including without limitation, any actions or defenses identified generally or specifically under the Uniform Commercial Code or other body of law governing sureties or guarantors, waives notice of acceptance of this Guaranty Agreement and notice of any of the Borrower's Obligations to which it may apply, and waives notice of default, non-payment, partial payment, presentment, demand,

protest, notice of protest or dishonor and all other notices to which the Guarantor might otherwise be entitled, or which might be required by law and required to be given by the Lender.

3. The obligations of the Guarantor hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, be a defense to or otherwise affected by:
   (a) any extension, renewal, settlement, indulgence, compromise, waiver or release of or with respect to any of the Borrower's Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of the Borrower's Obligations, whether (in any such case) by operation of law or otherwise, or any failure or omission to enforce any right, power or remedy with respect to any of the Borrower's Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Borrower's Obligations;
   (b) any modification or amendment of or supplement to the Note, including, without limitation, any such amendment which may increase the amount of the Borrower's Obligations guaranteed hereby;
   (c) any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Borrower's Obligations or any part thereof, any other guaranties with respect to the Borrower's Obligations or any part thereof, or any other obligation of any person or entity with respect to the Borrower's Obligations or any part thereof, or any non-perfection or invalidity of any direct or indirect security for any of the Borrower's Obligations;
   (d) any acceptance by the Lender of additional security to act as collateral for the Borrower's Obligations;
   (e) any change in the structure or ownership of the Borrower or any other guarantor of any of the Borrower's Obligations, or any solvency, bankruptcy, reorganization, or other similar proceeding affecting the Borrower or any other guarantor of any of the Borrower's Obligations, or any of their respective assets or any resulting release or discharge of any obligation of the Borrower any guarantor of any of the Borrower's Obligations;
   (f) the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Borrower, any other guarantor of any of the Borrower's Obligations, the Lender or any other person, whether in connection herewith or in connection with any unrelated transactions;
   (g) the enforceability or validity of the Borrower's Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto or with respect to any collateral securing the Borrower's Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower or any other guarantor of any of the Borrower's Obligations, for any reason related to the Note or any provision of applicable law or regulation purporting to prohibit the payment by the Borrower or any other guarantor of any of the Borrower's Obligations;
   (h) the failure of the Lender to take any steps to perfect and maintain any security interest in, or to preserve any rights to, any security or collateral for any of the Borrower's Obligations, if any;
   (i) any borrowing or grant of a security interest by the Borrower, debtor-in-possession, under Section 364 of the United States Bankruptcy Code;
   (j) the disallowance, under Section 502 of the United States Bankruptcy Code, of all or any portion of the claims of the Lender for repayment of all or any part of any of the Borrower's Obligations;

(k) the failure of any other guarantor to sign or become party to this Guaranty Agreement or any amendment, change, or reaffirmation hereof; or

(l) any other act or omission to act or delay of any kind by the Borrower, any other guarantor of any of the Borrower's Obligations, the Lender or any other person or any other circumstance whatsoever which might, but for the provisions of this Section constitute a legal or equitable discharge of the Guarantor's obligations hereunder.

4. Upon the occurrence of an Event of Default (as such term is defined in the Note), the Lender shall be immediately entitled to enforce the obligations of the Guarantor hereunder.
5. The Lender may at any time before or after an Event of Default exercise its right to set-off all or any portion of the Borrower's Obligations owed to it against any liability or indebtedness of the Lender to the Borrower or the Guarantor (whether owed by the Borrower or the Guarantor or alone or in conjunction with any other person or entity, provided that the Borrower or the Guarantor has a beneficial interest therein) without prior notice to the Borrower or Guarantor.
6. The Guarantor hereby waives any right or claim of right to cause a marshalling of the Borrower's assets or to cause the Lender to proceed against any of the security or collateral held by the Lender before proceeding against the Guarantor, and the Guarantor hereby waives any and all legal requirement that the Lender shall institute any action at law or in equity against the Borrower, or anyone else, with respect to the Note or with respect to any other documents, agreements or instruments executed by the Borrower or with respect to any security held by the Lender, as a condition precedent to bringing any action against the Guarantor upon this Guaranty Agreement.
7. Until repayment and performance of all of the Borrower's Obligations, the Guarantor hereby irrevocably waives and relinquishes any and all statutory, contractual, common law, equitable or other claims and rights (a) to seek reimbursement, contribution, indemnification, set-off or other recourse from or against the Borrower in connection with any payments made by the Guarantor under this Guaranty Agreement and (b) to be subrogated to the Lender's rights under the Note upon the Guarantor's performance under this Guaranty Agreement.
8. This Guaranty Agreement is made and shall continue as to any of the Borrower's Obligations to the Lender without regard to the existence of other collateral or security or guaranties, if any, or to the validity or effectiveness of any or all thereof; and any or all such collateral and security and guaranties may, from time to time, without notice to or consent of the Guarantor, be sold, released, surrendered, exchanged, settled, compromised, waived, subordinated or modified, with or without consideration, on such terms and conditions as may be acceptable to the Lender without in any manner affecting or impairing the liability of the Guarantor. The Guarantor's obligations under this Guaranty Agreement shall extend to any and all monies advanced by the Lender pursuant to the Note.
9. If claim is ever made upon the Lender for repayment or recovery of any amount or amounts received by the Lender in payment for, or on account of, any of the Borrower's Obligations, and the Lender repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over the Lender or any of its property, or (b) any settlement or compromise of any such claim effected by the Lender with any such claimant (including the Borrower), then, and in such event, the Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon him, notwithstanding the cancellation of any note or any other instrument evidencing any of the Borrower's Obligations, and the Guarantor shall be and remain liable to the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.
10. Settlement of any claim by the Lender against the Borrower, whether in any proceeding or not, and whether voluntary or involuntary, shall not reduce the amount due under the terms of this

