AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

| | | |
|---|---|---|
| R.P. Small Corp. *Plaintiff* v. Ruchir A. Kadakia et al. *Defendant* | ) ) ) ) ) ) | Civil Action No. 19-CV-271-CVE-JFJ |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Tethys Group Holdings, LLC served on registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Documents related to communications from July 31, 2019 to present for Jack Meyer and Robert Finnegan; cus; all note payments; and balance sheets and income/profit loss/ statements and reports. See Exhibit 1.

| Place: Eimer Stahl LLP, Scott Solberg<br>224 South Michigan Avenue, Suite 1100<br>Chicago, IL 60604 | Date and Time:<br>07/22/2020 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/08/2020

EXHIBIT 1

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* R.P. Small Corp., who issues or requests this subpoena, are:

R. Brent Blackstock, 401 S. Boston Ave. STE 500, Tulsa, OK 74103; brent@brentblackstock.com, 918-383-0777

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 19-CV-271-CVE-JFJ

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________
______________________________________________________________
______________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________
______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ______________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT 1

Please produce all notices, correspondence or other communications between John E. Meyer, Jr., or Robert Finnegan, and Tethys Group Holdings, LLC pursuant to the Tethys Group Holdings LLC Amended and Restated LLC Agreement including but not limited to any notices, reports, distributions or other communications referred to in the pages of the Tethys Group Holdings LLC Operating Agreement attached hereto as Exhibits A – D.

Please produce all balance sheets and income/profit loss statements, or any additional documents showing the profitability for Tethys Group Holdings that Robert Finnegan may have relied on when he stated that Tethys Group Holdings LLC was showing a "net profit of approximately $1,000,000.00 million per month." See Robert Finnegan's April 7, 2020 email attached hereto as Exhibit E.

**From:** Robert Finnegan <finnegan.rob@gmail.com>
**Sent:** Tuesday, April 7, 2020 1:21 PM
**To:** rsmall29@cox.net; ntsmall75@gmail.com; brent@brentblackstock.com
**Subject:** Robert Finnegan Update and Guarantee proposal
**Attachments:** 2018 Tax Return Documents (Tolleson Finnegan Rob - Client Copy).pdf; 2020-04-07_122355.pdf

Mr. Small, Mrs. Small, and Mr. Blackstock,

Good Afternoon – I hope that all of you are staying safe and healthy in these extraordinary times. I am writing to you today as an effort to discuss my guarantee for the first time outside of the umbrella of Tethys, Jack, or any other party. I am at a juncture for my family and I wanted to continue as I have always done and reach out to you from a very earnest and honest place. I will make the best effort I can to keep this as concise as I possibly can.

There is no other reason why I am not including Jack on this note other than I would like to repave my relationship with you to a direct route in order to completely represent myself to you rather than any third parties. To begin I would like to express my gratitude for your patience and time to allow me to keep my head down and rebuild Tethys to a platform that is capable of the re-payment of your note. Tethys is on a great path to become extremely profitable and is currently earning a net profit of approximately $1,000,000.00 per month. The program and the new controlling partners TMG are built for the adversity we are now seeing in the market and will continue to find ways to limit downside and maximize profits. I am extremely proud that after hard long years of raising capital, bank lines, and architecting the current program Tethys has never been more posed for absolute success as it is now. Now that I have gotten Tethys to this place and after lots of prayers, discussion with my wife, and with the TMG partners it is time for me to allow TMG to take the company to the next level and mange all aspects of the business. What that means for me is that I will no longer be the CEO and in a daily operational role but will remain on the board and in an advisory role. This will allow me the opportunity to take a step back and focus on the needs of my young growing family and that path is for me to seek normal employment with security, retirement benefits, and overall, the opportunity to be healthier for my family.

I am not a wealthy man, nor do I come from a wealthy family. Tethys has left me with nothing more than just at $100,000.00 of equity in my home and a modest savings account. [redacted] I am one of the few shareholders that has a positive Capital account and my equity is earning every day the company is profitable. By my estimates my capital account should be right around $250,000 and I currently have about 4.5% profit interest in the firm. Tethys is built to earn at a high rate, and I anticipate that my capital account should grow at 4-6 hundred thousand per year. In my new role I will be taking a consulting and broker opportunity for Willis Tower Watson on their marine insurance sales team. I am very excited about the new opportunity but again my Tethys Equity is the only value I have that could possibly satisfy my guarantee to your note.

Our current deal has me giving you 10% of the economic interest in my Tethys shares and 10% of everything I earn at Tethys outside of my base salary. [redacted] This will allow you to see the upside of Tethys without limitations, recoup all, part, or in excess of your losses and will allow me to take a normal Job and focus on security for my Family. I am very aware that this offer comes prior to you possibly getting a settlement against Ruchir Kadakia who has a high net worth and that settlement would most probably benefit me in our current workout agreement.



EXHIBIT 2
PAGE 1 OF 2

EXHIBIT 2
PAGE 2 OF 2

Of course, I will respect if you decline my offer and in that case I will continue to uphold 100% of our current agreement and its terms and when possible much more than 10% of any earnings I get from any employment in or outside the Tethys umbrella. I have attached 2019 w2 (haven't filled taxes yet) for your review as well as my 2018 taxes.

Please know that this note is intended to be as respectful as possible and I really appreciate your time in reading it and considering my offer. I can be available anytime to have a call with your or Mr. Blackstock directly.

All the best,

Robert Finnegan



EXHIBIT 2
PAGE 2 OF 2

additional Interests being purchased by Transmarket (based on the aggregate Capital Account balances of the Interest Holders as of the effective date of such issuance, as equitably reduced by the Board for distributions to be made with respect to the current Allocation Period) unless a Supermajority of the Board determines to use other means in determining the purchase price; provided, however, that, unless Transmarket has already provided notice of its intent to exercise its rights under this **Section 3.8** as of the end of an Allocation Period, Transmarket shall not be permitted to purchase additional Interests in connection with the Company's receipt of a bona fide written offer to consummate a Sale Transaction from a third party (e.g., a signed term sheet) until such transaction has closed or the Company has determined not to accept such offer. This right never expires or terminates.

## ARTICLE IV
## DISTRIBUTIONS

Section 4.1. Distribution Generally. Subject to the other provisions of this **Article IV**, a Supermajority of the Board shall have the right, in its sole discretion, to determine whether, and to what extent, distributions of Trading Net Cash Flow, Net Cash Flow and Net Capital Proceeds shall be made to the Interest Holders. Notwithstanding anything to the contrary herein, the Board shall have the right in its sole discretion to determine that any distributions made during the first four (4) months of any calendar year (i) relate to the prior calendar year and (ii) shall be deemed to be made for all purposes hereunder as of January 1 of such calendar year.