Guaranty Agreement except to the extent of the amount paid by the Borrower in connection with the settlement.

11. No delay on the part of the Lender in exercising any of its rights, powers or privileges or partial or single exercise thereof under the Note, this Guaranty Agreement or any other document made to or with the Lender by the Borrower shall operate as a waiver of any such privileges, powers or rights. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty Agreement, shall be deemed to be made by the Lender unless the same shall be in writing, duly signed on behalf of the Lender, by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of the Lender or the obligations of the Guarantor to the Lender in any other respect at any other time.
12. All rights, powers and remedies afforded to the Lender by reason of this Guaranty Agreement are separate and cumulative remedies and no one of such remedies whether or not exercised by the Lender shall be deemed to exclude any of the other remedies available to the Lender nor prejudice availability of any other legal or equitable remedy which the Lender may have with respect to the Loan.
13. This Guaranty Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma without reference to principles of conflicts of law, except to the extent that the validity or perfection of the security interest granted hereunder, or remedies hereunder, in respect of any particular collateral are governed by the laws of another jurisdiction. The fact that any part of this Guaranty or the Note may not be enforced will not affect the enforceability of the rest of such documents. The Guarantor irrevocably submits to the exclusive jurisdiction of any federal or state court located in the State of Oklahoma with respect to any proceedings relating to this Guaranty or the Note, and irrevocably agrees not to assert any objection to venue in such court or any claim of inconvenient forum. The Guarantor irrevocably consents to service of process by mailing of such process by registered or certified mail, postage prepaid, at its address set forth below.
14. This Guaranty Agreement shall be binding upon and inure to the benefit of and be enforceable by all parties hereto and their respective successors, assigns, heirs, administrators, executors and legal representatives.
15. All notices and other communications relating to this Guaranty shall be made in writing and delivered to the Borrower at 954 West Washington Blvd., Suite 250, Chicago, Illinois 60607, and delivered to the Lender at 1585 E. 22nd St., Tulsa, OK 74114-1305, or such other place as the Lender shall designate in writing, with a copy to the Guarantor at the address indicated on the signature page below. Any such notice shall be deemed effective (i) when delivered, if delivered personally or by email or facsimile transmission, (ii) two (2) days after delivered (properly addressed and all fees paid) for overnight delivery service to a courier that regularly provides such service and regularly obtains executed receipts evidencing delivery, or (iii) five (5) days after deposited (properly addressed and stamped for first-class delivery) in the United States mail.
16. In case of any proceedings to collect any liabilities from the Guarantor, the Guarantor shall pay all costs and expenses of every kind for collection, sale or delivery, including reasonable attorney's fees, and after deducting such costs and expenses from the proceeds of sale or collection, the Lender may apply any residue to the liabilities of the Guarantor who shall continue to be liable for any deficiency, with interest at the Note Rate (as such term is defined under the Note).
17. This Guaranty shall be binding upon the Guarantor and the heirs, legal representatives, successors and assigns of the Guarantor. If more than one party shall execute this Guaranty, the term

"Guarantor" shall mean all parties executing this Guaranty, and all such parties shall be jointly and severally obligated hereunder.

18. In all references herein to any parties, persons, entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.
19. The Guarantor hereby acknowledges and agrees that the Guarantor shall have the sole responsibility for obtaining from the Borrower such information concerning the Borrower's financial condition and business operations as the Guarantor may require, and that the Lender has no duty at any time to disclose to the Guarantor any information relating to the business operations or financial condition of the Borrower.
20. THE GUARANTOR HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION NOW EXISTING OR HEREAFTER ARISING RELATING TO THE LOAN, THIS GUARANTY AGREEMENT, THE NOTE OR ANY DEALINGS OR TRANSACTIONS RELATED THERETO AND THE GUARANTOR AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY.
21. THE GUARANTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. THE GUARANTOR CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER, IN THE EVENT OF LITIGATION, WILL NOT SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR THE LENDER TO ACCEPT THIS GUARANTY AGREEMENT AND MAKE THE LOAN.