Section 4.2. Distributions of Trading Net Cash Flow. Subject to the other provisions of this Article IV and the terms of the applicable Supplemental Trading Agreement, the Company shall distribute to each applicable Interest Holder, within ninety (90) days following the last day of any Allocation Period, any Trading Net Cash Flow attributable to any Net Trading Profits allocated to such Interest Holder with respect to such Allocation Period pursuant to such Interest Holder's Supplemental Trading Agreement; provided, however, that (x) prior to the first day of the Fiscal Year immediately following the Catch-Up Date applicable to any Principal, the Board shall have the right to withhold up to 50% of any such distributions of Trading Net Cash Flow to such Principal, and (y) on or following the first day of such Fiscal Year but prior to the first day of the Fiscal Year immediately following the Equalization Date applicable to any such Principal, the Board shall have the right to withhold up to 33% of any such distributions of Trading Net Cash Flow to such Principal (in each case, only to the extent that any such withholding of distributions would not cause the applicable Catch-Up Date or Equalization Date to occur); provided further that the Board shall have the right to reduce any amounts of Trading Net Cash Flow to be distributed to an Interest Holder pursuant to this **Section 4.2** by up to the total amount (if any) of Net Operating Losses, Net Trading Losses and/or Net Capital Losses that would be allocated to such Interest Holder with respect to the Allocation Period following such Allocation Period that if such subsequent Allocation Period ended as of the date that such distribution is made. Notwithstanding anything to the contrary contained in this **Section 4.2**, the Board shall have the right to offset against any distribution due to an Interest Holder pursuant to this **Section 4.2** any outstanding amounts under any loan made by the Company or any other Interest Holder to such Interest Holder and any outstanding advance distribution under **Section 4.6** or **Section 4.8**.

Section 4.3. Distributions of Net Cash Flow. Subject to the other provisions of this **Article IV**, if a Supermajority of the Board determines to make distributions of Net Cash Flow

pursuant to **Section 4.1**, a Supermajority of the Board shall have the right to make such distributions of Net Cash Flow to any Interest Holder or Interest Holders from time to time on a pro rata or non-pro rata basis in such proportions as a Supermajority of the Board determines in its sole discretion; provided, however, that (a) prior to the first day of the Fiscal Year immediately following the Catch-Up Date applicable to any Class A-1 Interest Holder, up to 50%, as determined by such Class A-1 Interest Holder, of any Net Cash Flow attributable to any Net Operating Profits allocated to such Class A-1 Interest Holder as part of the Management Pool shall be distributed to such Class A-1 Interest Holder, (b) on or following the first day of such Fiscal Year but prior to the first day of the Fiscal Year immediately following the Equalization Date applicable to such Class A-1 Interest Holder, up to 67%, as determined by such Class A-1 Interest Holder, of any Net Cash Flow attributable to any Net Operating Profits allocated to such Class A-1 Interest Holder as part of the Management Pool shall be distributed to such Class A-1 Interest Holder, and (c) on or following the first day of the Fiscal Year immediately following the Equalization Date applicable to such Class A-1 Interest Holder, up to 100%, as determined by such Class A-1 Interest Holder, of any Net Cash Flow attributable to any Net Operating Profits allocated to such Class A-1 Interest Holder as part of the Management Pool shall be distributed to such Class A-1 Interest Holder (in all cases, only to the extent that any such distributions would not cause the applicable Catch-Up Date or Equalization Date to no longer be deemed to have occurred); provided further that the Board shall have the right to reduce any amounts of Net Cash Flow to be distributed to an Interest Holder pursuant to this **Section 4.3** by up to the total amount (if any) of Net Operating Losses, Net Trading Losses and/or Net Capital Losses that would be allocated to such Interest Holder with respect to the Allocation Period following such Allocation Period that if such subsequent Allocation Period ended as of the date that such distribution is made. Notwithstanding anything to the contrary contained in this **Section 4.3**, the Board shall have the right to offset against any distribution due to an Interest Holder pursuant to this **Section 4.3** any outstanding amounts under any loan made by the Company or any other Interest Holder to such Interest Holder and any outstanding advance distribution under **Section 4.6** or **Section 4.8**. For the avoidance of doubt, in the case of an allocation period with Net Operating Losses, the Board, in its sole discretion, may determine that the Company will not accept additional Capital Contributions from such Class A-1 Interest Holder under this Section 4.3

Section 4.4. Intentionally Left Blank.

Section 4.5. Distributions of Net Capital Proceeds. Subject to the other provisions of this **Article IV**, if a Supermajority of the Board determines to make distributions of Net Capital Proceeds pursuant to **Section 4.1** with respect to any period, such distributions of Net Capital Proceeds shall be made to the Interest Holders in such proportions as the Board determines in its reasonable discretion reflect the allocation of Net Capital Profits and Net Capital Losses to the Capital Accounts of the Interest Holders pursuant to **Article V**; provided, however, that if any such distributions of Net Capital Proceeds are made in connection with a Sale Transaction, such Net Capital Proceeds shall be distributed in accordance with **Section 9.3**; provided further that the Board shall have the right to offset against any distributions due to an Interest Holder pursuant to this **Section 4.5** any outstanding amounts under any loan made by the Company or any other Interest Holder to such Interest Holder and any outstanding advance distribution under **Section 4.6** or **Section 4.8**.

Section 4.6. Distributions with Respect to Tax. Subject to the other provisions of this **Article IV**, the Board shall, to the extent the Board determines that cash is available, cause the

Company to distribute cash to each Interest Holder who is allocated taxable income pursuant to **Article V**, in an amount not in excess of the net taxable income of the Company allocated to each such Interest Holder for such year times the highest federal and state income tax rate applicable to an individual residing in the State of Illinois, which tax rate shall be determined by taking into account the character of the income and/or gain realized by the Company and allocated to such Interest Holder. Distributions made under this **Section 4.6** shall be treated as advance distributions against, and shall reduce the amounts otherwise distributable under, **Sections 4.2**, **4.3**, **4.4**, **4.5** and **9.3** as if made under **Sections 4.2**, **4.3**, **4.4**, **4.5** or **9.3**as applicable.

Section 4.7. Limitations on Distributions. Notwithstanding anything to the contrary contained herein or in any Supplemental Trading Agreement, no distribution of Net Cash Flow, Trading Net Cash Flow or Net Capital Proceeds shall be declared or made that shall impair the capital of the Company, nor shall any distribution of Net Cash Flow, Trading Net Cash Flow or Net Capital Proceeds be made to any Interest Holder unless (i) the value of the assets of the Company remaining after such distribution is at least equal to the aggregate of its debts and liabilities, including capital, (ii) payment thereof would not be prohibited or restricted by Applicable Law, and (iii) payment thereof would not violate any restrictions contained in credit facilities to which the Company or any of its Subsidiaries or other Affiliates may be a party from time to time. In addition, notwithstanding anything to the contrary contained herein or in any Supplemental Trading Agreement, unless otherwise determined by the Board, no distribution shall be made if it would cause a Negative Capital Account or further reduce any Negative Capital Account. The Board's good faith determination of the restrictions and limitations set forth in the preceding sentences shall be final and conclusive as to all Interest Holders. If a distribution is suspended or delayed pursuant to this **Section 4.7**, then such payment shall be made promptly after the Board determines that such payment restrictions and limitations are no longer in effect.