INTENDING TO BE BOUND, the Guarantor has caused this Guaranty Agreement to be duly executed and delivered, all as of the day and year first above written.

**Guarantor:**

______________________________

**Ruchir A. Kadakia**
**94 Deer Plain Dr.**
**Spring, TX 77389**

**NOTICE OF MATURITY DATE EXTENSION**

March 17, 2015

**Via Email and Certified Mail – Return Receipt Requested**

R.P. Small Corp.
Attn: Richard Small, President
1585 E. 22nd St.
Tulsa, OK 74114-1305
rsmall29@cox.net

This Notice to R.P. Small Corp. is for the purpose of extending the Maturity Date of that certain Promissory Note dated March 27, 2014 executed by Tethys Trading, LLC ("Maker") to the order and in favor of R.P. Small Corp. ("Payee"). Maker hereby extends the Maturity Date for a period of twelve (12) months from and after March 27, 2015, and such new Maturity Date shall be March 27, 2016. All other terms and conditions of the Promissory Note shall remain in full force and effect.

**"MAKER"**

**TETHYS TRADING, LLC, an Oklahoma limited liability company**

**By:** ______________________________
**John E. Meyer, Jr.**
**Manager**

cc: Via Email and Mail
Brent Blackstock, Attorney for Payee
Hartman, Blackstock & Moore
PO Box 700690
Tulsa, OK 74170
brent@brentblackstock.com

R. Jay Chandler, Attorney for Maker

EXHIBIT 8

FILED UNDER SEAL

R. BRENT BLACKSTOCK
BLACKSTOCK LAW OFFICES

MID-CONTINENT TOWER, FIFTH FLOOR
401 S. BOSTON
TULSA, OKLAHOMA 74103
Main: 918-383-0777 | Fax: 918-699-0325

Brent@BrentBlackstock.com

May 17, 2019

Sam Bratton, Attorney
Two West Second Street, Ste 700
Tulsa, OK 74103

RE: Jack Meyer Personal Guaranty made to R.P. Small Corp. guaranteeing a Promissory Note of Tethys Trading, LLC for Six Million Dollars

Dear Mr. Bratton:

This letter is to inform you that we will be filing the attached Complaint in the Northern District of Oklahoma soon. In March 2014, Tethys Trading LLC executed a Promissory Note ("Note") to R.P. Small Corp. promising to pay Six Million Dollars plus interest. On March 24, 2014, J.E. "Jack" Meyer executed a Personal Guaranty Agreement securing the Promissory Note of Tethys Trading, LLC. On March 17, 2015, an extension to the Maturity Date of the original Note was granted extending the Maturity Date for an additional twelve (12) months.

As of the writing of this letter, Tethys has not fulfilled its obligations on the Note. Mr. Meyer guaranteed that he would "immediately pay or perform the [Borrower's Obligations]." Please remit Six Million Dollars plus interest of $2,502,000 for a total of $8,502,000 due immediately. If payment in full is not remitted in the next 5 days of receipt of this letter, then we will initiate litigation to collect the monies due and owing.

Pursuant to the Fair Debt Collection Practices Act, you are advised that this office is deemed to be a debt collector and any information obtained may be used for that purpose.

Sincerely,

Brent Blackstock
Attorney at Law

Enclosures

cc: Richard Small

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **R.P. Small Corp.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. ________________** |
| **v.** | ) | |
| | ) | |
| **J.E. (Jack) Meyer, Jr.** | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now Plaintiff, R.P. Small Corp. ("RPS" or "Plaintiff") for its Complaint and claims against the Defendant, alleges and states as follows:

## PARTIES

1. R.P. Small Corp. ("RPS") is an Illinois corporation with its principal place of business located in Tulsa, Oklahoma.

2. The Defendant, Jack Meyer ("Meyer" or "Defendant"), is an individual currently domiciled in Chicago, Illinois.

3. The acts, events, and transactions complained of herein occurred by virtue of the execution of promissory notes, deemed executed in Tulsa County, Oklahoma, and the damages suffered by RPS as a result of Defendant's breach of contract, and non-payment of the notes, occurred in Tulsa County, Oklahoma.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action and the parties, pursuant to 28 U.S.C. § 1332, as this is an action between a citizen of a state and a citizen of a foreign state where the matter in controversy exceeds the amount of $75,000, exclusive of interests and costs.



EXHIBIT 9
PAGE 2 OF 5

5. Venue is proper in this judicial district under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district.

6. The Promissory Note and Guarantee Agreement underlying this Complaint were negotiated and entered into in Oklahoma, and the Note contains jurisdiction-consent provisions for the State of Oklahoma.