Section 4.8. Withholding Taxes. Notwithstanding anything to the contrary contained herein or in any Supplemental Trading Agreement, in the event that any state, local or other income tax imposed on the Company as an entity is reduced by reason of the holding of an Interest by any Interest Holder, no part of the expense of the Company for such tax shall be allocated to such Interest Holder. In addition, if the Company is obligated under Applicable Law to pay any amount to a governmental agency because of an Interest Holder's status as an Interest Holder of the Company for federal or state withholding or other taxes, such amount shall be treated as an advance against and reduce the distributions that would otherwise be made to such Interest Holder pursuant to this **Article IV** and/or **Section 9.3** or any Supplemental Trading Agreement, as applicable. An amount shall be considered withheld by the Company if remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Board as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. Each Interest Holder shall indemnify the Company and the other Interest Holders for any liability they may incur for underwithholding of taxes in respect of such Interest Holder; moreover, each Interest Holder hereby agrees that none of the Company, any Manager or any Interest Holder shall be liable for any excess taxes withheld and that, in the event of overwithholding, an Interest Holder's sole recourse shall be to apply for a refund from the appropriate governmental agency.

the Company or any Interest Holder or Manager to register as an investment adviser under the Investment Advisers Act of 1940, as amended, or any state law, or (z) require the Company or any Interest Holder or Manager to register as a "commodity pool operator" or "commodity trading advisor" pursuant to the Commodity Exchange Act or the regulations of the Commodity Futures Trading Commission thereunder;

(f) The Transfer will not cause the Company to be treated as a "publicly traded partnership" within the meaning of Sections 7704 and 469(k)(2) of the Code;

(g) The transferor or the transferee delivers the transferee's taxpayer identification number and the transferee's initial tax basis in the Transferred Interests to the Company; and

(h) The Transfer is not prohibited by Applicable Law; and

(i) The transferee is not a part of or affiliated with a Competitive Entity (other than an Affiliate of Transmarket).

Section 7.3. Voluntary Withdrawal of Members. Except as otherwise provided in **Section 6.1(h)** or **Article VIII**, no Member shall have the right or power to Voluntarily Withdraw from the Company. Any attempted Voluntary Withdrawal, other than in accordance with **Section 6.1(h)** or **Article VIII**, shall be void ab initio and of no force or effect, and any Member who shall attempt to Voluntarily Withdraw shall be in intentional breach of this Agreement. In any event, no Member who shall Voluntarily Withdraw shall be entitled to receive, in liquidation of his Interests, pursuant to the Act or otherwise, the fair value of the Member's Interests as of the date of any Voluntary Withdrawal.

Section 7.4. Transfers by Operation of Law and Involuntary Withdrawals.

(a) Immediately upon the occurrence of (i) an Involuntary Withdrawal of a Member, or (ii) a Transfer of Interests effected by operation of law that does not constitute an Involuntary Withdrawal (including, but not limited to, divorce and dissolution of marriage) (an "**Operation of Law Transfer**") (any such Involuntary Withdrawal or Operation of Law Transfer, a "**Transfer Event**"), the successor of the withdrawn Member, if any, or the transferee of the Operation of Law Transfer, as applicable, shall thereupon automatically become an Interest Holder, and such successor of the withdrawn Member or transferee of the Operation of Law Transfer, as applicable, shall, subject to **Section 7.4(b)**, have all of the rights and be subject to all of the obligations of an Interest Holder but shall not be a Member or have any other Membership Rights. None of the predecessor or the successor Interest Holder or the transferor or transferee of the Operation of Law Transfer shall be entitled to receive in liquidation of his Interests the fair value of the withdrawn Member's or transferor's Interests as of the date of the Transfer Event.

(b) Upon the occurrence of a Transfer Event (which Transfer Event, for purposes of this **Section 7.4(b)**, shall be deemed to include an Involuntary Withdrawal of an Interest Holder) with respect to any Interest Holder (but not including any Interest Holder whose Interests could be repurchased pursuant to **Article VIII** as a result of any such event or occurrence, which **Article VIII** shall govern such repurchase), the Company

shall have the right, but not the obligation, to purchase from such successor of the withdrawn Member or Interest Holder (if any) or other transferee of the Operation of Law Transfer, as applicable (each such Person is referred to herein as a "**Seller**"), any or all Interests held by the withdrawing Member or Interest Holder or Transferred pursuant to the Operation of Law Transfer (such Interests referred to herein as "**Seller Interests**") upon the following terms and conditions:

(i) The foregoing option shall be exercisable by written notice to the Seller provided within one (1) year of the later of (x) the date of the Transfer Event, and (y) the date upon which the Board acquires actual notice of such Transfer Event.

(ii) The purchase price for the Seller Interests shall be equal to the balance of the Capital Account of the Seller (determined without regard to any increases (but not decreases) in the Capital Account of such Seller resulting from revaluation of Company property (as provided in the definition of "Capital Account")) attributable to the Seller Interests to be purchased by the Company as of the last day of the month in which the Transfer Event occurs.

(iii) Subject to **Article VIII**, the aggregate purchase price for the Seller Interests to be purchased pursuant to this **Section 7.4(b)** may be paid in cash at the closing of such purchase or may be paid by delivery of an unsecured promissory note subordinated and junior in right of payment to all other indebtedness of the Company, and, if required by the Company, properly subordinated pursuant to Applicable Law, with customary terms and conditions, payable in three (3) equal annual installments, with the first installment due on the first anniversary of the closing and the subsequent annual installments due on the successive anniversary dates of the closing; provided, however, that if a contingent debt, obligation or liability (including, but not limited to, with respect to any damages, losses, costs or expenses the Board determines in its sole discretion that the Company has incurred or may incur in connection with the circumstances giving rise to a Transfer Event) exists with respect to the period of time during which the Seller was an Interest Holder, or if the Board determines in its sole discretion that the purchase price for the Seller Interests may undergo an adjustment pursuant to **Section 8.9**, the Board may establish a reserve from such purchase price in such amount as the Board determines in its sole discretion to satisfy such contingent debt, obligation or liability, or such adjustment, the balance of which reserve (if any) after offset against any such debt, obligation or liability, or such adjustment, shall be distributed as provided in this **Section 7.4(b)** only upon the termination of such contingency or adjustment as determined by the Board in its sole discretion. In connection with the purchase of Seller Interests under this **Section 7.4(b)**, interest shall accrue from the date of the closing on the balance of the purchase price remaining unpaid from time to time at the "Applicable Federal Rate" (as defined in the Code) in effect at the time of purchase, and accrued interest shall be payable together with each annual installment of the purchase price. All or part of the purchase price may be prepaid at any time without penalty or premium. As a condition to the issuance of the subordinated promissory note described above, the payee thereunder agrees to

promptly execute, verify, deliver and file any (x) subordination, intercreditor or similar agreement requested by any holder of other indebtedness of the Company, or (y) any other agreement, document or instrument thereafter requested by any holder of other indebtedness of the Company from time to time in connection with such subordination.