## FACTUAL ALLEGATIONS

7. On or around March 14, 2014, Tethys Trading LLC and RPS entered into a Promissory Note ("Note"), dated March 27, 2014. *See* Exhibit B.

8. As agreed, Meyer signed and executed a personal guaranty (the "Guaranty") to Plaintiff on or around that same date, March 14, 2014.

9. Pursuant to the Guaranty, Meyer agreed to be joint and severally liable for breach of the Note. *See* Exhibit A, at ¶ 17.

10. On or around March 17, 2015, an extension to the Maturity Date was granted on the original Note for a period of twelve (12) months after March 27, 2015 to March 27, 2016. *See* Exhibit C.

11. According to the Personal Guaranty that was executed by Meyer, he guaranteed the "full, prompt, and unconditional payment when due, of the Borrower's (Tethys) Obligations due and owing to the Lender (RP Small Corp)." *See* Exhibit A, at p. 1.

12. Meyer, as a Guarantor, also agreed to "immediately pay or perform the [Borrower's Obligations]." The Guaranty specifically states: "[T]his Guaranty Agreement [is] an absolute, irrevocable and unconditional guaranty of full payment and performance and not a guaranty of collection." *See* Exhibit A.

## I. FIRST CAUSE OF ACTION – BREACH OF GUARANTY

13. RPS realleges all of the foregoing allegations.

14. As of March 27, 2016, payments on the Promissory Note were not made as provided for in the Promissory Note.

15. Meyer is in breach of the terms of the personal guaranty on the promissory note note because he has not paid the amount due to RPS.

16. Meyer currently owes RPS the sum total of six million dollars, plus interest, of $2,502,000 for a total of $8,502,000, calculated as provided for in the Promissory Note at 10% interest per annum. *See* Exhibit B, at ¶13 and Exhibit D.

## PRAYER

WHEREFORE, RPS respectfully requests this Court grant the relief set forth in this Complaint, specifically:

1. A judgment declaring and finding the Defendant Meyer has breached its repayment obligation on the promissory note identified herein.
2. An award of damages in favor of RPS and against Defendant for Breach of Personal Guaranty of Promissory Note in the sum of $6,000,000, plus interest of $2,502,000, for a total of $8,502,000, plus prejudgment interest to be calculated under the laws of the State of Oklahoma.
3. Attorney fees and the costs of litigation pursuant to the terms of the promissory note serving as the underlying basis for RPS's claims.
4. Such further relief to which RPS is entitled.



EXHIBIT 9
PAGE 4 OF 5

Dated: April 17, 2019

Respectfully Submitted,

By: /s/ Brent Blackstock
R. Brent Blackstock, OBA No. 00839
Lacey L. Shirley, OBA 33269
Mid-Continent Tower, Suite 500
401 S. Boston Ave.
Tulsa, OK 74103
(918) 383-0777 (918) 699-0300 (fax)
***Counsel for Plaintiff***

EXHIBIT 10

FILED UNDER SEAL

EXHIBIT 11

FILED UNDER SEAL

**AFFIDAVIT OF RICHARD P. SMALL**

State of Oklahoma )
) ss.
County of Tulsa )

**RICHARD P. SMALL,** of lawful age, being first duly sworn upon oath, deposes and states:

1. I am the President of Plaintiff R.P. Small Corporation.
2. I have direct knowledge of the facts set forth below. I have full authority to make these statements on behalf of the Plaintiff.
3. R.P. Small Corporation received all of the payments as indicated on **Exhibit 1** and **Exhibit 2.**
4. The calculations of balance and interest shown on **Exhibit 1** are correct.
5. I received an email from Robert Finnegan on April 7, 2020 attached as **Exhibit 13.**
6. I have never received any notifications from Tethys Group from John E. "Jack" Meyer, Jr. or Robert Finnegan as promised in the 2019 Workout Agreement.

Further Affiant sayeth not.

Dated June 8, 2020.

R P Small

______________________
Richard P. Small

Subscribed and sworn to before me this 8th day of June, 2020.

SARAH ANDREWS NOTARY # 17008540 EXP. 09/12/21 PUBLIC STATE OF OKLAHOMA

Sarah Andrews
______________________,
Notary Public

[Notarial Seal]

My commission expires: 09/12/21.