(iv) Seller Interests to be purchased pursuant to this **Section 7.4(b)** shall be purchased and sold at such place and time as the Company designates. The Company shall give the Seller at least five (5) Business Days' prior written notice of the time, date, and place of closing. At the closing, the Seller shall deliver to the Company appropriate duly endorsed transfer instruments reasonably required by the Company to transfer the Seller Interests as to which the Company has delivered a notice of its intent to purchase pursuant to this **Section 7.4(b)**, free and clear of all claims, liens and encumbrances from any third parties, together with such other documentation as the Board may reasonably require, including an agreement containing representations and warranties with respect to due authority, enforceability, no conflicts or violations, no required consents or approvals and valid title to the Seller Interests, free and clear of all claims, liens and encumbrances of third parties. Notwithstanding the foregoing, the payment of the purchase price for the Seller Interests to be purchased by the Company shall be conditioned upon the Seller signing and delivering a general release, in form and substance satisfactory to the Board, which general release shall contain a release by the Seller of all claims that Seller (and Seller's Affiliates, agents, heirs, executors, representatives, attorneys or assigns) then has or may have in relation to the business of the Company or any of its Subsidiaries or other Affiliates against the Company or any of its Subsidiaries or other Affiliates, and their respective Affiliates, directors, members, managers, officers and employees.

(v) If the Seller fails, for any reason, to tender the documents required for the purchase and sale of the Seller Interests to be purchased by the Company from such Seller at the time and place specified by the Company pursuant to Section 7.4(b)(iv), the Seller shall be deemed to have assigned all of his right, title and interest in and to such Seller Interests to the Company, and the Seller shall cease to have any rights with respect to such Seller Interests except only to receive the purchase price therefor as computed pursuant to this **Section 7.4(b)** upon delivery of such documents and such Seller Interests shall be cancelled on the Company's books and shall no longer be outstanding.

Section 7.5. Consequences of Withdrawal. The Voluntary Withdrawal or Involuntary Withdrawal of a Member shall not cause a dissolution of the Company, but the rights of such Member to share in the profits and losses of the Company, to receive distributions of Company funds and to assign his Interests pursuant to this **Article VII** shall, on the happening of such an event, devolve on such Member's estate, trustee, receiver or other successor, subject to the terms and conditions of this Agreement, including **Section 7.4**, and the Company shall continue as a limited liability company. The estate, trustee, receiver or other successor, as the case may be, shall be liable for all the obligations of the withdrawn Member. However, such estate, trustee, receiver

or other successor shall be deemed to be an unadmitted assignee of the withdrawn Member and shall not become a Member except in accordance with this **Article VII**.

Section 7.6. Drag-Along.

(a) Subject to **Section 6.1(f)**, if a Sale Transaction is approved and the Board requires the Interest Holders to participate therein (an "**Approved Sale**"), each Interest Holder shall (i) consent to (if, and only if, such Interest Holder's consent is required with respect thereto pursuant to Applicable Law) and raise no objection to the Approved Sale or the process pursuant to which the Approved Sale was arranged, (ii) waive any dissenters' rights, appraisal rights and other similar rights and (iii) (x) if the Approved Sale is structured as a sale of Interests (or other equity interests of the Company), agree to sell all Interests (or other equity interests of the Company) held by such Interest Holder on the terms and conditions approved by the Board, (y) if the Approved Sale is structured as a merger or consolidation, vote in favor thereof (if, and only if, such Interest Holder has the right to vote with respect thereto pursuant to Applicable Law), and (z) if the Approved Sale is structured as a sale of all or substantially all of the assets of the Company and a subsequent dissolution and liquidation of the Company, vote in favor thereof and vote in favor of the subsequent dissolution and liquidation of the Company (in each case, if, and only if, such Interest Holder has the right to vote with respect to such matters pursuant to Applicable Law).

(b) In addition to the actions described in **Section 7.6(a)**, each Interest Holder agrees to cooperate in consummating an Approved Sale, including, but not limited to, by (i) executing such definitive documents as are required to be executed by such Interest Holder in order to effectuate the Approved Sale upon terms as are agreed upon between a Supermajority of the Board and the purchaser(s) in the Approved Sale, (ii) making any representations, warranties and indemnities that the Company or its owners are obligated to make in such Approved Sale; provided that each Interest Holder's maximum indemnification liability for such representations and warranties shall in no event exceed the proceeds paid or payable to such Interest Holder in connection with such Approved Sale, as applicable, and (iii) taking any other necessary or appropriate action in furtherance thereof, including delivering at the consummation of such Approved Sale, instruments of transfer for the Interests (or other equity interests of the Company) held by such Interest Holder reasonably required by the Company, duly endorsed for transfer, free and clear of all claims, liens and encumbrances.

(c) All Interest Holders shall bear their own expenses related to the Approved Sale, to the extent such expenses are not otherwise paid by the Company.

(d) Upon the consummation of an Approved Sale, the Interest Holders shall cooperate and take all steps necessary to distribute the net proceeds therefrom (after payment of all expenses related to such Approved Sale and any other compensation (including bonuses) or payments determined by the Board) in accordance with **Section 9.3**.

Section 7.7. Tag-along. Subject to **Section 7.1**, at least sixty (60) days prior to any proposed transfer of Interests (other than a Permitted Transfer or a transfer to an Affiliate of such