# Tethys Supply & Marketing, LLC

Financial Report
December 31, 2019

THE POWER OF BEING UNDERSTOOD
AUDIT | TAX | CONSULTING

RSM

**Contents**


| | |
|---|---|
| Independent auditor's report | 1 |
| Financial statements | |
| Balance sheet | 2 |
| Statement of operations | 3 |
| Statement of changes in member's equity (deficit) | 4 |
| Statement of cash flows | 5 |
| Notes to financial statements | 6-12 |

RSM

## Independent Auditor's Report

RSM US LLP

Board of Directors
Tethys Supply and Marketing, LLC

**Report on the Financial Statements**
We have audited the accompanying financial statements of Tethys Supply & Marketing, LLC (the Company), which comprise the balance sheet as of December 31, 2019, the related statements of operations, changes in member's equity (deficit) and cash flows for the year then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**
Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**
Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**
In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Tethys Supply & Marketing, LLC as of December 31, 2019, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

RSM US LLP

Chicago, Illinois
March 31, 2020

THE POWER OF BEING UNDERSTOOD
AUDIT | TAX | CONSULTING



RSM US LLP is the U.S. member firm of RSM International, a global network of independent audit, tax, and consulting firms. Visit rsmus.com/aboutus for more information regarding RSM US LLP and RSM International.

EXHIBIT 13
PAGE 3 OF 14

**Tethys Supply & Marketing, LLC**

**Balance Sheet**
**December 31, 2019**

| | |
|---|---|
| **Assets** | |
| Current assets: | |
| Cash | $ 9,339,177 |
| Receivable from broker-dealer | 371,699 |
| Accounts receivable | 8,145,492 |
| Inventories | 19,934,961 |
| Receivable from affiliate | 18,963 |
| Other assets | 1,740,183 |
| **Total current assets** | 39,550,475 |
| Property and equipment: | |
| Machinery and equipment | 29,102 |
| Vehicles | 55,467 |
| Furniture | 4,279 |
| | 88,848 |
| Less accumulated depreciation and amortization | 33,663 |
| | 55,185 |
| **Total assets** | $ 39,605,660 |
| **Liabilities and Member's Equity** | |
| Current liabilities: | |
| Accounts payable, accrued expenses and other liabilities | $ 27,561,732 |
| Payable to affiliates | 12,653 |
| **Total current liabilities** | 27,574,385 |
| Notes payable to members | 2,200,000 |
| Member's equity | 9,831,275 |
| **Total liabilities and member's equity** | $ 39,605,660 |

See notes to financial statements.

**Tethys Supply & Marketing, LLC**

**Statement of Operations**
**For the year ended December 31, 2019**

| | |
|---|---|
| Net sales | $ 795,558,505 |
| Cost of goods sold | (789,634,725) |
| **Gross margin** | 5,923,780 |
| General and administrative | 2,748,095 |
| **Operating income** | 3,175,685 |
| Other income and expenses: | |
| Interest income | 3,013 |
| Interest expense | (1,824,338) |
| **Total other income and expenses** | (1,821,325) |
| **Net income** | $ 1,354,360 |

See notes to financial statements.

**Tethys Supply & Marketing, LLC**

**Statement of Changes in Member's Equity (Deficit)**
**For the year ended December 31, 2019**

| | |
|---|---|
| Balance, beginning of year | $ (5,023,085) |
| Contributions | 13,500,000 |
| Net income | 1,354,360 |
| Balance, end of year | $ 9,831,275 |

See notes to financial statements.



EXHIBIT 13
PAGE 6 OF 14

**Tethys Supply & Marketing, LLC**

**Statement of Cash Flows**
**Year Ended December 31, 2019**

| | |
|---|---|
| Cash flows from operating activities: | |
| Net income | $ 1,354,360 |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
| Depreciation and amortization | 10,030 |
| Change in fair value of derivative financial instruments | 32,767 |
| Changes in operating assets and liabilities: | |
| Receivable from broker-dealer | 1,267,603 |
| Accounts receivable | (1,848,730) |
| Inventories | (10,648,950) |
| Funded letters of credit | 1,500,000 |
| Receivable from affiliate | (18,963) |
| Other assets | (1,083,000) |
| Accounts payable, accrued expenses and other liabilities | 25,602,933 |
| Payable to affiliates | 12,653 |
| **Net cash provided by operating activities** | 16,180,703 |
| | |
| Adjustments to reconcile net income to net cash used in financing activities: | |
| Proceeds from revolving line of credit | 390,315,360 |
| Repayments on revolving line of credit | (404,054,918) |
| Proceeds on notes payable to members | 700,000 |
| Contributions | 6,000,000 |
| **Net cash used in financing activities** | (7,039,558) |
| | |
| **Net increase in cash** | 9,141,145 |
| | |
| Cash: | |
| Beginning | 198,032 |
| | |
| Ending | $ 9,339,177 |
| | |
| Supplemental schedule of noncash investing and financing activities: | |
| Cash payments for interest | $ 1,779,721 |
| Settlements of notes payable to members with funded letters of credit | $ 714,833 |
| Notes payable to members converted to contributions | $ 7,500,000 |

See notes to financial statements.