Interest Holder approved by the Board) (a "**Tag-along Sale**") by any Interest Holder (the "**Tag-Along Seller**"), the Tag-Along Seller shall deliver a written notice (a "**Sale Notice**") to each other Interest Holder holding Interests to which at least a 5% Percentage Interest is attributable (the "**Tag-Along Offerees**"), specifying in reasonable detail the identity of the prospective transferee(s) and the material terms and conditions of the proposed transfer. Each Tag-Along Offeree may elect to participate in the proposed transfer (on the same terms and conditions on which the Interests of the Tag-Along Seller were to be sold to the transferee(s)) by delivering written notice to the Tag-Along Seller within thirty (30) days after delivery of the Sale Notice. Such participation (as a share of total proceeds) shall be based upon the Percentage Interest of a participating Interest Holder relative to the Percentage Interests of all Interest Holders participating in the transfer (including the Tag-Along Seller); provided that, if the Tag-along Sale constitutes a Sale Transaction, the Interest Holders shall cooperate and take all steps necessary to distribute the net proceeds therefrom (after payment of all expenses related to such Tag-along Sale and any other compensation (including bonuses) or payments determined by the Board) in accordance with **Section 9.3(d)**. If any Tag-Along Offeree has not elected to participate in the Tag-Along Sale (through notice to such effect or expiration of the thirty (30) day period after delivery of the Sale Notice), then the Tag-Along Seller and the electing Tag-Along Offeree(s) may transfer the Interests in accordance with this **Section 7.7** at a price and on other material terms no more favorable to such transferors than specified in the Sale Notice during the one hundred twenty (120) day period immediately following the end of such thirty (30) day period. Each participating Interest Holder shall take all actions as may be reasonably necessary to consummate the Tag-along Sale in accordance with this paragraph, including by executing definitive documents required to be executed by such Interest Holder in order to effectuate the Tag-along Sale upon terms as may be agreed between the participating Interest Holders and the transferee(s). Any Interest not transferred within such one hundred twenty (120) day period shall again be subject to the provisions of this paragraph prior to any subsequent transfer. The Tag-along Offerees' rights to participate in a transfer pursuant to this **Section 7.7** shall not apply with respect to transfers of Interests pursuant to **Section 7.4**, **7.6** or, for the avoidance of doubt, a repurchase pursuant to **Article VIII**.

Section 7.8. Transferees Bound by Agreement. Any successor or transferee of an Interest Holder hereunder shall be subject to and bound by all of the provisions of this Agreement as if such successor or transferee was originally a party to this Agreement.

## ARTICLE VIII
## REPURCHASES OF INTERESTS

Section 8.1. Right of Repurchase of Class A Interests. Notwithstanding anything to the contrary contained herein, all of the Class A Interests beneficially owned by each Class A Interest Holder shall be subject to the Company's right of repurchase under the circumstances and on the terms and conditions specified below.

(a) Removal of a Class A-1 Interest Holder for Death or Disability. Subject to the other provisions of this **Article VIII**, if a Class A-1 Interest Holder's engagement with the Company and its Subsidiaries is terminated as a result of such Class A-1 Interest Holder's death or Disability, then the Company shall have the right, but not the obligation, to exercise either one of the following options at any time prior to the later of (x) one hundred eighty (180) days following such death or Disability or (y) thirty (30) days

following the payment of any distributions pursuant to **Section 4.2** or **Section 4.3** attributable to the Allocation Period in which such death or Disability occurred: (i) purchase all or any portion of such Class A-1 Interest Holder's Class A-1 Interests for an aggregate price equal to the greater of $1 and the sum of (A) the balance of such Class A-1 Interest Holder's Capital Account attributable to the Class A-1 Interests to be purchased by the Company as of the last day of the month in which such death or Disability occurs, and (B) two (2) times the total amount of Net Operating Profits allocated to such Class A-1 Interest Holder with respect to the twelve (12) month period immediately preceding the last day of the month in which such death or Disability occurs, or (ii) purchase one third (1/3rd) of such Class A-1 Interest Holder's Class A-1 Interests as of each of the three (3) successive one (1) year anniversaries of the last day of the month in which such death or Disability occurs for a purchase price equal to the balance of such Class A-1 Interest Holder's Capital Account attributable to the portion of such Class A-1 Interest Holder's Class A-1 Interests to be purchased by the Company as of such anniversary (after allocating profits and losses of the Company with respect to the Allocation Period ending on such month-end). Notwithstanding anything to the contrary contained herein, if the Company has the right to remove a Class A-1 Interest Holder for Class A-1 Cause (including, as a result of a Class A-1 Interest Holder's breach of **Section 6.3(i)** (i.e. improper Resignation)) at the time of such Interest Holder's termination under this **Section 8.1(a)**, such Interest Holder shall be deemed to have been removed for Class A-1 Cause and **Section 8.1(c)** shall govern the repurchase of such Class A-1 Interest Holder's Class A-1 Interests.

(b) Removal of a Class A-1 Interest Holder for Bankruptcy, Resignation or Without Class A-1 Cause. Subject to the other provisions of this **Article VIII**, if a Class A-1 Interest Holder's engagement with the Company and its Subsidiaries is terminated as a result of such Class A-1 Interest Holder's Bankruptcy, Resignation (in accordance with **Section 6.3(i)**) or by the Company without Class A-1 Cause, then the Company shall have the right, but not the obligation, to purchase all or any portion of such Class A-1 Interest Holder's Class A-1 Interests for an aggregate price equal to the greater of: (i) $1 and (ii) the lesser of (A) the balance of such Class A-1 Interest Holder's Capital Account attributable to the Class A-1 Interests to be purchased by the Company as of the last day of the month that is two (2) months prior to the month in which such termination occurred, and (B) the balance of such Class A-1 Interest Holder's Capital Account attributable to the Class A-1 Interests to be purchased by the Company as of the last day of the month in which such termination occurred. The foregoing option shall be exercisable by the Company by written notice to such Class A-1 Interest Holder at any time prior to the later of (x) one hundred eighty (180) days following the last day of the month in which such termination occurred or (y) thirty (30) days following the payment of any distributions pursuant to **Section 4.2** or **Section 4.3** attributable to the Allocation Period in which such termination occurred. Notwithstanding anything to the contrary contained herein, if the Company has the right to remove a Class A-1 Interest Holder for Class A-1 Cause (including, as a result of a Class A-1 Interest Holder's breach of **Section 6.3(i)** (i.e. improper Resignation)) at the time of such Interest Holder's termination under this **Section 8.1(b)**, such Interest Holder shall be deemed to have been removed for Class A-1 Cause and **Section 8.1(c)** shall govern the repurchase of such Class A-1 Interest Holder's Class A-1 Interests.