**Tethys Supply & Marketing, LLC**

**Notes to Financial Statements**

**Note 1. Nature of Business and Significant Accounting Policies**

**Organization of business:** Tethys Supply & Marketing, LLC ("the Company"), an Oklahoma limited liability company, was formed on October 23, 2015. During 2019, certain Class A Members converted their related party member promissory notes payable into equity interests in the Company. Subsequently, on July 31, 2019, all of the Class A Members contributed all of their equity interest in the Company to a newly formed entity, Tethys Group Holdings, LLC ("the Parent"). The Company's principal place of business is located in Chicago, Illinois. The Company engages primarily in the business of purchasing, blending and selling of gasoline.

**Note 2. Summary of Significant Accounting Polices**

**Use of estimates:** The preparation of financial statements in conformity with United States Generally Accepted Accounting Principles (U.S. GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

**Cash:** The Company maintains cash in bank deposit accounts, which at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts and does not believe it is exposed to any significant credit risk on cash.

**Accounts receivable:** The Company carries its accounts receivable at the original invoiced amounts less an allowance for doubtful accounts. On a periodic basis, the Company reviews the allowance for adequacy and bases its assessment on a combination of current information about its customers and historical write-off experience. At December 31, 2019, management has established an allowance for doubtful accounts of $0. The Company does not accrue interest on past due accounts.

**Inventories:** Inventory is stated at the lower of cost or net realizable value. Inventory costs have been determined under the first-in, first-out (FIFO) method.

**Derivative instruments:** To reduce the risk of price volatility on its inventory the Company will use commodity derivative instruments consisting of futures contracts. Futures transactions are recorded on a trade date basis. The net fair value of open trade equity in futures is included in receivable from broker-dealer and measured at the closing exchange price.

The Company records all financial and nonfinancial derivative instruments at fair value with the exception of those fixed purchase and sales commitments entered into in connection with its wholesale operations. For those derivatives entered into in connection with its wholesale operations, the Company does not trade or generally use these instruments with the objective of earning financial gains on commodity price fluctuations through net settlement. In accordance with Accounting Standards Codification (ASC) Topic 815, certain contracts that are settled by physical delivery, among other criteria, are eligible for and may be designated as normal purchases or normal sales. The Company has determined and documented that all such contracts outstanding at December 31, 2019, having the characteristics of derivatives meet the "normal purchase and normal sales" exception provided in ASC Topic 815, and as such, are not required to be accounted for as derivatives pursuant to ASC Topic 815 and other guidance. They are not marked to market, and settled amounts are recognized in the statement of operations as incurred.

**Income taxes:** As a limited liability company, the Company's taxable income or loss is allocated to the members. Accordingly, no provision or liability for income taxes has been included in these financial statements.



EXHIBIT 13
PAGE 8 OF 14

**Tethys Supply & Marketing, LLC**

**Notes to Financial Statements**

**Note 2. Summary of Significant Accounting Polices (continued)**

The Company has adopted the provisions of ASC Topic 740, Income Taxes. Under this topic of the ASC, in order to recognize an uncertain tax benefit, it must be more likely than not the taxpayer will sustain the position, and the measurement of the benefit is calculated as the largest amount that is more than 50 percent likely to be realized upon resolution of the benefit. The Company has not recorded a reserve for any tax positions for which the ultimate deductibility is highly certain but for which there is uncertainty about the timing of such deductibility. When and if applicable, potential interest and penalty costs are accrued as incurred, with expenses recognized in general and administrative expenses in the statement of operations, of which there were none in the period presented. As of December 31, 2019, the Company has no liability for unrecognized tax benefits.

**Property and equipment:** Property and equipment is carried at cost. Depreciation of equipment is computed using the straight-line method over the estimated useful lives of the assets.

**Revenue recognition:** Effective January 1, 2019, the Company adopted the Financial Accounting Standards Board's (FASB) Accounting Standards Update (ASU) 2014-09, *Revenue from Contracts with Customers (Topic 606)*, applying the modified retrospective transition method to those contracts that were not completed as of January 1, 2019. Topic 606 requires entities to recognize revenue in an amount that reflects the consideration to which the entity expects to be entitled in exchange for transferring goods or services to a customer. The Company applied the five-step method outlined in Topic 606 to all contracts with customers. The new revenue standard did not have an impact on the Company's financial statements.

As outlined in Note 1, the Company primarily sells gasoline blendstock. The Company's performance obligations identified within their customer contracts is to deliver gasoline blendstock. Customers of the Company consist of wholesale customers and other trading organizations located both in the United States and in foreign countries. The Company has determined that a performance obligation is satisfied at a point in time when title has been transferred to customers and typically corresponds with when the gasoline exits the terminal.

Credits are purchased from third parties to offset the renewable volume obligation generated from the related revenue. The obligation is accrued and expensed as incurred. Purchased credits are accounted for as an asset on the balance sheet. Sales of these credits to third parties are recognized as revenue when title transfers.