(c) Removal of a Class A-1 Interest Holder for Class A-1 Cause. Subject to the other provisions of this **Article VIII**, if a Class A-1 Interest Holder's engagement with the Company and its Subsidiaries is terminated for Class A-1 Cause, then the Company shall have the right, but not the obligation, to purchase all or any portion of such Interest Holder's Covered Interests for an aggregate price equal to the greater of $1 and the difference of (x) the balance of such Class A-1 Interest Holder's Capital Account attributable to the Class A-1 Interests to be purchased by the Company as of the last day of the month in which such termination occurred, minus (y) any realized or unrealized damages, losses, costs or expenses the Board (excluding such Class A-1 Interest Holder, if applicable) determines in its sole discretion that the Company or its Subsidiaries or its Affiliates have incurred or may incur in connection with a Class A-1 Interest Holder's breach of this Agreement or any Supplemental Trading Agreement or any other matter resulting in a Class A-1 Interest Holder's removal for Class A-1 Cause. The foregoing option shall be exercisable by the Company by written notice to the applicable Class A-1 Interest Holder at any time and from time to time following the effective date of such Class A-1 Interest Holder's termination. Notwithstanding anything to the contrary contained herein, if a Class A-1 Interest Holder's engagement is terminated for any reason other than as provided in this **Section 8.1(c)** and, after such termination, such Class A-1 Interest Holder or any of his Affiliates violates any provision of this Agreement (including, but not limited to, **Section 6.6**), then (i) such Class A-1 Interest Holder shall be deemed to have been removed for Class A-1 Cause, (ii) the Company shall have the right, upon written notice to such Class A-1 Interest Holder, to purchase such Class A-1 Interest Holder's Class A-1 Interests for an aggregate price equal the price set forth in this **Section 8.1(c)** at any time and from time to time following the date of such Class A-1 Interest Holder's violation, and (iii) if the Company has purchased such Class A-1 Interests prior to such violation, then such Class A-1 Interest Holder shall be obligated to immediately repay to the Company all amounts previously paid by the Company to such Class A-1 Interest Holder in connection with such purchase of his Class A-1 Interests, and if any promissory note was delivered by the Company to any such Class A-1 Interest Holder pursuant to **Section 8.2**, then such Class A-1 Interest Holder shall, automatically without any further action on such Class A-1 Interest Holder's part, be deemed to have assigned all of his right, title and interest in and to such promissory note to the Company, and such Class A-1 Interest Holder shall cease to have any rights with respect to such promissory note and such promissory note shall be deemed cancelled; provided that the Company may issue a new promissory note to such Class A-1 Interest Holder with respect to any remaining payments due under this **Section 8.1(c)**. Any rights of the Company set forth in this **Section 8.1(c)** shall be in addition to (and not in lieu of) any other remedies at law, in equity or otherwise that may be available to the Company.

(d) Repurchase of Class A-2 Interests. Subject to the other provisions of this **Article VIII**, in the event that any Class A-2 Interest Holder (i) is disqualified by a regulatory authority or other government body from having an ownership stake in the Company or any of its Subsidiaries or other Affiliates (or other Trading or financial enterprise) or otherwise disqualifies the Company or any of its Subsidiaries or other Affiliates from its current regulatory or tax status, (ii) is under investigation for, or charged or convicted of, any felony or securities law violation that could reasonably be expect to result in a material adverse effort on the business or reputation of the Company and/or any

of its Subsidiaries or other Affiliates, or (iii) materially breaches this Agreement or any other agreement between such Class A-2 Interest Holder and the Company and fails to cure such breach (to the extent such breach is capable of being cured) within ten (10) days of written notice thereof then the Company, then the Company shall have the right, but not the obligation, to purchase all of such Class A-2 Interest Holder's Class A-2 Interests for an aggregate price equal to the greater of $1 and the balance of such Class A-2 Interest Holder's Capital Account as of the last day of the month in which such disqualification, investigation, breach or other applicable event occurred.

Section 8.2. Payment Terms.

(a) Subject to the other provisions of this **Article VIII**, the aggregate purchase price for any Class A Interests to be purchased pursuant to **Section 8.1** may be paid in cash at the closing of such purchase or may be paid by delivery of an unsecured promissory note subordinated and junior in right of payment to all other indebtedness of the Company, and, if required by the Company, properly subordinated pursuant to Applicable Law, with customary terms and conditions, (x) payable in three (3) equal annual installments with respect to any purchase pursuant to **Section 8.1(a)** or **Section 8.1(b)**, or (y) payable in five (5) equal annual installments with respect to any purchase pursuant to **Section 8.1(c)** or **Section 8.1(d)**, in each case, with the first installment due on the date of closing and the subsequent annual installments due on the successive anniversary dates of the closing. Interest shall accrue from the date of the closing on the balance of the purchase price remaining unpaid from time to time at the "Applicable Federal Rate" (as defined in the Code) in effect at the time of purchase and applicable to the length of such note, and accrued interest shall be payable together with each annual installment of the purchase price. All or part of the purchase price may be prepaid at any time without penalty or premium. As a condition to the issuance of the subordinated promissory note described above, the payee thereunder agrees to promptly execute, verify, deliver and file any (i) subordination, intercreditor or similar agreement requested by any holder of other indebtedness of the Company, and (ii) any other agreement, document or instrument thereafter requested by any holder of other indebtedness of the Company from time to time in connection with such subordination.

(b) Notwithstanding anything to the contrary in this **Section 8.2**, if a contingent debt, obligation or liability (including, but not limited to, with respect to any damages, losses, costs or expenses the Board determines in its sole discretion that the Company or its Subsidiaries or its Affiliates have incurred or may incur in connection with a Class A Interest Holder's breach of this Agreement or any Supplemental Trading Agreement, any other matter resulting in a Class A-1 Interest Holder's removal for Class A-1 Cause or the disqualification, investigation, breach or other event applicable to a Class A-2 Interest Holder pursuant to **Section 8.1(d)**) exists with respect to the period of time during which such Class A Interest Holder was an Interest Holder, or if the Board determines in its sole discretion that the purchase price for the Class A Interests may undergo an adjustment pursuant to **Section 8.9**, the Board may establish a reserve from the purchase price for the Class A Interests to be purchased pursuant to **Sections 8.1** in such amount as the Board determines in its sole discretion to satisfy such contingent debt, obligation or liability, or such adjustment, the balance of which reserve (if any) after offset against any such debt,

obligation or liability, or such adjustment, shall be distributed as provided in this **Section 8.2** only upon the termination of such contingency or adjustment as determined by the Board in its sole discretion. Without limiting any other equitable relief and other remedies the Company may have under this Agreement at law, in equity or otherwise, the Board may offset any payment for Class A Interests to be purchased pursuant to **Sections 8.1** against any damages, losses, costs or expenses incurred by the Company or its Subsidiaries or its Affiliates in connection with a Class A Interest Holder's breach of this Agreement or any Supplemental Trading Agreement, any other matter resulting in a Class A-1 Interest Holder's removal for Class A-1 Cause or the disqualification, investigation, breach or other event applicable to a Class A-2 Interest Holder pursuant to **Section 8.1(d)**.