**Concentration of risks:** Due to the nature of its operations, the Company is subject to concentration of credit risk relating to business with a few customers. The Company performs ongoing credit evaluations of its customers' financial condition. During 2019, the Company had aggregate sales to three customers that approximated 62% of total gross sales. As of December 31, 2019, approximately 60% of trade accounts receivable held is with these customers.

**Recently adopted accounting pronouncements:** In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*. The guidance in this ASU supersedes the leasing guidance in Topic 840, *Leases.* Under the new guidance, lessees are required to recognize lease assets and lease liabilities on the balance sheet for all leases with terms longer than 12 months. Leases will be classified as either finance or operating, with classification affecting the pattern of expense recognition in the income statement. The Company adopted ASU 2016-02 during the year ended December 31, 2019. The adoption of the ASU did not have a material impact on the Company's financial statements because their agreements held as of year-end do not meet the definition of a lease under the new standard.



EXHIBIT 13
PAGE 9 OF 14

**Tethys Supply & Marketing, LLC**

**Notes to Financial Statements**

**Note 2. Summary of Significant Accounting Polices (continued)**

**Recently issued accounting pronouncements:** In August 2018, FASB issued ASU 2018-13, *Fair Value Measurement - Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement (Topic 820).* This update modifies the fair value measurement disclosure requirements specifically related to Level 3 fair value measurements and transfers between levels. The standard is effective on January 1, 2020. The Company is currently evaluating the impact of the adoption of this update but does not believe it will have a material impact on its balance sheet, results of operations or cash flows.

**Note 3. Commitments**

The Company enters into long term storage and throughput agreements with vendors. Annual rent expenses associated with these agreements for the year ended December 31, 2019 was $4,244,311 and was recorded in cost of goods sold on the statement of operations. These rental commitments do not meet the definition of a lease under ASC Topic 842 because the Company does not control the use of storage assets.

The minimum annual rental commitments under these agreements are as follows as of December 31, 2019:

| | |
|---|---|
| Years ending December 31, | |
| 2020 | $ 4,334,111 |
| 2021 | 4,442,464 |
| 2022 | 2,251,558 |
| | $ 11,028,133 |

The Company has outstanding sales commitments of approximately 625,000 barrels of gasoline at an expected sales price of approximately $43,188,000, and outstanding purchase commitments of approximately 376,000 barrels of gasoline at an expected purchase price of approximately $26,480,000.

**Note 4. Related Party Transactions**

On July 31, 2019, the Company entered into two separate revolving lines of credit with affiliates, each with a maximum borrowing of $6,000,000. The lines bear an interest rate that is mutually agreed upon at the time of funding. As of December 31, 2019, there were no outstanding borrowings against these lines.

The Company entered into a note payable with a member of the Company. The interest on this note is based on the Wall Street Journal (WSJ) Prime plus 6.5%. Interest is paid monthly, with principal due on the note on January 31, 2021 with a principal balance of $2,200,000 outstanding as of December 31, 2019.



EXHIBIT 13
PAGE 10 OF 14

**Note 5. Fair Value of Financial Instruments**

Under the FASB's authoritative guidance on fair value measurements, ASC Topic 820, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. ASC Topic 820 provides a fair value hierarchy, which gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). Inputs are broadly defined as assumptions market participants would use in pricing an asset or liability. The three levels of the fair value hierarchy are described below:

Level 1: Unadjusted quoted prices in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date.

Level 2: Inputs other than quoted prices within Level 1 that are observable for the asset or liability, either directly or indirectly, and the fair value is determined through the use of models or other valuation methodologies. A significant adjustment to a Level 2 input could result in the Level 2 measurement becoming a Level 3 measurement.

Level 3: Inputs are unobservable for the asset or liability and include situations where there is little, if any, market activity for the asset or liability. The inputs into the determination of fair value are based upon the best information in the circumstances and may require significant management judgment or estimation.

In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, a financial instrument's level within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment, and considers factors specific to the financial instrument.

The Company assesses the levels of the financial instruments at each measurement date, and transfers between levels are recognized on the actual date of the event or change in circumstances that caused the transfer in accordance with the Company's accounting policy regarding the recognition of transfers between levels of the fair value hierarchy. For the year ended December 31, 2019, there were no transfers among levels.

Financial securities traded on a national securities exchange are stated at the last reported sales price on the day of valuation. Futures contracts are valued at exchange settlement prices. These financial instruments are classified as Level 1 in the fair value hierarchy.