Section 8.3. Closing. Subject to the other provisions of this **Article VIII**, any Class A Interests to be purchased pursuant to **Sections 8.1** shall be purchased and sold at such place and time as the Company designates. The Company shall give the applicable Class A Interest Holder (or his estate, trustee, receiver or other successor, as applicable) at least five (5) Business Days' prior written notice of the time, date and place of closing. At the closing, each such Person shall deliver to the Company duly endorsed transfer documents reasonably required by the Company to transfer all of the Class A Interests to be purchased by the Company pursuant to **Sections 8.1** (the "**Transferred Interests**"), free and clear of all claims, liens and encumbrances of third parties, together with such other documentation as the Company may reasonably require, including an agreement containing representations and warranties with respect to due authority, enforceability, no conflicts or violations, no required consents or approvals and valid title to the Transferred Interests, free and clear of all claims, liens and encumbrances of third parties. If more than one Person owns the Transferred Interests, the Company shall pay the purchase price therefor to such Persons pro rata when due pursuant to **Section 8.2**. The applicable Class A-1 Interest Holder shall be deemed to have withdrawn (x) as a Member (if applicable) upon the applicable termination or other event resulting in repurchase, and (y) as an Interest Holder as of the applicable date that the price of the Transferred Interests to be redeemed is based on (i.e., end of the applicable month); provided, however that, with respect to a repurchase of Class A-1 Interests as a result of such Class A-1 Interest Holder's death or Bankruptcy, the deceased or Bankrupt Class A-1 Interest Holder shall be deemed to have withdrawn as a Member (if applicable) and Interest Holder as of the date of such death or Bankruptcy. Following such withdrawal, in the event that any such former Class A Interest Holder continues to be owed amounts pursuant to **Section 7.4** or this **Article VIII**, such former Class A Interest Holder shall continue to be a partner of the Company for federal income tax purposes until such time as required by the Code. Notwithstanding the foregoing, the payment of the purchase price for the any Class A-1 Interests to be purchased by the Company pursuant to **Sections 8.1** shall be conditioned upon (i) the applicable Class A-1 Interest Holder signing and delivering a written separation agreement, in form and substance satisfactory to the Board, which shall include a general release by such Class A-1 Interest Holder of all claims that such Class A-1 Interest Holder (and such Class A-1 Interest Holder's agents, heirs, executors, representatives, attorneys or assigns) then has or may have in relation to the business of the Company and its Subsidiaries or other Affiliates against the Company or any of its Subsidiaries or other Affiliates, and their respective Affiliates, directors, members, managers, officers and employees; provided that, for the avoidance of doubt, such separation agreement may not expand the scope or increase the duration of the Restrictive Covenants, and (ii) in the event the applicable Class A-1 Interest Holder is age 40 or older, such written release and separation agreement must not be revoked by the applicable Class A-1 Interest Holder during the applicable seven (7) day revocation period. For

## ARTICLE IX
## DISSOLUTION, LIQUIDATION AND TERMINATION OF THE COMPANY

Section 9.1. Dissolution. Subject to **Section 6.1(f)**, the Company shall only be dissolved by the written consent of the Board.

Section 9.2. Procedure for Winding Up.

(a) In the event of the dissolution of the Company, the Board or a liquidating agent appointed by the Board (the Board or liquidating agent referred to herein as the "**Liquidating Agent**") shall commence to wind up the affairs of the Company and to liquidate the Company's assets. The Interest Holders shall continue to share all income, losses and distributions during the period of liquidation in accordance with **Article IV** and **Article V**. The Liquidating Agent shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation, giving due regard to the activity and condition of the relevant market and general financial and economic conditions. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets may receive that interest as a tenant-in-common with all other Interest Holders so entitled. The fair market value of the assets shall be determined by the Liquidating Agent in its sole discretion.

(b) The Liquidating Agent shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and termination of the Company that the Interest Holders and the Managers would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidating Agent is hereby expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any assets.

(c) Notwithstanding the foregoing, a Liquidating Agent that is not an Interest Holder shall not be deemed an Interest Holder and shall not have any of the economic interests in the Company of an Interest Holder, and such Liquidating Agent shall be compensated for its services to the Company at normal and customary rates for its services to the Company as reasonably determined by the Board.

Section 9.3. Distributions at Liquidation. The Liquidating Agent shall, as soon as practicable, wind up the affairs of the Company and sell and/or distribute the assets of the Company. The assets of the Company shall be applied in the following order of priority:

(a) first, to pay the costs and expenses of the winding up, liquidation and termination of the Company;

(b) second, to creditors of the Company (other than any current or former Interest Holder (or his or its transferee) who is owed any amount pursuant to a promissory note delivered to such Interest Holder pursuant to the provisions of this Agreement), in the order of priority provided by law;

(c) third, to repay any loans or guarantees made by Transmarket or its Affiliates to the Company;

(d) fourth, to establish Reserves adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company; provided that at the expiration of such period of time as the Liquidating Agent may deem advisable, the balance of such Reserves remaining after the payment of such contingencies or liabilities shall be distributed as hereinafter provided;

(e) fifth, after allocating Net Operating Profits, Net Operating Losses, Net Capital Profits and Net Capital Losses in accordance with Article V related specifically to the Transmarket Trading Accounts, the then current capital balance related to the Transmarket Trading Accounts; and

(f) sixth, after allocating Net Operating Profits, Net Operating Losses, Net Capital Profits and Net Capital Losses in accordance with **Article V**, pro rata to the Interest Holders and to any current or former Interest Holders who are owed any amount pursuant to a promissory note delivered pursuant to the provisions of this Agreement in proportion to the amounts owed to such Persons, which for the purposes of this **Section 9.3(f)** shall mean (x) with respect to current Interest Holders, their respective positive Capital Account balances, and (y) with respect to any former Interest Holder who is owed any amount pursuant to a promissory note delivered pursuant to the provisions of this Agreement (excluding amounts previously paid under 9.3(c), the then current outstanding balance owed under such promissory note; provided, however, that the Board shall have the right to offset against any distribution due to an Interest Holder pursuant to this **Section 9.3(f)** any outstanding amounts under any loans made by the Company to such Interest Holder and any outstanding advance distribution under **Section 4.6** or **Section 4.8**.

Notwithstanding anything to the contrary in this **Section 9.3(f)**, in the event that the amount distributable to Transmarket pursuant to this **Section 9.3(f)** (without giving effect to this paragraph) is less than the greater of (x)Transmarket's Capital Account balance as of such date after allocation of all profits and losses of the Company with respect to the final Allocation Period (calculated without regard to (a) the application of **Section 5.6** with respect to any Allocation Period or (b) any prior or current increases or decreases in Transmarket's Capital Account balance resulting from revaluation of Company property) or (y) $6,250,000 (as adjusted for future equity investments and distributions) collectively referred to as the "Transmarket Liquidation Value", then (i) the Company shall distribute to Transmarket 100% of all available funds until the Transmarket Liquidation Value has been paid in full prior to any other distributions pursuant to this **Section 9.3(f)**, then (ii) after the Transmarket Liquidation Value has been fully paid, the Company shall distribute 100% of the remaining funds pro-rata to Paula Morrison and Annmarie Donovan until each such Interest Holder has been distributed an amount equal to the greater of such Interest Holder's respective Capital Account balance (x) which was equitably adjusted by the Board based on any disproportionate increases and/or decreases to the respective Capital Account balances of the Interest Holders resulting from any disproportionate distributions, allocations, redemptions, Capital Contributions and other similar occurrences with respect to any Interest Holder(s) and the prior Allocation Period but in no instance will be greater

that $7,500,000 ($7,000,000 related to Paula Morrison and $500,000 Anamarie Donovan) or (y) the starting capital balances, as adjusted, set forth in Schedule A and (iii) any remaining amount to be distributed pursuant to this **Section 9.3(f)** shall be distributed to the other Interest Holders and any current or former Interest Holders in the manner described in the foregoing paragraph of this **Section 9.3(f)**.