EXHIBIT 13
PAGE 11 OF 14

**Tethys Supply & Marketing, LLC**

**Notes to Financial Statements**

**Note 5. Fair Value of Financial Instruments (continued)**

The following table presents the Company's fair value hierarchy for those assets and liabilities measured at fair value on a recurring basis as of December 31, 2019:

| Description | Fair Value Measurements Using Quoted Prices in Active Markets for Identical Assets and Liabilities (Level 1) |
|---|---|
| Assets: | |
| Receivable from broker-dealer | |
| Exchange traded futures - open trade equity | $ 15,725 |
| Total assets | $ 15,725 |
| Liabilities: | |
| Receivable from broker-dealer | |
| Exchange traded futures - open trade equity | $ 30,509 |
| Total liabilities | $ 30,509 |

As of December 31, 2019, the Company had no assets or liabilities that fall within the Level 2 or Level 3 categories.

**Note 6. Receivable from Broker-Dealer**

Amount receivable from broker-dealer at December 31, 2019, consists of the following:

| | |
|---|---|
| Exchange traded futures - open trade equity, net | $ (14,784) |
| Cash held by broker | 386,483 |
| | $ 371,699 |

**Note 7. Derivative Financial Instruments**

The Company's trading activities may result in notional value of open derivative positions that is not representative of the risk in the outstanding derivative contracts. The Company's trading activities may involve the use of hedging strategies to reduce directional and non-directional risks. There is no guarantee that the hedging strategies will achieve their desired result. The Company does not consider any derivative instruments to be hedging instruments, as those terms are generally understood under GAAP.

**Tethys Supply & Marketing, LLC**

**Notes to Financial Statements**

**Note 7. Derivative Financial Instruments (continued)**

The following table sets forth the gross fair value of the Company's derivatives contracts by certain risk types as of December 31, 2019:

| Underlying Risk | Gross Asset Derivatives at Fair Value December 31, 2019 | Gross Liability Derivatives at Fair Value December 31, 2019 |
|---|---|---|
| Energy contracts | | |
| Futures | $ 15,725 | $ (30,509) |

The Company's derivative instruments had the following impact on the statement of operations during the year ended December 31, 2019:

| Underlying Risk | Statement of Income Location | Gains (Losses), Net |
|---|---|---|
| Energy contracts | | |
| Futures | Cost of goods sold | $ (1,834,542) |

**Note 8. Off-Balance Sheet Risk and Concentration of Credit Risk**

**Market risk:** Derivative financial instruments involve varying degrees of off-balance-sheet market risk whereby changes in the fair values of the underlying financial instruments may result in changes in the value of the financial instruments in excess of the amounts reflected in the balance sheet. Exposure to market risk is influenced by a number of factors, including the relationships between financial instruments and the Company's proprietary positions, as well as the volatility and liquidity in the markets in which the financial instruments are traded. In many cases, the use of such financial instruments serves to modify or offset market risk associated with other transactions and, accordingly, serves to decrease the Company's overall exposure to market risk. The Company attempts to manage its exposure to market risk arising from the use of these financial instruments through various monitoring techniques.

**Credit risk:** Exchange traded financial instruments, such as futures, generally do not give rise to significant counterparty exposure due to the cash settlement procedures for daily market movements and the margin requirements of the individual exchanges or centralized clearing parties.

**Concentrations of credit risk:** The Company also enters into various transactions with domestic broker-dealers and other financial institutions. These transactions may at times represent a concentration of credit risk. In the event these counterparties do not fulfill their obligations, the Company may be exposed to risk. This risk of default depends on the creditworthiness of the counterparties to these transactions. It is the Company's policy to monitor the creditworthiness of each party with which it conducts business.

**Tethys Supply & Marketing, LLC**

**Notes to Financial Statements**

**Note 9. Bank Loan Payable and Lines of Credit**

The Company had a revolving loan agreement with a bank up to a maximum of $29,500,000 that was to terminate on February 9, 2019, but was amended to extend the maturity date to September 9, 2019. Interest was paid on the outstanding principal loan balance at a rate equal to the U.S. prime rate plus 2.5%, provided that the interest rate was never below 6% per annum. This agreement was terminated on September 9, 2019, with the remaining outstanding balance at that date being paid.

On August 14, 2019, the Company entered into a revolving line of credit with a maximum borrowing of $37,500,000. The line of credit bears interest at a rate quoted by the Lender at or about the time of any advance plus 4.375%. The Company had no advances outstanding under the revolving line of credit at December 31, 2019. The Company is subject to certain restrictions and covenants as defined in the agreement. The Company holds letters of credit in connection with purchasing of inventory. The Company had $29,065,379 of letters of credit outstanding, which reduced the available maximum borrowing on the line of credit to $8,434,621 at December 31, 2019.

**Note 10. Subsequent Events**

The financial statements and related disclosures include evaluation of events through and including March 31, 2020, which is the date the financial statements were available to be issued. The revolving line of credit was amended on February 28, 2020, to increase the maximum borrowing capacity to $45,000,000. This facility is used in conjunction with the Company's normal gasoline operations. On February 24, 2020, an additional $1,000,000 of capital was contributed to the Company.



EXHIBIT 13
PAGE 14 OF 14