Section 9.4. Negative Capital Account. Except as otherwise provided in a Class A-1 Interest Holder's Supplemental Trading Agreement, no Interest Holder shall be obligated to restore a Negative Capital Account.

Section 9.5. Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets shall have been distributed as provided in **Section 9.3**. The Liquidating Agent shall then execute and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State.

## ARTICLE X
## BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS

Section 10.1. Bank Accounts. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Board shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

Section 10.2. Books and Records. The Board shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Certificate and this Agreement and all amendments to the Certificate and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Interest Holders; and the Company's federal, state or local tax returns. The Company shall permit each Manager to inspect the books and records of the Company at any reasonable time during normal business hours and upon reasonable advance written notice; provided, however, that no Member or Interest Holder shall have any rights to inspect the books and records of the Company in his or its capacity as a Member or Interest Holder.

Section 10.3. Annual Accounting Period and Taxable Year. The annual accounting period of the Company shall be its Fiscal Year. The Company's taxable year shall be selected by the Board, subject to the requirements and limitations of the Code.

Section 10.4. Reports. The Board shall use reasonable efforts to cause to be sent to each Person who was an Interest Holder at any time during the Fiscal Year then ended, within one hundred and eighty (180) days after the end of each Fiscal Year, the tax information concerning the Company that is necessary to prepare the Interest Holder's income tax returns for that Fiscal Year. In addition, to the extent that the Company obtains annual audited financial statements, then the Company shall provide a copy thereof to each Interest Holder after such annual audited financial statements are finalized.

Section 10.5. Partnership Representative.

or privilege. The Board shall have the right, in his sole discretion, to waive any provision(s) of this Agreement at any time on behalf of the Company with respect to any Member or Interest Holder; provided, however, for so long as Finnegan is still a Class A-1 Member and CEO, the approval of a Supermajority of the Board shall be required to approve any such waiver that will materially, adversely and disproportionately affect any other Member or Interest Holder.

Section 11.2. Amendments Without Consent of the Members. In addition to any amendments that may be made by the Board otherwise authorized herein, including, but not limited to, **Section 3.1**, amendments may be made to this Agreement from time to time by the Board, without the consent of the Members, to (a) cure any ambiguity, to correct or supplement any provisions herein that may be inconsistent with any other provision herein, or to add other provisions with respect to matters arising under this Agreement that will not be inconsistent with the provisions of this Agreement; (b) delete or add any provision to this Agreement required to be so deleted or added by any federal or state agency deemed to be for the benefit or protection of the Members; or (c) better assure, in the opinion of counsel to the Company, that the Company will continue to be classified as a pass-through entity for purposes of federal income taxes; provided, however, that no amendment shall be adopted pursuant to this **Section 11.2** unless the adoption thereof (i) is for the benefit of or not adverse to the interests of all of the Members; (ii) is consistent with **Article V**; and (iii) does not adversely affect the limited liability of the Interest Holders or the status of the Company as a pass-through entity for federal income tax purposes. Additionally, the Board may, without the consent of the Members, amend Schedule A from time to time to accurately reflect any issuance or Transfer of Interests or the admittance of any new or substituted Members in accordance with the terms contained herein.

## ARTICLE XII
## GENERAL PROVISIONS

Section 12.1. Uniform Commercial Code. Interests and Membership Rights shall for all purposes be deemed to be a "security" under Articles 8 and 9 of the Uniform Commercial Code as adopted in any applicable jurisdiction.

Section 12.2. Further Assurances. Each Interest Holder shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Board deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company, and to vest in the Company ownership of all Work in accordance with **Section 6.7(b)**.

Section 12.3. Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "**notice**") required or permitted under this Agreement must be in writing (which shall be deemed to include e-mail communications) and either delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested, sent by recognized overnight delivery service or sent via e-mail (with confirmation). A notice must be addressed to an Interest Holder at the Interest Holder's address listed on the records of the Company. A notice to the Company must be addressed to the Company's principal office (or the e-mail addresses of the Managers, if applicable). A notice that is sent by mail will be deemed given: (i) five (5) Business Days to an address within the United States or (ii) seven (7) Business Days to

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

1. R.P. SMALL CORP.,
Plaintiff,

v.

1. RUCHIR A. KADAKIA,
Defendant.

and

1. RUCHIR A. KADAKIA, individually and Derivatively on behalf of Tethys Trading,

Counterclaimant and
Third-Party Plaintiff,

v.

2. R.P. Small Corp., an Illinois corporation

Counterclaim Defendant,

and

1. JOHN E. MEYER, JR.;
2. ROBERT FINNEGAN;
and
3. TETHYS SUPPLY AND MARKETING, LLC;
4. TETHYS CAPITAL, LLC;
5. TETHYS TRADING, LLC;
6. TETHYS ENERGY, LLC;
7. TETHYS BIOFUELS, LLC;
8. TETHYS LATIN AMERICA, LLC;
9. TETHYS PARTNERS, LLC;
10. TETHYS DERIVATIVES, LLC; and
11. TETHYS SHIPPING, LLC,
each an Oklahoma limited liability company;
and
12. JOHN DOES and JANE DOES 1 to 10;

Third-Party Defendants.

CASE NO. 19-CV-271-CVE-JFJ
JURY TRIAL DEMANDED

**AFFIDAVIT OF AUTHENTICATION OF RECORDS**

**ILLINOIS** )
) **ss:**
**COUNTY OF____________** )

____________________, of __________________________, of lawful age and being first duly sworn upon oath, deposes and states as follows:

I am a custodian of records at ____________________-. Attached hereto are ____ pages of records in response to the *subpoena duces tecum* served by R.P. Small Corp. These ____ pages of records are kept by __________________________ in the regular course of business and it is was the regular course of business of __________________________ for an employee or representative of ____________________________ with knowledge of the act, event, condition, or opinion recorded to make the record or to transmit information thereof to be Included in such record; and the record was made at or near the time of the act, event, condition, or opinion. The records attached hereto are the original or exact duplicates of the original.

FURTHER AFFIANT SAYETH NOT.

Dated this _____day of ____________ 2020.

____________________________
Name of Affiant

Subscribed and sworn to before me this _____day of ____________ 2020.

____________________________
Notary Public

My commission expires: __________